# EXHIBIT A

KAHN SWICK & FOTI, LLC

1100 Poydras Street, Suite 960
New Orleans, LA 70163

TEL +1 504.455.1400
FAX +1 504.455.1498
KSFcounsel.com

**NEW ORLEANS**
NEW YORK
DELAWARE
LOS ANGELES
CHICAGO
NEW JERSEY
LUXEMBOURG*

Melinda A. Nicholson
Partner – Admitted in LA, NY & TX
Direct: 504.648.1842
melinda.nicholson@ksfcounsel.com

November 4, 2025

**VIA CERTIFIED MAIL,**
**<u>RETURN RECEIPT REQUESTED</u>**
Mr. Edward K. Aldag, Jr.
Chairman, President & Chief Executive Officer
Medical Properties Trust, Inc.
1000 Urban Center Drive, Suite 501
Birmingham, AL 35242

**<u>VIA OVERNIGHT DELIVERY</u>**
Medical Properties Trust, Inc.
Attn: Board of Directors
c/o The Corporation Trust Company, Inc.
2405 York Road, Suite 201
Lutherville Timonium, MD 21093-2264

**Re: Medical Properties Trust, Inc. Stockholder Litigation Demand**

Dear Mr. Aldag and Board Members:

Kahn Swick & Foti, LLC represents William Bercury (the "Stockholder"), a current stockholder of Medical Properties Trust, Inc. ("Medical Properties," "MPT," or the "Company"). The purpose of this letter is to demand that the Company's Board of Directors (the "Board") take action to remedy serious harm caused to the Company, including to remedy the breaches of fiduciary duties and other wrongdoing committed by certain current Medical Properties directors and executive officers, including but not limited to the following "Alleged Wrongdoers":

1. Edward K. Aldag, Jr. ("Aldag"), who founded the Company in 2003 and has at all times served as its founder, Chief Executive Officer ("CEO"), and Board Chairman;
2. R. Steven Hamner ("Hamner"), who has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since 2003 and a Company director since 2005; and
3. J. Kevin Hanna ("Hanna"), who has served as the Company's Controller since 2008 and as its Senior Vice President and Chief Accounting Officer since 2016.

The Stockholder has decided to submit this letter to the Board after review and analysis of: (a) public filings and statements made by the Company and other persons with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications caused to be disseminated by certain of the Alleged Wrongdoers and other persons at the Company; (c) news articles, stockholder communications, and postings on MPT's website concerning the Company's public statements; (d) complaints, orders, and other related materials in litigation commenced by and/or against the Company and/or its affiliates; and (e) review of other publicly available information concerning MPT and other persons. In sum, the Stockholder believes that the Alleged Wrongdoers have violated their core fiduciary duty principles, causing MPT to suffer significant damages.

Indeed, on September 29, 2023, a Securities Class Action[1] was filed alleging that the Company, Aldag, Hamner, and Hanna (collectively, the "Securities Class Action Defendants") violated federal securities laws by issuing false and misleading statements to the investing public. The Securities Class Action alleges that, between May 23, 2023, and August 17, 2023, inclusive (the "Class Period"), the Securities Class Action Defendants made materially false and misleading statements and omissions concerning MPT's investment in assets related to its third largest tenant, Prospect Medical Holdings, Inc. ("Prospect").[2] Specifically, the Securities Class Action Defendants are alleged to have falsely represented to investors that a restructuring transaction involving Prospect was a done deal when, in fact, it required approval by California's Department of Managed Health Care ("DMHC") before being consummated. Moreover, in violation of Generally Accepted Accounting Principles ("GAAP"), the Company improperly reported millions in revenue from the restructuring transaction before it had even been approved. The truth only began to be revealed when, on August 18, 2023, the *Wall Street Journal* ("*WSJ*") published an article revealing the undisclosed regulatory setbacks and questioning the Company's recognition of revenue in light of same. Ultimately, the Company was forced to make onerous revisions to the restructuring transaction's terms to finally obtain the DMHC's approval months later in April 2024, after which the Company wrote down the value of its investment in Prospect by ***more than $360 million***.

## I. LEGAL OBLIGATIONS OF THE COMPANY'S FIDUCIARIES

As you are aware, by reason of their positions as the officers and/or directors of MPT and because of their ability to control the business and corporate affairs of the Company, the Alleged Wrongdoers owed and owe the Company and its stockholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage MPT in a fair, just, honest, and equitable manner. The Alleged Wrongdoers were and are required to act in furtherance of the best interests of MPT and

---

[1] *See In re Med. Prop. Tr., Inc. Sec. Litig.*, No. 1:23-cv-008597 (S.D.N.Y.).

[2] *See generally* the first amended class action complaint filed in the Securities Class Action on October 31, 2024 (the "Securities Class Action Complaint"), which is attached hereto as **Exhibit 1** and is incorporated into this demand letter.

KSF
KAHN SWICK & FOTI



its stockholders in a manner benefitting all stockholders equally and not in furtherance of their own personal interests or benefits. Similarly, the Alleged Wrongdoers owe to MPT and its stockholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Company's directors and officers have and had a duty to promptly disseminate accurate and truthful information with regard to the Company's true financial prospects.

**A. Medical Properties Trust, Inc. Code of Ethics and Business Conduct**

In addition, the Alleged Wrongdoers are bound by the Company's Code of Ethics and Business Conduct ("Code"). The purpose of the Code, as stated therein, is to deter wrongdoing and promote:

- honest and ethical conduct, including ethical handling of conflicts of interest, anticorruption, and bribery;
- full, fair, accurate, timely and understandable disclosure in the Company's filings with the Securities and Exchange Commission, from and after the time the Company is required to make such filings, and other public communications;
- compliance with applicable laws, rules and regulations;
- prompt reporting of violations of the Code; and
- accountability for adherence to the Code.

The Code further states, in relevant part:

> Each director, officer, [and] employee owes a duty to the Company to act in an honest and ethical manner and to abide by the letter and the spirit of all applicable laws, rules and regulations applicable wherever the Company does business. All directors, officers and employees of the Company are expected to be familiar with the Code and to adhere to those principles and procedures set forth in the Code that apply to them.
>
> ***
>
> It is of critical importance that the Company's filings with the Securities and Exchange Commission ("SEC") and related public disclosures be accurate and timely. Depending on his or her position with the Company, a director, officer or employee may be called upon to provide necessary information to assure that the Company's public reports are complete, fair and understandable. The Company expects directors, officers and employees to take their responsibility very seriously

and to provide prompt, accurate answers to inquiries related to the Company's public disclosure requirements.

**B. Corporate Governance Guidelines**

Certain of the Alleged Wrongdoers are further bound by MPT's Corporate Governance Guidelines (the "Guidelines"), which require that directors:

> (i) possess the highest personal and professional ethics, integrity, and values; (ii) have, or demonstrate an ability and willingness to acquire in short order, a clear understanding of the Company's business; (iii) be committed to representing the long-term interests of the Company's stockholders; and (iv) be willing to devote sufficient time to carry out their duties and responsibilities effectively and be committed to serving on the Board of Directors for an extended time.

The Guidelines further state, in pertinent part:

> The basic responsibility of the directors is to direct the management of the business and affairs of the Company and, in doing so, to exercise their business judgment and to act in a manner that they reasonably believe to be in the best interests of the Company and its stockholders. In discharging that obligation, directors should be entitled to rely on the honesty and integrity of the Company's senior management and its outside advisors and auditors.

## II. FACTUAL BACKGROUND

**A. Company Background**

MPT is a Maryland corporation with principal executive offices located in Birmingham, Alabama. MPT's common stock trades on the NYSE under the ticker symbol "MPW."

MPT is a self-advised real estate investment trust ("REIT") formed in 2003 to acquire and develop net-leased healthcare facilities. MPT's financing model facilitates acquisitions and recapitalizations and allows operators of hospitals to unlock the value of their real estate assets to fund facility improvements, technology upgrades, and other investments in operations.

Prospect was the Company's third largest tenant, representing 7.5% of its assets and more than 10% of its revenue. But by February 2023, MPT announced that Prospect had experienced underperformance at its Pennsylvania facilities and had stopped paying rent, resulting in a $283 million impairment.

**B. The Company Announces a Restructuring Transaction with Prospect and Makes False and Misleading Statements Concerning Same**

On May 23, 2023, MPT issued a press release announcing that it had entered into a restructuring transaction (the "Restructuring Transaction") with Prospect. Pursuant to the

Restructuring Transaction, in relevant part, MPT would take an equity stake in Prospect's managed care business, PHP Holdings, LLC ("PHP"), in lieu of a cash payment of outstanding loans and accrued but unpaid rent and interest owed by Prospect to MPT totaling $721 million. This interest in PHP would comprise two components: (i) a 49% equity interest in PHP consisting of preferred equity units valued at approximately $75 million (the "Minority Interest Transaction"); and (ii) a $646 million note convertible into additional preferred equity units that would give MPT a majority stake in PHP. Notably, the Restructuring Transaction contemplated that only converting the Prospect note—and not the Minority Interest Transaction—would require approval from the DMHC, the regulatory body responsible for governing managed health care plans in California.

After the Company announced the Restructuring Transaction, analysts and investors roundly determined that the issuance of equity in PHP to MPT was a done deal and that, as a result, the Company's debt payment issues with Prospect were behind it. However, in June 2023, unbeknownst to investors, DMHC unexpectedly concluded that the Minority Interest Transaction must proceed as a notice of material modification ("NMM"), which would require approval under California law. On June 23, 2023, Prospect filed the NMM disclosing, among other things, that the Minority Interest Transaction granted MPT certain "blocking rights" over major decisions at PHP which MPT would later explain were intended to "protect" MPT's investment. Then on July 20, 2023, the DMHC issued an order (the "DMHC Order") finding that the Minority Interest Transaction "does not demonstrate compliance" with California law and putting the Restructuring Transaction on hold in order to obtain further information from the Company. Notably, if the DMHC did not approve the Minority Interest Transaction, it would also bar conversion of the Prospect note for the same reasons and MPT would be left without any equity in PHP and hold no blocking rights whatsoever.

Nevertheless, the Securities Class Action Defendants failed to disclose the DMHC Order when the Company reported its second quarter 2023 results on August 8, 2023 or in its quarterly report filed on Form 10-Q with the SEC on August 9, 2023, signed by Hanna and reviewed by Aldag and Hamner as per their attached SOX certifications. Instead, in these documents and in a related earnings call on August 8, 2023, the Securities Class Action Defendants continued to misleadingly tout the benefits of the Restructuring Transaction as if the Company had already received equity in PHP and, indeed, even recognized $68 million in gain from that equity. Not only was this false and misleading, but it also violated GAAP because the revenue was subject to the undisclosed "contingency" of needing the DMHC's approval of the Minority Interest Transaction. Nonetheless, recognizing this revenue (and another $13 million in the third quarter) while the DMHC's review remained pending specifically benefited Aldag and Hamner by significantly increasing their cash bonuses and equity awards.

### C. The Truth Regarding the Restructuring Transaction's Regulatory Woes Emerges

The truth regarding the Restructuring Transaction's approval status came to light on August 18, 2023, when the *WSJ* published an article entitled "Cracks Deepen for America's

Biggest Hospital Landlord: Struggling Tenants, a Bailout on Hold" (the "*WSJ* Article").[3] The *WSJ*, which had obtained a copy of the DMHC Order and other documents from the DMHC under California's Public Records Act, discussed the DMHC's decision to halt the Restructuring Transaction and the negative impact MPT and Prospect could each experience if the DMHC permanently rejected the deal. The *WSJ* Article also questioned the Company's recognition of the $68 million in revenue in the second quarter in light of the uncertainty created by, *inter alia*, the July 2023 DMHC Order.

That same day, MPT issued a press release responding to the *WSJ* Article, downplaying the DMHC Order as a "standard, expected, and non-controversial part of the approval process" for the Restructuring Transaction. The Company also attempted to excuse its nondisclosure of the DMHC Order to stockholders by stating that the "DMHC's request was deemed immaterial to [MPT's] financials and thus did not require disclosure." Despite the Company's attempts to reassure investors following publication of the *WSJ* Article, MPT's stock price fell $0.57 per share, or 7.6%, to close at $6.93 per share on August 18, 2023.

Thereafter, the DMHC and Prospect engaged in protracted negotiations for several months regarding MPT's blocking rights. During those negotiations, purportedly to avoid further "undue expense and burden on the parties," MPT decided it would forgo entirely the possibility of converting the Prospect note into equity. Finally, on April 18, 2024, the DMHC entered an order approving of the Minority Interest Transaction only after Hamner first signed several "undertakings" which included, among other things, provisions requiring that MPT obtain regulatory review for any sale or acquisition of Prospect, not convert the Prospect note into equity or otherwise be issued any additional equity interests in Prospect without the prior approval of the DMHC, and address the DMHC's concerns regarding blocking rights.[4]

## III. <u>DAMAGES TO THE COMPANY</u>

As a result of the improprieties described above, the Company has sustained significant damage, all of which stems proximately from the Alleged Wrongdoers' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance. Indeed, the DMHC did not approve the Restructuring Transaction until April 18, 2024. According to a statement issued

---

[3] The *WSJ* Article is attached hereto as **Exhibit E** to **Exhibit 1** and is incorporated into this demand letter.

[4] Notably, just prior to this on April 15, 2024, U.S. Senators from Massachusetts, Elizabeth Warren and Edward J. Markey, sent Aldag a letter asserting that the Company was running a "Ponzi scheme" regarding its largest tenant, Steward Health Care. According to the Senators, the Company continued "to provide capital to Steward, which allowed the hospital system to continue paying rent to MPT … [which] allowed MPT to avoid devaluing its real estate purchases and the leases that it held, bolster its stock price, and report lucrative cash flows." *See* https://www.warren.senate.gov/newsroom/press-releases/warren-markey-call-out-medical-properties-trust-and-macquarie-infrastructure-partners-for-exploiting-steward-hospitals-urge-them-to-help-keep-the-hospitals-open.

KSF
KAHN SWICK & FOTI



by Prospect before the DMHC approved the deal, "the continuing delays in approving the filings are resulting in undue expense and burden on the parties." Then, on May 29, 2024, the Company stated that: (i) "on May 23, 2024, Prospect's investment bankers informed us that they had received updated indications of interest from prospective bidders for PHP Holdings," and (ii) "based on our consideration of information in the updated indications, along with consultations with our third party appraisers, we recorded as of March 31, 2024, a ***$201 million*** unfavorable fair value adjustment, resulting in a total investment in PHP Holdings of approximately $500 million at March 31, 2024." The reported "approximately $500 million" investment in PHP constituted a 50% reduction in value from the $1 billion estimate provided by Aldag during a fourth quarter 2022 earnings call. Then in its second quarter Form 10-Q filed on August 9, 2024, MPT advised that it had further adjusted the value of its investment in Prospect downward by another ***$160 million*** from $500 million to $340 million as of June 30, 2024, based on "our consideration of information in the indications of interest and discussions with the investment bankers, along with consultations with our third party appraisers." All told, the Company was forced to write off more than ***$360 million*** in value from its Prospect investment, amounting to a $660 million reduction from Aldag's $1 billion projection little more than a year earlier.

In general, current and potential investors consider a company's ability to accurately value its business prospects and evaluate its own performance when making decisions on whether to purchase, sell, or hold a company's stock. Investors are less likely to invest in companies that are not transparent about their revenues, let alone companies, like MPT, which was purposefully misleading about significant regulatory hurdles it faced in restructuring its investments and relationships with critical partners. MPT's ability to raise equity capital or debt on favorable terms in the future has now been impaired.

Further, the Company stands to incur higher marginal costs of capital and debt because the improper and misleading statements disseminated on the Company's behalf by the Alleged Wrongdoers have materially increased the perceived risks of investing in and lending money to the Company. MPT's goodwill and reputation have been materially undermined and tarnished.

Moreover, as a direct and proximate result of the actions and/or inactions described herein, the Company has expended and will continue to expend significant sums of money. Such expenditures include but are not limited to costs incurred from: (i) as noted above, the devaluation of the Company's investment in Prospect resulting from the drawn-out (and undisclosed) DMHC approval process for the Restructuring Transaction; (ii) defending and paying any judgment or settlement in the Securities Class Action, for which the Stockholder's economist expert has preliminarily estimated that the potential class-wide damages arising from the claims in the Securities Class Action could total more than $115 million; and (iii) compensation and benefits paid to the Alleged Wrongdoers who breached their fiduciary duties to the Company.

## IV. DEMAND

Based on these events, the Stockholder contends that the Alleged Wrongdoers breached their fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight. Accordingly, pursuant to Maryland law, and on behalf of the Stockholder, we hereby demand that

KSF
KAHN SWICK & FOTI



the Board undertake (or cause to be undertaken) a ***completely independent*** internal investigation into the Alleged Wrongdoers' violations of Maryland and/or federal law with the assistance of independent outside legal counsel. This investigation should be sufficient to determine, *inter alia*:

i. which of the Alleged Wrongdoers were responsible for the submission, use, transmission, or publication of falsified or misleading information discussed herein;

ii. exactly when the Alleged Wrongdoers were informed regarding the truth about the matters discussed herein, including, *inter alia*, that the Company's public statements regarding the Restructuring Transaction were false and misleading for failing to disclose the DMHC Order; and

iii. the extent of the Company's damages as a result of the foregoing.

Following the investigation, the Stockholder demands that the Company take appropriate disciplinary action, up to and including suspension and/or recovery of incentive compensation and termination for cause, against the persons responsible for perpetrating the wrongdoing and/or failing to detect and prevent it. Further, the Stockholder demands that the Company commence a civil action against those individuals and/or entities who harmed the Company to recover for the benefit of the Company the amount of damages sustained by the Company as a result of the breaches of fiduciary duties alleged herein. In addition to the claims for breaches of fiduciary duty, the legal proceedings should also bring claims for indemnification and contribution, among other relevant and appropriate claims. The legal proceedings should also seek recovery of the salaries, bonuses, director remuneration, and other compensation paid to the parties responsible, because these parties were unjustly enriched by such compensation.

The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods. In order to allow the current Board sufficient time to perform the above actions, the Stockholder also demands that if the Company has not already done so, that it immediately enters into a tolling agreement with each of the Alleged Wrongdoers, substantively in the form included herewith as **Exhibit 2**.

This letter is also being sent so that, if derivative litigation on behalf of MPT shall be necessary, the Company will have been given the first opportunity to commence the demanded litigation itself. Absent prompt action by the Company to obtain recovery of its damages and to prevent further damages, we intend to pursue legal redress on behalf of the Stockholder and the Company.

Finally, following the investigation, the Stockholder demands that the Company undertake a comprehensive review and overhaul of the Company's corporate governance and compliance practices and systems of internal controls and reporting for the purpose of not only preventing a recurrence of the failures detailed above, but also to optimize them in light of current relevant best practices.

Please confirm, as soon as possible, but not later than ninety (90) days from today, that the Company has commenced an investigation into these serious allegations and has entered into appropriate tolling agreements in the interim. Please also advise who has been appointed to conduct the investigation described above and the scope and authority of the investigation. If the Company does not respond appropriately, the Stockholder will pursue all appropriate means to address the wrongdoing described herein.

Thank you for your attention to this matter. Please do not hesitate to contact the undersigned should you have any questions or wish to discuss this matter.

Best Regards,

*/s/ Melinda A. Nicholson*

Melinda A. Nicholson

Encls.

cc: William Bercury

William Savitt, Esq. (*via overnight delivery and email*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd St.
New York, NY 10019
*wdsavitt@wlrk.com*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MEDICAL PROPERTIES TRUST, INC. SECURITIES LITIGATION | Case No. 1:23-cv-008597-VSB<br><br><u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | FIRST AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**NATURE OF THE ACTION** ........ **1**

**JURISDICTION AND VENUE** ........ **25**

**PARTIES** ........ **26**

**SUBSTANTIVE ALLEGATIONS** ........ **27**

1. Applicable Accounting Standards ........ 27

2. Additional Applicable SEC Regulations ........ 33

3. The History of MPW's Relationship With Prospect ........ 34

4. MPW Reports Results for Q1 2023, Including Developments With Respect to Prospect ........ 38

5. MPW and Prospect Enter Into the Restructuring Agreement ........ 40

6. MPW Announces the Restructuring Transactions ........ 43

7. Prospect Plan Files the June 2023 NMM With the DMHC To Secure Approval of the Minority Interest Transaction ........ 46

8. The DMHC Postpones the Effectiveness and Prohibits the Implementation of the Minority Interest Transaction Pending the DMHC's Further Regulatory Review ........ 49

9. MPW Reports Results for Q2 2023, Including $68 Million in Revenue From a Purported Increase in the Value of Equity in PHP Holdings Received by MPW ........ 50

10. The *WSJ* Reveals the Existence of the June 2023 NMM and the July 2023 DMHC Order ........ 57

11. The DMHC and Prospect Plan Engage in Months of Extensive Correspondence Culminating in DMHC Approval of the Minority Interest Transaction on April 18, 2024, On Condition That MPT Picasso Address the Blocking Rights and Not Increase Its Equity Stake in PHP Holdings Without Prior DMHC Approval ........ 63

12. MPW Reports Results for Q3 2023, Including $13 Million in Additional Revenue From the Purported $82 Million Increase in the Value of MPW's "Equity Interest" in PHP Holdings ........ 67

13. MPW Beats Guidance for NFFO in 2023, But Only Because of the Improper Recognition of $82 Million in Prospect Gain in 2023 in Violation of GAAP ........ 70

14. Defendants Aldag and Hamner Were Economically Incentivized to Conceal the June 2023 NMM and the July 2023 DMHC Order, and to Improperly Recognize the $68 Million Q2 2023 Prospect Gain and $13 Million Q3 2023 Prospect Gain ...... 71

15. MPW Sharply Decreases the Value of MPW's Investment in PHP Holdings After Entry of the April 2024 DMHC Order ........ 76

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........ 79**

1. Materially False and Misleading Statements and Omissions in the May 2023 Release ........ 79

2. Materially False and Misleading Statements and Omissions in the May 2023 Form 8-K ........ 80

3. Omissions That Rendered Misleading Statements in the Q2 2023 Release, During the Q2 2023 Call, and in the Q2 2023 Form 10-Q ........ 81

4. Materially False and Misleading Statements in the Q2 2023 Release ........ 84

5. Materially False and Misleading Statements During the Q2 2023 Call ........ 86

6. Materially False and Misleading Statements in the Q2 2023 Form 10-Q ........ 88

**LOSS CAUSATION ........ 94**

**ADDITIONAL SCIENTER ALLEGATIONS ........ 95**

**CLASS ACTION ALLEGATIONS ........ 97**

**PRESUMPTION OF RELIANCE ........ 99**

**INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........ 100**

**COUNT I ........ 100**

**COUNT II ........ 103**

**PRAYER FOR RELIEF ........ 105**

**DEMAND FOR TRIAL BY JURY ........ 105**

Lead Plaintiff John Cuomo ("Lead Plaintiff") and additional Plaintiff Christopher Armstrong (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, and for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, reviewing documents produced to Plaintiffs pursuant to requests for records submitted to California's Department of Managed Health Care under the California Public Records Act; filings by Defendant Medical Properties Trust, Inc. ("MPW" or the "Company") with the United States Securities and Exchange Commission ("SEC"), and transcripts of MPW's quarterly conference calls; media stories regarding MPW; and other public information concerning MPW readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**[1]

1. This federal securities class action is brought on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired MPW securities between May 23, 2023 and August 17, 2023, both dates inclusive (the "Class Period"), and were damaged thereby. This action seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. As detailed below, Defendants—*i.e.*, MPW and three of its senior executives—made materially false and misleading statements and omissions during the Class Period concerning MPW's investment in assets related to its third largest tenant, Prospect Medical

[1] Any emphasis in quotations is added unless otherwise noted.

Holdings, Inc. ("Prospect"). As a result of such materially false and misleading statements and omissions, MPW investors acquired MPW securities at artificially inflated prices, and thereafter suffered substantial losses when the truth was revealed, and the risks concealed by Defendants materialized.

***MPW's Challenges With Respect to Prospect***

2. MPW is a real estate investment trust, or REIT, that acquires and leases hospitals and other healthcare facilities. In August 2019, MPW invested approximately $1.5 billion in a portfolio of acute care hospitals in three states (California, Pennsylvania, and Connecticut) operated by Prospect.

3. Beginning in 2020, Prospect struggled through the COVID-19 pandemic due to falling admissions, surgeries, and ER visits. As a result of, among other things, the COVID-related decline in hospital activity, and higher labor and other costs due to inflation, Prospect experienced a decline in cash flows in 2022.

4. On February 23, 2023, in connection with reporting its fourth quarter ("Q4") 2022 and full year ("FY") 2022 results, MPW announced that it was recording a $283 million impairment charge in Q4 2022 with respect to Prospect consisting of (i) a real estate impairment of approximately $171 million related to four properties in Pennsylvania leased to Prospect, and (ii) a write-off of approximately $112 million in unbilled Prospect rent. In its Form 10-K for 2022 filed on March 1, 2023, MPW confirmed that it had reserved $112 million in non-cash rent from Prospect, and further disclosed that it expected to "record rent on our Prospect leases on a ***cash only*** basis for the foreseeable future." MPW later clarified that it had also started reporting receipt of interest from Prospect on a cash only basis.

5. MPW's challenges with respect to Prospect were a material concern since, as of December 31, 2022, Prospect was MPW's third largest tenant on a "total asset basis" with assets related to Prospect valued at $1.48 billion, or 7.5% of MPW's total assets. Additionally, MPW disclosed in its 2022 Form 10-K as a "Concentration of Credit Risk" that revenue from Prospect represented more than 10% of MPW's total revenue in 2022. For this reason, as one J.P. Morgan analyst observed, MPW's stock price was "extremely sensitive" to "headlines and decisions" related to Prospect.

6. To address its challenges concerning Prospect, MPW announced that it intended to reallocate capital away from real estate tied to Prospect by, among other steps, restructuring Prospect's debt, and acquiring an equity interest in Prospect's California-based managed care business that could be monetized via a subsequent sale or recapitalization. MPW estimated that it would take 12 to 18 months for Prospect to restructure, and for MPW to then monetize its equity interest in Prospect's managed care business. On a quarterly earnings call held on February 23, 2023 ("Q4 2022 Call"), MPW's Chief Executive Officer ("CEO"), Defendant Edward K. Aldag, Jr. ("Aldag"), advised analysts that "based on third-party offers and negotiations and independent valuations" Prospect's managed care business was "worth about ***$1 billion***."

***Execution of Agreement to Restructure and Monetize MPW's Investment in Prospect***

7. On May 23, 2023, as part of MPW's plan to restructure and monetize its investment in Prospect, certain wholly-owned affiliates of MPW, including MPT Picasso Investors TRS, LLC ("MPT Picasso"), entered into a restructuring agreement ("Restructuring Agreement") with Prospect, and certain wholly-owned affiliates of Prospect, including PHP Holdings LLC ("PHP Holdings"). PHP Holdings is the parent of Prospect Health Plan, Inc. ("Prospect Plan"), the affiliate that operates Prospect's managed care business in California. A copy of relevant portions

of the Restructuring Agreement cited below are annexed hereto as Exhibit A, and relevant organizational charts are annexed hereto as Exhibit B.

8. Defendant R. Steven Hamner ("Hamner"), MPW's Chief Financial Officer ("CFO"), signed the Restructuring Agreement on behalf of MPT Picasso and other MPW affiliates in his capacity as CFO and Executive Vice President of those MPW affiliates.

9. The Restructuring Agreement provided for a series of transactions designed to restructure Prospect-related assets held by MPW ("Restructuring Transactions"). Under Sections 3.2(a) and (b) of the Restructuring Agreement, among the Restructuring Transactions was the issuance by PHP Holdings to MPT Picasso of (i) a minority equity interest in PHP Holdings consisting of preferred equity units ("Initial PHP Preferred Units") valued at approximately $75 million, or 49% of PHP Holdings' net equity value (hereinafter, the "Minority Interest Transaction"), and (ii) a note convertible into additional PHP Preferred Units ("PHP Convertible Note") with an original principal amount of approximately $646 million. Issuance of the minority interest in PHP Holdings to MPT Picasso pursuant to the Minority Interest Transaction was accompanied by certain governance rights pursuant to a Third Amended and Restated Limited Liability Company Agreement between PHP Holdings and MPT Picasso, dated May 23, 2023 ("LLC Agreement"), and signed by Defendant Hamner on behalf of MPT Picasso.

10. Section 3.2(c) of the Restructuring Agreement provided that issuance of the Initial PHP Preferred Units and PHP Convertible Note to MPT Picasso was intended to fully satisfy certain obligations owed by Prospect to MPW with a face value of approximately $721 million (i.e., $646 million plus $75 million). As per Exhibit A to the Restructuring Agreement, those obligations consisted of the following:

| **Obligations Released for Equity Interests** | **Amount** |
|---|---|
| Proceeds from sale of Connecticut and Pennsylvania facilities | $203M |
| Principal of two outstanding loans | $264M |
| Principal of outstanding convertible note | $50M |
| Past due rent, and past due interest on outstanding loans and note | $204M |
| **Total** | **$721M** |

11. Section 3.2(c) of the Restructuring Agreement also provided that PHP Holdings was issuing the PHP Convertible Note in lieu of issuing additional PHP Preferred Units to MPT Picasso because the issuance of additional PHP Preferred Units (over and above the Initial PHP Preferred Units issued) was subject to the regulatory approval of, *inter alia*, the Director of California's Department of Managed Health Care ("DMHC"). In turn, (i) Section 4.1(b) of the Restructuring Agreement obligated Prospect and its affiliates to promptly submit "***a notice of material modification by or on behalf of Prospect Health Plan, Inc. to the DMHC***, which notifies and requests the approval [of] the DMHC of the [conversion of the PHP Convertible Note into equity in PHP Holdings]," and (ii) Section 4.1(c) of the Restructuring Agreement obligated Prospect and its affiliates to provide representatives of the MPW affiliates that signed the Restructuring Agreement with at least three (3) business days to review and provide comments on the draft notice of material modification before it was submitted to the DMHC under Section 4.1(b).

12. In contrast, the Restructuring Agreement did not require Prospect to seek DMHC approval before issuing the Initial PHP Preferred Units to MPT Picasso pursuant to the Minority Interest Transaction. Plainly, MPW and Prospect did not expect that the Minority Interest Transaction would require DMHC approval.

13. Section 4.4 of the Restructuring Agreement provided that, upon receipt of all regulatory approvals—including from the DMHC—MPT Picasso would be entitled in "Phase II" of the Restructuring Transactions to convert the PHP Convertible Note into additional equity in PHP Holdings. The Restructuring Agreement contemplated receiving all such approvals by no later than November 30, 2023. However, as a fallback, in the event that DMHC approval for conversion of the PHP Convertible Note into equity was not timely received before consummation of a sale of PHP Holdings, Section 4.1(e) of the Restructuring Agreement provided for MPT Picasso to receive a share of the proceeds from any such sale equal to the share of the proceeds that it would have otherwise received from such sale had it converted the PHP Convertible Note into equity ("Fallback Provision"). The Fallback Provision did not address what would happen were the DMHC to require approval of the Minority Interest Transaction, and then decline to approve that transaction.

***MPW Announces the Restructuring Transactions***

14. On May 23, 2023, MPW issued a press release ("May 2023 Release") announcing the Restructuring Transactions. According to the May 2023 Release, the Restructuring Transactions would, among other steps, result in the issuance of "equity interests" in PHP Holdings to MPW valued $573 million in exchange for the release of obligations as follows:

| Source of Equity Interest | Amount |
|---|---|
| Proceeds from Connecticut Hospital Sale | $103M |
| Proceeds from transfer of Pennsylvania real estate | $100M |
| Principal of two outstanding loans | $264M |
| Principal of outstanding convertible note | $50M |
| Accrued rent and interest (2022) | $56M |
| **Total** | **$573M**[2] |

15. Even though the Restructuring Transactions were governed by the Restructuring Agreement, the May 2023 Release failed to disclose the existence of the Restructuring Agreement and its material terms, including the need for DMHC approval to convert the PHP Convertible Note into equity.

[2] As per MPW's SEC filings, the $148 million difference between the (i) $573 million value assigned to the equity interests and released obligations in the May 2023 Release, and (ii) the $721 million value assigned to the equity interests and released obligations under Exhibit A of the Restructuring Agreement, resulted from an unexplained marketability discount applied by MPW when calculating the fair value of the PHP Convertible Note and PHP Preferred Units. On the obligations side of the equation, the discount inexplicably adjusted only the unpaid rent and interest, which was valued at $204 million in the Restructuring Agreement, but at only $56 million in the May 2023 Release.

Notably, in a slide deck dated October 31, 2023, an analyst at Hedgeye Risk Management, a leading independent provider of real-time investment research and an online financial media company, analyzed the amounts of past due rent reported in Exhibit A of the Restructuring Agreement, in the May 2023 Release, and in MPW's SEC filings, and found glaring inconsistencies that it was unable to reconcile. Hedgeye concluded its analysis by stating that "Hedgeye continues to believe that, unless MPW management clearly and transparently addresses [Hedgeye's] questions, the company remains 'un-investible,' especially for fiduciaries. In our view, these issues raise additional questions around management's transparency and the way it conducts business."
*See* https://app.hedgeye.com/mu/prospect-rent_10-31-23?encoded_data=fL75!iWZDoMFHHAMwa6WMYBQZzUdlD5c= (last visited on October 30, 2024).

16. On May 25, 2023, MPW filed a Form 8-K disclosing the Restructuring Transactions, which attached the May 2023 Release as an exhibit. The Form 8-K was filed under Item 8.01, which requires a reporting company to disclose "any events, ***with respect to which information is not otherwise called for by this Form***, that the registrant deems ***of importance to security holders***," thus conceding the materiality of the Restructuring Transactions. Item 1.01 of Form 8-K, however, "calls for" a company that has entered into a material agreement not made in the ordinary course of business to briefly describe the material terms of that agreement. Since the Restructuring Transactions were concededly material and not in the ordinary course, the Restructuring Agreement governing the Restructuring Transactions was also material and not in the ordinary course, and thus MPW was obligated to briefly describe the material terms of the Restructuring Agreement under Item 1.01, including the need for DMHC approval to convert the PHP Convertible Note into equity, and the assumption that DMHC approval was not required to consummate the Minority Interest Transaction. Instead, MPW provided an incomplete description of the Restructuring Transactions under Item 8.01.

17. The failure to disclose the Restructuring Agreement in the May 2023 Release rendered the May 2023 Release materially false and misleading because reasonable MPW investors would have understood from its contents that the Restructuring Transactions were a "done deal" without any further requirements or conditions outside the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW. For example, on May 25, 2023, the Motley Fool investment website published an article entitled "***With a Major Tenant Issue Addressed***, *Is Medical Properties Trust's Ultra-High-Yielding Dividend Finally Safe?*" The article observed that under the Restructuring Transactions, MPW was "making a big shift in its relationship with Prospect," essentially exchanging "rental income from hospital real estate for

upside potential in the managed-care business," the value of which will ideally grow, and enable MPW "to eventually sell its equity interests at a profit."[3] In another article entitled "*Medical Properties Trust Got A Base Hit*," an investor opined that by virtue of the Restructuring Transactions, "it does appear that MPW management can now ***put the Prospect issues in the 'resolved' column*** so that management can now tackle more issues."[4]

18. Plainly, reasonable MPW investors would have deemed it important to learn about the emergence of any regulatory risk to the Restructuring Transactions, including the Minority Interest Transaction. As discussed below, MPW failed to advise MPW investors about developing regulatory risk to the Minority Interest Transaction from the DMHC.

***The Minority Interest Transaction Unexpectedly Becomes Subject to DMHC Approval***

19. As discussed in further detail below, under Section 1399.65 of Article 10.2 of Chapter 2.2 of Division 2 of the California Health and Safety Code, a health care service plan like Prospect Plan that intends to enter into an agreement resulting in a change of "control" must give "notice to, and secure prior approval from" the DMHC, and may not consummate the agreement until such approval is obtained. In order to obtain such approval, the health plan must file "all the information necessary for the [DMHC] director to make the determination to approve, ***conditionally approve***, ***or disapprove***" the agreement. Under Section 1352 of Article 3 of Chapter 2.2 of Division 2 of the California Health and Safety Code, requests for DMHC approval of a change in control are made by filing what is known as a notice of material modification.

---

[3] *See* https://www.fool.com/investing/2023/05/25/with-a-major-tenant-issue-addressed-is-medical-pro/ (last visited on October 27, 2024).

[4] *See* https://seekingalpha.com/article/4607079-medical-properties-trust-got-a-base-hit) (last visited on October 27, 2024).

20. As noted, the Restructuring Agreement did not contemplate that issuance of a minority equity interest in PHP Holdings to MPW pursuant to the Minority Interest Transaction would require DMHC approval. But as per a filing by Prospect Plan with the DMHC on June 23, 2023, at some point after execution of the Restructuring Agreement, the DMHC had "expressed a preference that the submission" of the Minority Interest Transaction "be processed as a notice of material modification." Although Prospect Plan disputed that the Minority Interest Transaction required DMHC approval under Section 1399.65, it agreed to "provide the information and documentation that would ordinarily be submitted in connection with a notice of material modification." Accordingly, on June 23, 2023, before the close of MPW's Q2 2023, Prospect Plan filed a Notice of Material Modification ("June 2023 NMM") with the DMHC seeking approval under Section 1399.65 of MPT Picasso's acquisition of a minority equity interest in PHP Holdings pursuant to the Minority Interest Transaction.

21. The June 2023 NMM contended that the Minority Interest Transaction was not a change of "control" requiring DMHC approval under Section 1399.65 since it transferred only a minority interest in PHP Holdings to MPT Picasso. The June 2023 NMM acknowledged, however, that (i) "MPT was not previously included in PHP's chain of ownership and the Minority Interest Transaction was not [merely] an internal restructuring," and (ii) pursuant to the Minority Interest Transaction, MPT Picasso had been granted "blocking rights with respect to certain major decisions of [PHP Holdings]." While the June 2023 NMM argued that these blocking rights "do not entitle [MPT Picasso] to exercise direction or control over the day-to-day business or governance of [PHP Holdings] or [Prospect Plan], the care of any subscribers or enrollees or any decisions regarding health plan contracting or provider networks, and that [MPT Picasso] is simply

a passive investor in [PHP Holdings],” MPT Picasso’s blocking rights subsequently became a subject of substantial concern for the DMHC.

22. In sum, contrary to expectations, the DMHC required Prospect Plan to seek regulatory approval of the Minority Interest Transaction under Section 1399.65. This development—occurring before the end of Q2 2023—created a risk that the DMHC might only approve the Minority Interest Transaction subject to onerous conditions, or disapprove the Minority Interest Transaction altogether. The latter outcome would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions). And while the Fallback Provision purported to address MPW’s economic rights in the event of a failure to timely secure regulatory approval for conversion of the PHP Convertible Note into equity, it did not address a failure to secure regulatory approval of the Minority Interest Transaction.

23. Moreover, the process for approving the Minority Interest Transaction might drag out, thus putting consummation of the Restructuring Transactions in limbo for a considerable amount of time until Prospect and MPW resolved any concerns about the Minority Interest Transaction that the DMHC might raise during its review (which is what ultimately occurred, as described below). Indeed, as one Wells Fargo analyst prophetically remarked after first learning in August 2023 about the need for DMHC approval of the Minority Interest Transaction, “regulatory snags have a tendency to drag on.”

24. As noted, Section 4.1(c) of the Restructuring Agreement obligated Prospect and its affiliates to provide representatives of the MPW affiliates that signed the Restructuring Agreement with at least three (3) business days to review and provide comments to any notice of material modification before it was submitted to the DMHC. Since Defendant Hamner was the MPW

representative who signed the Restructuring Agreement, and was closely monitoring the Restructuring Transactions, it is reasonable to infer that no later than June 20, 2023 (*i.e.*, three (3) business days before the June 2023 NMM was submitted), Defendant Hamner would have become aware that the Minority Interest Transaction had unexpectedly become subject to significant regulatory risk. Additionally, given the importance of the Restructuring Transactions to MPW, and how closely Aldag monitored the Restructuring Transactions together with Hamner, it is also reasonable to infer that Aldag was also promptly made aware that the Minority Interest Transaction had unexpectedly become subject to significant regulatory risk.

***The DMHC Suspends the Effectiveness and Prohibits the Implementation of the Minority Interest Transaction***

25. On July 20, 2023, in response to the June 2023 NMM, the DMHC sent a letter to Prospect Plan with extensive comments attached ("July 2023 DMHC Letter") (i) disputing that the Minority Interest Transaction was not a change of "control" under Section 1399.65 that could be implemented without prior DMHC approval, and (ii) inquiring into the "blocking rights" that had been granted to MPT Picasso. The July 2023 DMHC Letter further advised Prospect Plan that an order ("July 2023 DMHC Order") had been entered "***postpon[ing] the effectiveness of the material modification of the Plan or its operations*** as proposed in the [June 2023 NMM], and thereby ***prohibit[ing] the Plan from implementing the terms of the [June 2023 NMM]*** until the Director issues a subsequent Order approving the [June 2023 NMM]."

26. The July 2023 DMHC Order stated in relevant part that "the terms of the Notice of Material Modification filed on June 23, 2023, ***proposing a change of control resulting from a Minority Interest Transaction***, ***are postponed as of the date set forth below*** for the reasons stated in the letter attached hereto and incorporated herein by reference. This Order shall remain in effect until revoked or superseded by further Order of the Director."

27. The July 2023 DMHC Order heightened the regulatory risk to the Minority Interest Transaction that had already become apparent to Defendants no later than June 20, 2023. In particular, the July 2023 DMHC Letter and attached comments ("Comments Table") incorporated by reference into the July 2023 DMHC Order indicated that the DMHC intended to thoroughly review the circumstances of the Minority Interest Transaction, including the blocking rights granted to MPT Picasso. Consequently, the DMHC might raise additional concerns about the Minority Interest Transaction during the course of its review (which is what ultimately occurred), and might ultimately disapprove the Minority Interest Transaction. A refusal by the DMHC to approve the Minority Interest Transaction would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

28. The DMHC gave Prospect Plan until September 13, 2023 to respond to the July 2023 DMHC Letter. Copies of the July 2023 DMHC Letter and attached Comment Table, and July 2023 DMHC Order are annexed hereto as Exhibit C.

***Defendants Ignore the June 2023 NMM and the July 2023 DMHC Order When Reporting Q2 2023 Results***

29. Meanwhile, on August 8, 2023, MPW issued a press release ("August 2023 Release") announcing its results for the Q2 2023 ending on June 30, 2023, including an update concerning the Restructuring Transactions. That same day, MPW also held a conference call ("Q2 2023 Call") during which Defendants Aldag and Hamner discussed the Restructuring Transactions with analysts. Subsequently, on August 9, 2023, MPW filed its Form 10-Q for Q2 2023 ("Q2 2023 Form 10-Q), which detailed the accounting for the Restructuring Transactions.

30. Despite becoming aware no later than June 20, 2023, of substantial regulatory risk to the Minority Interest Transaction, Defendants failed to disclose the June 2023 NMM and the

July 2023 DMHC Order in the August 2023 Release and the Q2 2023 Form 10-Q, and/or during the Q2 2023 Call, when discussing the issuance of equity under the Restructuring Transactions. Instead, when reporting Q2 2023 results, MPW acted as if there were *no regulatory risk at all* to the Minority Interest Transaction from the DMHC, and recorded a purported *increase* in the fair value of MPW's equity interest in PHP Holdings to $655 million—up $82 million from the $573 million originally reported on May 23, 2023. In turn, from this $82 million increase in value, MPW recognized $68 million in revenue in Q2 2023 from the "receipt of equity" in PHP Holdings under the Restructuring Agreement in lieu of payment of previously unrecorded rent and interest contractually owed by Prospect during Q1 and Q2 2023 ("Q2 2023 Prospect Gain").[5]

31. Recognizing the non-cash $68 million Q2 2023 Prospect Gain as revenue in Q2 2023 was inconsistent with the accounting treatment of non-cash gain from Prospect-related assets previously described in MPW's SEC filings, which had stated that, as of January 1, 2023, MPW was recognizing rent and interest from Prospect on a cash only basis. Indeed, on April 27, 2023, Hamner had stated on a conference call discussing Q1 2023 results that "[as] we reported last quarter, we are currently recognizing prospect rental income ***only as cash is received, and prospect paid no rent or interest during the quarter***."

***Defendants' Public Statements Concerning MPW's Results During Q2 2023 Were Materially False and Misleading***

32. The multiple statements by Defendants in the August 2023 Release and the Q2 2023 Form 10-Q, and during the Q2 2023 Call, concerning the issuance of equity in PHP Holdings

[5] The actual amount of the Q2 2023 Prospect Gain reported in MPW's Q2 2023 Form 10-Q consisted of $55.3 million in rent owed during Q2 2023, and $13.5 million in interest owed during Q1 and Q2 2023, for a total of $68.8 million. As discussed below, the remaining approximately $13 million of the $82 million purported increase in the fair value of MPW's interests in PHP Holdings was recognized as rent and interest revenue in Q3 2023.

to MPW pursuant to the Restructuring Transactions (as if such issuance was a done deal), were rendered misleading by Defendants' failure to disclose the filing of the June 2023 NMM, and the postponement of the effectiveness and bar on the implementation of the Minority Interest Transaction under the July 2023 DMHC Order pending the DMHC's review. The June 2023 NMM and the July 2023 DMHC Order were critical qualifying facts, the disclosure of which would have significantly altered the total mix of information for MPW investors by making them aware of a substantial regulatory risk to the issuance of equity in PHP Holdings to MPW, *i.e.*, that the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or not approve the Minority Interest Transaction altogether. The latter outcome would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

33. Additionally, recognition of the $68 million Q2 2023 Prospect Gain as revenue on account of the purported increase in the value of MPW's equity interest in Prospect violated Generally Accepted Accounting Principles, or GAAP. Specifically, the $68 million "gain" from the receipt of equity under the Restructuring Agreement was subject to contingencies (*i.e.*, the DMHC's approval of the Minority Interest Transaction and the conversion of the PHP Convertible Note into equity), and GAAP bars recognizing contingent gains as revenue due to uncertainty as to whether the relevant contingency will resolve favorably. Indeed, as discussed below, a key contingency here—DMHC approval of the Minority Interest Transaction—was not resolved until ***April 18, 2024***, when the DMHC finally entered an order ("April 2024 DMHC Order") approving the Minority Interest Transaction, but only after Defendant Hamner first signed certain "undertakings" addressing numerous concerns that the DMHC had flagged during its detailed review of the Minority Interest Transaction ("April 2024 Undertakings"). A copy of the April 2024

DMHC Order and accompanying letter of the DMHC, and the April 2024 Undertakings, is annexed hereto as Exhibit D.

34. Even though MPW's premature recognition and reporting of the Q2 2023 Prospect Gain violated GAAP, the Form 10-Q for Q2 2023 reporting those items was (i) signed by Defendant J. Kevin Hanna ("Hanna"), MPW's Chief Accounting Officer ("CAO"), and (ii) certified as compliant with GAAP, and not containing any materially false and misleading statements or omissions, by Defendants Hamner and Aldag.[6]

***Defendants Aldag and Hamner Had Strong Economic Incentives to Conceal the June 2023 NMM and the July 2023 DMHC Order, and Improperly Recognize Purported "Gains" From MPW's Receipt of Equity in PHP Holdings as Revenue in 2023***

35. Aldag and Hamner had strong economic incentives to conceal the contingency created by the June 2023 NMM and the July 2023 DMHC Order, and prematurely recognize as much revenue as possible in 2023 from MPW's receipt of equity in PHP Holdings—to boost their annual cash bonuses and Performance-Based Share awards. Under MPW's 2023 executive compensation program ("2023 Comp Program"), Aldag and Hamner were eligible to receive annual cash bonuses and Performance-Based Share awards, based on whether certain performance metrics were met or exceeded. One of those metrics was Normalized Funds From Operations, or NFFO. Because NFFO is a key performance metric for MPW, the 2023 Comp Program assigned a weighting of 50% to NFFO when calculating annual cash bonuses—the highest weighting among all of the relevant performance metrics.

36. According to MPW, investors and analysts following REITs like MPW utilize funds from operations, or FFO, as a key supplemental performance measure. Using its net income

[6] SEC regulations (17 C.F.R § 210.4-01(a)(1)) state that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles ***will be presumed to be misleading or inaccurate*** . . ."

or loss under GAAP as a starting point, MPW calculates FFO by excluding items like depreciation and amortization, impairment charges, and gains or losses on sales of real estate. Normalized FFO, of NFFO, then "adjusts FFO for items that relate to unanticipated or ***non-core events or activities*** or accounting changes that MPW believes, if not noted, would make comparison to prior period results and market expectations ***less meaningful to investors and analysts***."

37. By prematurely recognizing the Q2 2023 Prospect Gain derived from the Restructuring Transactions as "revenue" in Q2 2023 before the undisclosed contingency arising from DMHC's review of the Minority Interest Transaction was resolved—and by not excluding the Q2 2023 Prospect Gain from NFFO even though it derived from a non-core event (*i.e.*, the Restructuring Transactions)—MPW was able to boost NFFO in Q2 2023 by nearly 30% from $0.37 per share to $0.48 per share.

38. Moreover, in Q3 2023 (ending on September 30, 2023), MPW "doubled down" on its improper accounting with respect to Prospect, and improperly recognized another $13 million in "gain" ("Q3 2023 Prospect Gain") as revenue from the receipt of equity under the Restructuring Agreement in lieu of payment of rent and interest accrued in Q3 2023, even though (i) it remained unclear as of September 30, 2023, whether the DMHC would approve the Minority Interest Transaction from which the $13 million Q3 2023 Prospect Gain derived, and (ii) as noted, under MPW's accounting policies, NFFO is supposed to exclude gains like the Q3 2023 Prospect Gain that derive from "non-core events or activities" like the Restructuring Transactions in order to avoid making comparison to "prior period results and market expectations less meaningful to investors and analysts."

39. Taken together, the Q2 2023 Prospect Gain and Q3 2023 Prospect Gain resulted in premature recognition of $82 million in revenue in 2023 from a purported "gain" from the receipt

of equity under the Restructuring Agreement ("2023 Prospect Gain") before the contingency of DMHC approval of the Minority Interest Transaction was resolved. In turn, by prematurely recognizing the $82 million 2023 Prospect Gain—and failing to exclude such gain from NFFO because it derived from a non-core event—MPW boosted NFFO in 2023 by $0.14 per share. Without the additional NFFO of $0.14 per share in 2023, NFFO in 2023 would have dropped to $1.45 per share, and missed not only the "Maximum" benchmark of $1.50 per share, but also the "Target" benchmark of $1.46 per share under the annual cash bonus calculation for Aldag and Hamner. In turn, missing the "Maximum" and "Target" benchmarks for NFFO in 2023 would have reduced Aldag's annual cash bonus in 2023 by $1 million, and reduced Hamner's annual cash bonus in 2023 by $422,000. (*See* calculations in tables in paragraph 190 below).

40. Additionally, besides NFFO, another performance metric used to calculate annual cash bonuses (with a 20% weighting)—as well as the issuance of Performance-Based Share awards (with a 50% weighting)—was Earnings Before Interest Taxes Depreciation and Amortization, or EBITDA, which is a non-GAAP measure of profitability. To the extent prematurely recognizing the 2023 Prospect Gain boosted revenue, it also boosted the "earnings" used to calculate EBITDA. Exceeding the "Maximum" benchmark for the EBITDA/Interest Expense ratio in 2023, added another $600,000 to Aldag's annual cash bonus, and another $304,000 to Hamner's annual cash bonus. Additionally, in 2023, MPW issued Performance-Based Share awards to Aldag and Hamner with calculated values of $8.25 million, and $4.125 million, respectively, based on meeting certain targets for EBITDA (which, as noted, was weighted 50% for purposes of granting such awards).[7]

[7] Notably, on April 15, 2024, in connection with MPW's maneuverings with respect to its largest tenant, Steward Health Care, United States Senators Elizabeth Warren (D-Mass.) and Edward J. Markey (D-Mass.) sent a letter to Aldag accusing MPW of running a "Ponzi scheme" with respect to Steward by continuing "to provide capital to Steward, which allowed the hospital system to

***The Wall Street Journal Reveals the Existence of the June 2023 NMM and the July 2023 DMHC Order***

41. The existence of the June 2023 NMM and the July 2023 DMHC Order was finally revealed by the *Wall Street Journal* ("*WSJ*") on August 18, 2023, when it published an article concerning the DMHC's review of the Minority Interest Transaction (based on materials that the *WSJ* had secured from the DMHC via a requests for records submitted under the California Public Records Act). The article observed that it was not "clear how Prospect would pay MPT if the [DMHC] rejected the deal permanently." It also questioned recognition of the $68 million Q2 2023 Prospect Gain as revenue in light of the uncertainty created by the June 2023 NMM and the July 2023 DMHC Order. A copy of the *WSJ* article is annexed hereto as Exhibit E.

***MPW's Stock Price Drops Upon Publication of the WSJ Article Even as MPW Seeks to Reverse the Decline With a False and Misleading Rebuttal***

42. Upon publication of the *WSJ* article, MPW's stock price fell approximately 15% in intraday trading. Then, at approximately 1:50 P.M., the NYSE halted trading in MPW's stock pending an announcement from MPW. Thereafter, at 2:26 P.M, in an effort to reverse the decline, MPW issued a materially false and misleading press release purporting to rebut the *WSJ* article. Among other things, MPW's press release claimed that (i) the DMHC's "hold" on the Minority Interest Transaction was an "expected" and "non-controversial" part of the DMHC approval process; (ii) MPW expected DMHC to approve the Minority Interest

---

continue paying rent to MPT . . . [which] allowed MPT to avoid devaluing its real estate purchases and the leases that it held, ***bolster its stock price, and report lucrative cash flows***."

*See* https://www.warren.senate.gov/newsroom/press-releases/warren-markey-call-out-medical-properties-trust-and-macquarie-infrastructure-partners-for-exploiting-steward-hospitals-urge-them-to-help-keep-the-hospitals-open and https://www.warren.senate.gov/imo/media/doc/2024.04.15%20MPT%20and%20Macquarie%20Letter.pdf (last visited on October 30, 2024).

Transaction in due course once the additional information requested by the DMHC was provided; (iii) even in the event of non-approval, the PHP Convertible Note had "identical economics to equity;" and (iv) the recording of the "$68 million equity investment as revenue in the second quarter was fully consistent with accounting requirements, and was entirely unrelated to the DMHC approval process."

43. The statements in MPW's purported rebuttal were materially false and misleading because (i) MPW had *not* expected a "hold" on the Minority Interest Transaction, as evidenced by the fact that the Restructuring Agreement did not condition the Minority Interest Transaction on DMHC approval (a fact of which MPW investors would have been unaware since MPW never disclosed the Restructuring Agreement in its SEC filings); (ii) the "hold" placed by the DMHC on the Minority Interest Transaction was "controversial" because it was contrary to MPW's expectation that the Minority Interest Transaction would not require DMHC approval; (iii) MPW would not have had any idea when the Minority Interest Transaction might be approved since the July 2023 DMHC Order indicated that the DMHC intended to thoroughly investigate the circumstances of the Minority Interest Transaction, including the "blocking rights" granted to MPT Picasso, and as a Wells Fargo analyst observed, "regulatory snags have a tendency to drag on" (indeed, as noted, the DMHC's review ultimately dragged on for nearly ten months after submission of the June 2023 NMM until the DMHC finally approved the Minority Interest Transaction in April 2024, but only after Defendant Hamner signed the April 2024 Undertakings); (iv) the Fallback Provision in the Restructuring Agreement (which attempted to replicate the economics of a conversion of the PHP Convertible Note into equity) did not address the adverse impact were the DMHC to invalidate the Minority Interest Transaction; (v) recognition of the $68 million Q2 2023 Prospect Gain violated GAAP, for the reasons discussed above; and (vi)

recognition of the $68 million Q2 2023 Prospect Gain as revenue was clearly related to the DMHC approval process since that process created a contingency that barred recognition of that revenue until the contingency was resolved.

44. After the publication of MPW's false and misleading "rebuttal" of the *WSJ* article, MPW's stock price partially reversed its earlier decline, but still closed down at $6.93 per share on August 18, 2023, a decline of $0.57 per share, or 7.6%, from the prior close of $7.50 per share on August 17, 2023. This decline represented a loss of $341 million in market capitalization (based on approximately 598 million MPW shares outstanding as of August 18, 2023).

45. Three days later, on August 21, 2023, a J.P. Morgan analyst downgraded MPW from "Neutral" to "Underweight," and reduced its price target from $9.00 per share to $7.00 per share. Likewise, a Wells Fargo analyst reduced its price target for MPW from $8.00 per share to $7.00 per share, and advised investors "to monitor developments related to" the DMHC's approval since "regulatory snags have a tendency to drag on" (which, as noted, is precisely what happened).

46. The Wells Fargo analyst also questioned "how the $68m of PHP equity made it into MPW's revenue line" since it was a non-cash item that would not be converted into cash until MPW monetized its equity interest in Prospect's managed care business. Another analyst at Hedgeye Risk Management ("Hedgeye"), a leading independent provider of real-time investment research and an online financial media company, was more blunt denigrating the $68 million Q2 2023 Prospect Gain as "Bullsh*t PHP Equity Booked as Rent." These criticisms were well-founded given that (i) Defendants had repeatedly publicly stated that after December 31, 2022, MPW had begun recording rent and interest due from Prospect on a "cash only" basis, and (ii) the $68 million Q2 2023 Prospect Gain did not represent a cash receipt, but was merely a purported

increase in the value of the yet unmonetized equity in PHP Holdings issued under the Restructuring Agreement.

***MPW Continues to Violate GAAP After the Class Period***

47. Notwithstanding the *WSJ*'s disclosure of the June 2023 NMM and the July 2023 DMHC Order, and the ongoing regulatory review of the Minority Interest Transaction by the DMHC, MPW continued to violate GAAP after the Class Period by booking another $13 million in revenue in Q3 2023 from the previously reported $82 million increase in the value of MPW's interest in Prospect's managed care business. Also in Q3 2023, MPW reported another $30 million increase in the value of MPW's interest in Prospect's managed care business. But conducting itself inconsistently, MPW did *not* book that additional increase in value as revenue in Q3 2023. Defendants provided no explanation for this inconsistent accounting treatment of increases in the value of MPW's interest in Prospect other than citing "accounting requirements."

***The DMHC's Review of the Minority Interest Transaction Drags Out Until April 2024***

48. After the *WSJ* revealed the June 2023 NMM and the July 2023 DMHC Order, correspondence between Prospect Plan and the DMHC concerning the DMHC's review and approval of the Minority Interest Transaction continued to drag out (as Wells Fargo had predicted). In response to the DMHC's concerns about the blocking rights, Prospect Plan advised the DMHC on October 25, 2023, that, among other things, MPT Picasso Investors TRS had "assured [Prospect] Plan that it has no intention or desire to be an impediment to Plan's continued compliance" with certain prior undertakings signed by Prospect Plan concerning its funding requirements. This assurance confirmed that Prospect Plan had remained in close contact with MPT Picasso's representatives (which would have included Defendant Hamner) concerning the

back-and-forth correspondence with the DMHC concerning review and approval of the Minority Interest Transaction.

49. On December 22, 2023, however, Prospect Plan threw in the towel with respect to conversion of the PHP Convertible Note into equity, advising the DMHC that MPT Picasso had "determined not to pursue a full conversion of the convertible note, has no current plans to convert the remaining amount of its convertible note into equity, and therefore no additional filing will be forthcoming." Based on that representation, Prospect Plan asked the DMHC to approve the Minority Interest Transaction.

50. When the DMHC demanded an explanation for abandonment of the conversion of the PHP Convertible Note into equity, Prospect Plan explained that, among other things, "the continuing delays in approving the filings are resulting in undue expense and burden on the parties." This statement further confirms that DMHC approval of the Minority Interest Transaction was material to MPW.

51. The DMHC finally approved the Minority Interest Transaction on April 18, 2024, pursuant to the April 2024 DMHC Order—***nearly ten months after the initial filing of the June 2023 NMM on June 23, 2023***. As a condition precedent to the approval, the DMHC obligated Defendant Hamner to sign the April 2024 Undertakings. *See* Exhibit D.

***MPW Reduces the Value of its Interest in Prospect by $360 Million***

52. On May 29, 2024—just over a month after issuance of the April 2024 Order—MPW advised that (i) "on May 23, 2024**,** Prospect's investment bankers informed us that they had received updated indications of interest from prospective bidders for PHP Holdings," and (ii) "based on our consideration of information in the updated indications, along with consultations with our third party appraisers, we recorded as of March 31, 2024, ***a $201 million <u>unfavorable</u>***

***fair value adjustment*, resulting in a total investment in PHP Holdings of approximately *$500 million* at March 31, 2024**."

53. The $201 reduction in the value of MPW's interest in Prospect to $500 million as of March 31, 2024, constituted a 50% drop in the $1 billion valuation that Aldag had previously projected during the Q4 2022 Call.

54. Then in its Q2 2024 Form 10-Q filed on August 9, 2024, MPW advised that it had further adjusted the value of its investment in Prospect downward by another $160 million from $500 million to $340 million as of June 30, 2024, based on "our consideration of information in the indications of interest and discussions with the investment bankers, along with consultations with our third party appraisers."

55. The $340 million valuation of MPW's interest in Prospect as of June 30, 2024, constituted a 66% drop in the $1 billion valuation that Aldag had previously projected during the Q4 2022 Call. Based on timing, it is reasonable to infer that the April 2024 Undertakings and the April 2024 DMHC Order contributed to the sharp reduction in the value of MPW's interest in Prospect's managed care business in Q1 and Q2 2024—MPW's investment bankers advised MPW about the reduced bids on ***May 23, 2024***, just over a month after execution of the April 2024 Undertakings and entry of the April 2024 DMHC Order. Moreover, the total reduction in value reported in Q1 and Q2 2024—$360 million—closely matched the drop in value that occurred (approximately $340 million) when the *WSJ* revealed the existence of the June 2023 NMM and the July 2023 DMHC Order on August 18, 2023.

* * *

56. In sum, as evidenced by the substantial decline in the market value of MPW's securities when the *WSJ* disclosed the June 2023 NMM and the July 2023 DMHC Order on August

18, 2023, Defendants' materially false and misleading statements and omissions during the Class Period concerning MPW's investment in Prospect led Plaintiffs and other Class members to acquire MPW shares during the Class Period at artificially inflated prices, which resulted in substantial losses when the truth was revealed.

**<u>JURISDICTION AND VENUE</u>**

57. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

58. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act.

59. Venue is proper in this District under 15 U.S.C. § 78aa(a) because an act or transaction constituting the violations alleged herein occurred in this District. Specifically, MPW's stock traded under the ticker "MPW" on the New York Stock Exchange ("NYSE"), which is headquartered in this District. *See Avalon Holdings Corp. v. Gentile*, 2019 WL 4640206, at *4 (S.D.N.Y. Sept. 24, 2019) (venue proper for Exchange Act claim in Southern District of New York under 15 U.S.C. § 78aa(a) because stock traded on the NYSE) (citing *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003)). Additionally, MPW maintains corporate office space in New York City. Venue is also proper in this District under 28 U.S. Code § 1391(b).

60. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

61. Lead Plaintiff John Cuomo acquired MPW securities at artificially inflated prices during the Class Period, as set forth in his previously-filed Certification (Dkt. No. 18-3), and was damaged as a result of the revelation of the alleged corrective disclosures, and materialization of undisclosed risks.

62. Additional Plaintiff Christopher Armstrong acquired MPW securities at artificially inflated prices during the Class Period, as set forth in his previously-filed Certification (Dkt. Nos. 1-1 and 1-2), and was damaged as a result of the revelation of the alleged corrective disclosures, and materialization of undisclosed risks.

63. Defendant MPW is a Maryland corporation with principal executive offices located at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama 35242. MPW's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "MPW".

64. Defendant Edward K. Aldag, Jr. ("Aldag") served as MPW's CEO and President at all relevant times. Aldag was also Chairman of MPW's board of directors ("Board") at all relevant times.

65. Defendant R. Steven Hamner ("Hamner") served as MPW's Executive Vice President and CFO at all relevant times. Hamner was also a member of the Board at all relevant times.

66. Defendant J. Kevin Hanna ("Hanna") served as MPW's Vice President, Controller, and CAO at all relevant times.

67. Defendants Aldag, Hamner, and Hanna are sometimes referred to herein collectively as the "Individual Defendants."

68. The Individual Defendants possessed the power and authority to control the contents of MPW's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of MPW's SEC filings and press releases alleged herein to be materially false and misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with MPW, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

69. MPW and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### 1. Applicable Accounting Standards

70. Public reporting companies like MPW are required to prepare their publicly filed financial statements in accordance with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures defining accepted accounting practice at a particular point in time.

71. Since 1973, the SEC has entrusted the maintenance of GAAP to the Financial Accounting Standards Board ("FASB"), which periodically updates or revises GAAP in light of new accounting and legal developments. The Accounting Standards Codification ("ASC") published by the FASB is the single authoritative source of GAAP for public reporting companies like MPW.

72. SEC regulations (17 C.F.R § 210.4-01(a)(1)) state that "[f]inancial statements filed with the Commission ***which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate***, despite footnote or other disclosures, unless the Commission has otherwise provided."

73. Additionally, SEC regulations (17 C.F.R. § 229.601(b)(31)) obligate CEOs and CFOs of public reporting companies like MPW to certify in annual reports on Form 10-K, and quarterly reports on Form 10-Q, that they (i) have reviewed the applicable annual or quarterly report, and it does not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," (ii) "are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting," and (iii) have . . . [d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes ***in accordance with generally accepted accounting principles***." MPW's Form 10-Q for Q2 2023 contained the foregoing certifications signed by Defendants Aldag and Hamner.

74. Several ASCs promulgated by FASB are relevant to an understanding of the GAAP violations committed by Defendants. *First*, ASC 825-10, allows companies to value financial assets using what is known as the "fair value option." Under ASC 820-10-35-37, fair value reporting provides for three distinct levels of inputs when valuing financial assets. Level 1 assets can be valued using observable market inputs such as daily stock prices. Level 2 assets cannot be valued using readily-available market inputs, but can be accurately valued using comparable and

observable data points. Level 3 assets have no independent market prices, and thus their value cannot be determined from observable inputs such as publicly quoted market prices. Instead, Level 3 assets must be valued using unobservable inputs such as a company's own data, and known risks that other entities in a like situation would consider when pricing the assets.[8]

75. Here, as discussed below, MPW disclosed that it valued its interest in Prospect as a Level 3 asset using fair value accounting principles. Yet, MPW's SEC filings do not indicate that MPW ever took DMHC's regulatory review of the Minority Interest Transaction into account when valuing its interest in Prospect even though the DMHC's review increased the risk that the Minority Interest Transaction might be invalidated. Such a risk would discount the value of MPW's interest in Prospect.

76. *Second*, ASC-450-10-20 defines a contingency as "[a]n existing condition, situation, or ***set of circumstances involving uncertainty as to possible gain*** (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Thus, under ASC-450-10-20, a "gain contingency" is "[a]n existing condition, situation, or ***set of circumstances involving uncertainty as to possible gain to an entity***

[8] *See* ASC 820-10-35-53 ("Unobservable inputs shall be used to measure fair value to the extent that relevant observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. However, the fair value measurement objective remains the same, that is, an exit price at the measurement date from the perspective of a market participant that holds the asset or owes the liability. ***Therefore, unobservable inputs shall reflect the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk.***"); ASC 820-10-35-54 ("Assumptions about risk include the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and the risk inherent in the inputs to the valuation technique. ***A measurement that does not include an adjustment for risk would not represent a fair value measurement if market participants would include one when pricing the asset or liability***."); ASC 820-10-35-54A ("A reporting entity shall develop unobservable inputs using the best information available in the circumstances, ***which might include the reporting entity's own data***.").

that will ultimately be resolved when one or more future events occur or fail to occur." Here, as noted, no later than June 20, 2023, Defendants were aware of regulatory risk in the form of uncertainty as to whether the DMHC would approve the Minority Interest Transaction, thus rendering DMHC approval of the Minority Interest Transaction a "gain contingency."

77. *Third*, ASC 450-30-25-1 provides that a "contingency that might result in a gain usually ***should not be reflected in the financial statements because to do so might be to recognize revenue before its realization***." In other words, the ASC generally bars the recognition of a gain subject to a contingency before the contingency is resolved because doing so constitutes the premature recognition of revenue that might never be realized if the contingency resolves unfavorably. Here, as noted, MPW prematurely recognized the Q2 2023 Prospect Gain as revenue before the contingency regarding DMHC approval was resolved, thus recognizing revenue before its realization.

78. *Fourth*, ASC 450-30-50-1 provides that "[a]dequate disclosure shall be made of a contingency that might result in a gain, but care shall be exercised to avoid misleading implications as to the likelihood of realization." Here, MPW made no disclosure in its SEC filings or other public communications concerning the June 2023 NMM, or the DMHC's review of the Minority Interest Transaction under the July 2023 DMHC Order.

79. *Fifth*, under ASC 855-10-20, there are two types of subsequent events that can occur *after* the closing date for financial statements, but *before* the release of such financial statements to the public. The first type of subsequent events (Type I) consist of "material events or transactions that provide additional evidence about conditions that existed at the date of the balance sheet." Here, the issuance of the July 2023 DMHC Order *after* June 30, 2023 (the balance sheet date for Q2 2023), but *before* August 8, 2023 (the release date of Q2 2023 results), provided

additional evidence concerning a condition that existed before June 30, 2023, *i.e.*, the regulatory risk posed to the Minority Interest Transaction by the DMHC's request that review and approval of the Minority Interest Transaction under Section 1399.65 proceed as a notice of material modification. This risk was apparent to Defendants no later than June 20, 2023 (the date by which Prospect Plan would have been obligated to share the June 2023 NMM with Defendant Hamner and other MPW representatives for comment before submitting it to the DMHC on June 23, 2023).

80. *Sixth*, under ASC 855-10-25-1A, an SEC filer like MPW "shall evaluate subsequent events through the date the financial statements are issued," and under ASC 855-10-25-1, "[a]n entity ***shall recognize*** in the financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet [i.e., Type 1], including the estimates inherent in the process of preparing financial statements." ASC 855-10-55-1 provides the following example of a subsequent event—analogous to the issuance of the July 2023 DMHC Order—that must be recognized under ASC 855-10-25-1:

> ***If the events that gave rise to litigation had taken place <u>before</u> the balance sheet date*** and that litigation is settled after the balance sheet date but before the financial statements are issued or are available to be issued, for an amount different from the liability recorded in the accounts, then the settlement amount should be considered in estimating the amount of liability recognized in the financial statements at the balance sheet date.

81. Here, as noted, MPW recognized the Q2 2023 Prospect Gain as revenue, even though the issuance of the July 2023 DMHC Order was a Type 1 subsequent event that provided additional evidence concerning regulatory risk that was already apparent no later than June 20, 2023, because of the DMHC's insistence that review and approval of the Minority Interest Transaction under Section 1399.65 proceed as a notice of material modification. The July 2023 DMHC Order thus heightened the uncertainty posed by the existing contingency of DMHC

approval of the Minority Interest Transaction. By booking the $68 million Q2 2023 Prospect Gain despite the heightened uncertainty posed by the July 2023 DMHC Order, MPW violated GAAP.[9]

82. In addition to the above GAAP principles, also relevant to the allegations herein is MPW's internal accounting policy, which calculates two non-GAAP metrics commonly used by investors and analysts to evaluate REITs like MPW—FFO and NFFO:

> Investors and analysts following the real estate industry utilize funds from operations, or FFO, as a supplemental performance measure. FFO, reflecting the assumption that real estate asset values rise or fall with market conditions, principally adjusts for the effects of GAAP depreciation and amortization of real estate assets, which assumes that the value of real estate diminishes predictably over time. We compute FFO in accordance with the definition provided by the National Association of Real Estate Investment Trusts, or Nareit, which represents net income (loss) (computed in accordance with GAAP), excluding gains (losses) on sales of real estate and impairment charges on real estate assets, plus real estate depreciation and amortization, including amortization related to in-place lease intangibles, and after adjustments for unconsolidated partnerships and joint ventures.
>
> In addition to presenting FFO in accordance with the Nareit definition, we disclose ***normalized FFO***, ***which adjusts FFO for items that relate to unanticipated or <u>non-core events</u> or activities or accounting changes that, if not noted, would make comparison to prior period results and market expectations less meaningful to investors and analysts***.[10]

---

[9] The second type of subsequent events (Type II) consist of events or transactions that "provide evidence about conditions that did *not* exist at the date of the balance sheet but arose subsequent to that date." While, under ASC 855-10-25-3, an "entity shall not recognize subsequent events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date but before financial statements are issued or are available to be issued," ASC 855-10-50-2 provides that "[s]ome non-recognized subsequent events may be of such a nature ***that they must be disclosed to keep the financial statements from being misleading***. For such events, an entity shall disclose the following: a. The nature of the event [and] b. an estimate of its financial effect, or a statement that such an estimate cannot be made." ASC 855-10-55-2 provides the following example of a Type II subsequent event: "[s]ettlement of litigation ***when the event giving rise to the claim took place after the balance sheet date*** but before financial statements are issued or are available to be issued."

[10] MPW's exclusion of items relating to "non-core events" from NFFO is analogous to the definition of "revenue" in the ASC Master Glossary, which defines "revenue" as comprised of "[i]nflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities ***that constitute the entity's ongoing major or central operations***."

83. As discussed below, MPW's recognition of the Q2 2023 Prospect Gain as revenue in MPW's income statement, and failure to disclose the June 2023 NMM and the July 2023 DMHC Order, violated ASC 450-30-25-1, ASC 450-30-50-1, and ASC 855-10-25-1. Notwithstanding these GAAP violations, Defendants Aldag and Hamner certified the Q2 2023 Form 10-Q reporting the Prospect Gain as compliant with GAAP, and Hanna signed the Q2 2023 Form 10-Q.

84. Further, inclusion of the Q2 2023 Prospect Gain in NFFO for 2023 violated MPW's own internal accounting policy concerning calculation of NFFO, which should exclude gains like the $68 million Q2 2023 Prospect Gain that derive from "non-core events or activities" like the Restructuring Transactions in order to avoid making comparison to "prior period results and market expectations less meaningful to investors and analysts."

## 2. <u>Additional Applicable SEC Regulations</u>

85. The SEC requires a reporting company to file a Form 8-K within four business days after the occurrence of an event required to be disclosed in a Form 8-K. Item 1.01 of Form 8-K requires a reporting entity to disclose the date, the parties, and a brief description of the material terms and conditions of any "material definitive agreement not made in the ordinary course of business." A "material definitive agreement means an agreement that provides for obligations that are material to and enforceable against the registrant."

86. Under Item 8.01 of Form 8-K, a "registrant may, at its option, disclose under this Item 8.01 any events, ***with respect to which information is not otherwise called for by this Form***, that the registrant deems of importance to security holders." Thus, when certain information is otherwise called for by Form 8-K—such as under Item 1.01—a reporting company cannot rely on Item 8.01 to disclose such information.

87. Item 601 of the SEC's Regulation S-K requires publicly-traded companies to attach a "material contract . . . [that] is executed or becomes effective during [a] reporting period" as "an exhibit to the Form 10–Q or Form 10–K filed for the corresponding period" (17 C.F.R. § 229.601(a)(4)). The regulation defines a "material contract" as a "contract not made in the ordinary course of business that is material to the registrant and is to be performed in whole or in part at or after the filing of [a quarterly or annual report]." (17 C.F.R. § 229.601(b)(10)(i)(A)).

### 3. The History of MPW's Relationship With Prospect

88. MPW is a REIT formed in 2003 to acquire and lease hospitals and other healthcare facilities. As of December 31, 2022, MPW had investments in 444 facilities and approximately 44,000 licensed beds in 31 states in the U.S., seven countries in Europe, Australia, and in Colombia in South America.

89. In August 2019, MPW invested approximately $1.5 billion in a portfolio of acute care hospitals in three states (California, Pennsylvania, and Connecticut) operated by Prospect.

90. Beginning in 2020, Prospect struggled through the COVID-19 pandemic due to falling admissions, surgeries, and ER visits. As a result of the COVID-related decline in hospital activity, and the impact of higher labor and other costs due to inflation, Prospect experienced a decline in cash flows during 2022.

91. On October 5, 2022, MPW announced the sale of three Prospect hospital facilities in Connecticut to Yale New Haven Health ("Yale") for approximately $457 million ("Connecticut Hospital Sale"). According to MPW's 2022 Form 10-K filed on March 1, 2023 ("2022 Form 10-K"), the Connecticut Hospital Sale was "expected to close in 2023 subject to certain regulatory approvals and the completion of Yale's acquisition of the hospital operations from Prospect."[11]

---

[11] As of the close of Q2 2024 on June 30, 2024, the Connecticut Hospital had still not closed. Instead, Yale sued Prospect to exit the agreement on the ground that Prospect violated the terms

92. On February 23, 2023, in connection reporting its Q4 2022 and Full Year 2022 results, MPW announced that it was recording a $283 million impairment charge with respect to Prospect consisting of (i) a real estate impairment of approximately $171 million related to four properties in Pennsylvania leased to Prospect, and (ii) a write-off of approximately $112 million in unbilled Prospect rent. MPW also provided an estimate of NFFO in 2023 of $1.50 to $1.65 per share.

93. Subsequently, in its 2022 Form 10-K, MPW reiterated that it had recorded a $283 million impairment charge with respect to Prospect in Q4 2022 consisting of a "$171 million impairment on the Pennsylvania real estate and a $112 million reserve on non-cash rent." MPW further disclosed that it expected to "record rent on our Prospect leases on a ***cash only basis*** for the foreseeable future."

94. MPW's challenges with respect to Prospect were a material concern since, as of December 31, 2022, Prospect was MPW's third largest tenant on a "total asset basis" with assets attributable to MPW's relationship with Prospect valued at $1.48 billion, or 7.5% of total assets. The 2022 Form 10-K further disclosed under a section entitled "Concentration of Credit Risks," that revenue from Prospect represented more than 10% of MPW's total revenue in 2022. For this reason, as one J.P. Morgan analyst observed, MPW's stock price was "extremely sensitive" to "headlines and decisions" related to Prospect.

---

of the agreement, and left the facilities in "dire" condition. *See* https://www.healthcaredive.com/news/yale-new-haven-health-prospect-medical-holdings-lawsuit-connecticut-hospital-acquisitions/715489/. In turn, Prospect has sued Yale to close the transaction, alleging that Yale "actively worked to prevent" the deal closing in a bid to get a lower purchase price, and "knew it was purchasing struggling hospitals" and had agreed to acquire the facilities on an "as-is" basis. *See* https://www.healthcaredive.com/news/prospect-lawsuit-yale-new-haven-connecticut-acquisition/718436/

95. To address its challenges concerning Prospect, MPW decided to reallocate capital away from real estate tied to Prospect by, among other steps, restructuring Prospect's debt and acquiring an equity interest in Prospect's managed care business that could be monetized. On the Q4 2022 Call held on February 23, 2023, Aldag described the plan for MPW to recover its investment in Prospect by taking a stake in Prospect's managed care business via an equity interest in PHP Holdings, and then monetizing that interest via a sale or recapitalization of the managed care business (which he said was currently worth $1 billion):

> In conjunction with Prospect's continuing progress in improving its East Coast operations and strategies, we have decided to fully exit our non-California Prospect investments and reallocate that capital to new investments.
>
> ***At the end of this period of transition, we expect that we will have recovered and have available for reinvestment, most or all of our original investment plus any interim deferrals of rent through the following; as we have alluded to in recent months, Prospect owns a valuable managed care business that we believe, <u>based on third-party offers and negotiations and independent valuations is currently worth about $1 billion</u>***.
>
> More immediately, we continue to expect the pending sale to the Yale New Haven Health System of our Connecticut hospitals to close by late next quarter. We do anticipate also that as hospital operations and financial results improve over the next several quarters, our Pennsylvania hospitals will become increasingly attractive acquisition targets. And proceeds from their future sale will provide additional resources for reinvestment.
>
> The accounting adjustment in the fourth quarter to recognize an impairment acknowledges the possibility that such proceeds may be less than our original investment. ***However, we expect the value of the managed care business will significantly exceed the aggregate amount of the fourth quarter impairment***.

96. Thereafter, Hamner provided guidance for MPW's NFFO in 2023 based on assumptions about Prospect's payment of rent and interest in 2023, and the timing of any monetization of MPW's anticipated interest in Prospect's managed care business:

> [O]ur 2023 guidance estimates take into account the range of our expectations about rent and interest that may not be paid during that period. So, today, we are providing our estimate of calendar 2023 normalized FFO. The following may help investors

bridge from our fourth quarter 2022 normalized FFO annualized run rate of about $1.71 to our guidance range of approximately $1.50 to $1.65 for normalized FFO [in 2023] on a calendar basis.

Starting with the $1.71. Contractual rent escalations will add about $0.05 a share and the impact of rent and interest income from acquisitions and dispositions and the Common Spirit Utah transaction, their related cash proceeds and interest expense with respect to transactions in the fourth quarter and through today, is an aggregate pro forma of another $0.03 a share.

So, those estimates on their own would yield a guidance estimate of approximately $1.79 of normalized FFO on a Prospect-neutral basis. ***That is as if Prospect paid all its 2023 rent and interest obligations.***

Our estimates of potential outcomes regarding Prospect range from a worst-case scenario, in which case we would recognize no rent or interest, to our more reasonably expected likely outcome that we recognize most of our California and Connecticut rent, but nothing from the Pennsylvania investment.

The per share range of these scenarios would be 2023 normalized FFO of between $1.50 and $1.65 and that is what we reported in this morning's press release.

Even at the $1.65 high end of our 2023 guidance, ***it does not consider incremental FFO that would be created by the recycling of our current investment in our Prospect East Coast investment, assuming succession [sic] the restructuring and monetization of Prospect's managed care business***.

97. Based on Defendant Hamner's comments above, MPW expected that it would recoup its equity interest in Prospect's managed care business via a monetization of that business in the form of a sale or recapitalization, and *only then* would recognize the cash receipts from such monetization as FFO.

98. During the Q&A session that followed prepared remarks, Hamner and Aldag further addressed the Minority Interest Transaction:

**Austin Wurschmidt** (KeyBanc Capital Markets)

***And then I was hoping that you could maybe share with us how to think about sort of the monetization of the managed care? Do you expect to receive proceeds, I guess, from the sale of their managed care business? Or could you end up in some scenario with just a partial investment in that business down the line that maybe takes longer to monetize and ultimately reinvest the proceeds?*** I mean, is

there any time line you can give us on when you expect to received that investment? Or proceeds from that investment?

**Steven Hamner**
Yes, I think it's the 12 to 18 months that Ed mentioned earlier. That business, as probably many on this call are aware, is ***very, very vibrant, very, very attractive right now*** . . .

And to try to anticipate kind of beyond a 12 to 18-month sale process, which could involve any number of alternatives, and I won't mention them here. ***But that's our expectation is that -- we hope not to end up with a long-term equity type investment, and we don't think that's the likely outcome. We think it's more likely that there will be a sale or a recapitalization that will recover at least and possibly more than our investment in the East Coast properties***.

**Edward Aldag**
You're absolutely right. It is our intent as we work through this to push forward sales sooner rather than later, but there are other issues that [we] have to work through.

**4. MPW Reports Results for Q1 2023, Including Developments <u>With Respect to Prospect</u>**

99. On April 27, 2023, via a Form 8-K, MPW issued a press release reporting net income of $0.05 per share, and NFFO of $0.37 per share, in Q1 2023 (which ended on March 31, 2023). The press release advised that included in Q1 2023 net income is "approximately $90 million of impairment and other non-cash charges related to the expected sale of hospitals and ***no rent or interest revenue recognized from Prospect leases or loan investments***."

100. On April 27, 2023, MPW held a conference call with analysts to discuss Q1 2023 results ("Q1 2023 Call"). With respect to Prospect-related matters, Defendant Aldag advised analysts that the Connecticut Hospital Sale "continues to move along positively." Aldag also stated that Prospect's "managed care business continues to grow its membership and its profits. It continues to exceed budgets. ***We remain confident that our overall investment in prospect will be fully realizable from that investment***."

101. Later on the Q1 2023 Call, Defendant Hamner explained that MPW's results in Q1 2023 reflected, among other things, no rent or interest revenue recognized from Prospect leases or loan investments since as "we reported last quarter, we are currently recognizing prospect rental income ***only as cash is received, and prospect paid no rent or interest during the quarter***." Hamner further explained on the Q1 2023 Call that unpaid rent from Prospect would be converted into an equity interest in Prospect's managed care business via PHP Holdings: Prospect's "rent deferral, whatever it may be, goes into our interest in the managed care company."

102. In its Form 10-Q for Q1 2023 ("Q1 2023 Form 10-Q"), filed on May 10, 2023, MPW disclosed that, in late March 2023, Prospect received a binding commitment from several lenders that was expected to provide Prospect with liquidity to pay down certain debt. Alongside these commitments from third-party lenders, MPW also disclosed that it had agreed to pursue certain anticipated transactions with Prospect that would result in the following:

- maintaining the master lease covering six California hospitals with no changes in rental rates or escalator provisions, and with the expectation that Prospect will begin making cash payments for approximately 50% of the contractual monthly rent due on these California properties starting in September 2023;

- transitioning the Pennsylvania properties back to Prospect in return for a mortgage on the facilities;

- providing up to $75 million in a loan secured by a first lien on Prospect's accounts receivable and certain other assets;

- ***obtaining a non-controlling ownership interest in PHP Holdings*** (the managed care business of Prospect), equal in value to unpaid rent and interest, approximately $264 million in outstanding loans, and various other obligations due and owing at the time such interest would be conveyed; and

- completing the previously disclosed Connecticut Hospital Sale.

103. The Q1 2023 Form 10-Q further disclosed that as part of the above series of anticipated "capital restructuring transactions," MPW originated a $50 million convertible loan

("$50M Convertible Note") to PHP Holdings, which was "convertible into equity of PHP Holdings."

104. Additionally, the Q1 2023 Form 10-Q clarified that both rent *and* interest from Prospect were being recognized on a *cash basis* ("[i]n the first quarter of 2023, [MPW] began accounting for Prospect revenue on a cash basis and did not recognize any rent or interest revenue in the quarter.").

105. As of March 31, 2022, Prospect remained MPW's third largest tenant on a "total asset basis" with assets attributable to MPW's relationship with Prospect valued at $1.53 billion, or 7.8% of total assets.

**5. <u>MPW and Prospect Enter Into the Restructuring Agreement</u>**

106. On May 23, 2023, to effectuate the Restructuring Transactions, Prospect, PHP Holdings, and various other Prospect affiliates entered into the Restructuring Agreement with various MPW affiliates, including MPT Picasso. *See* Exhibit A.

107. The Restructuring Agreement was signed by Defendant Hamner on behalf of MPT Picasso and other MPW affiliates that were parties to the Restructuring Agreement in his capacity as CFO and Executive Vice President of those affiliates.

108. Among the Restructuring Transactions provided for under the Restructuring Agreement was the Minority Interest Transaction providing for the issuance by PHP Holdings to MPT Picasso of a minority equity interest in PHP Holdings consisting of the Initial PHP Preferred Units valued at approximately $75 million, or 49% of PHP Holdings' net equity value. The Restructuring Agreement also provided for the issuance of the PHP Convertible Note to MPT Picasso with an original principal amount of approximately $646 million.

109. Issuance of the minority interest in PHP Holdings to MPT Picasso pursuant to the Minority Interest Transaction was accompanied by certain governance rights pursuant to the LLC Agreement, dated May 23, 2023, and signed by Defendant Hamner on behalf of MPT Picasso.

110. Section 3.2(c) of the Restructuring Agreement provided that the issuance of the Initial PHP Preferred Units and PHP Convertible Note by PHP Holdings to MPT Picasso was intended to fully satisfy certain obligations owed by Prospect to MPW with a face value of approximately $721 million (i.e., $646M+75M). As per Exhibit A to the Restructuring Agreement, those obligations consisted of the following:

| **Obligations Released for Equity Interests** | **Amount** |
|---|---|
| Proceeds from sale of Connecticut and Pennsylvania facilities | $203M |
| Principal of two outstanding loans | $264M |
| Principal of outstanding convertible note | $50M |
| Past due rent and past due interest on outstanding loans and note | $204M |
| **Total** | **$721M** |

111. Section 3.2(c) of the Restructuring Agreement also provided that PHP Holdings was issuing the PHP Convertible Note in lieu of issuing additional PHP Preferred Units to MPT Picasso because the issuance of additional PHP Preferred Units (over and above the Initial PHP Preferred Units issued) was subject to the regulatory approval of, *inter alia*, the Director of the DMHC. In turn, (i) Section 4.1(b) of the Restructuring Agreement obligated Prospect Plan to promptly submit "***a notice of material modification by or on behalf of Prospect Health Plan, Inc. to the DMHC***, which notifies and requests the approval [of] the DMHC of the [conversion of the PHP Convertible Note into equity in PHP Holdings];" and (ii) Section 4.1(c) of the Restructuring Agreement obligated Prospect and its affiliates to provide representatives of the MPW affiliates

that signed the Restructuring Agreement with at least three (3) business days to review and provide comments on the notice of material modification to be submitted to the DMHC under Section 4.1(b) ("Three Business Day NMM Review Requirement").

112. In contrast, the Restructuring Agreement did not require Prospect to seek DMHC approval before issuing the Initial PHP Preferred Units to MPT Picasso pursuant to the Minority Interest Transaction. Plainly, MPW and Prospect did not expect that the Minority Interest Transaction would require DMHC approval

113. Section 4.4 of the Restructuring Agreement provided that, upon receipt of all regulatory approvals—including from the DMHC—MPT Picasso would be entitled in "Phase II" of the Restructuring Transactions to convert the PHP Convertible Note into additional equity in PHP Holdings. The Restructuring Agreement contemplated receiving all such approvals by no later than November 30, 2023. However, under the Fallback Provision in Section 4.1(e) of the Restructuring Agreement, if DMHC approval for conversion of the PHP Convertible Note into equity was not timely received before consummation of a sale of PHP Holdings, MPT Picasso was entitled to receive a share of the proceeds from any such sale equal to the share of the proceeds that it would have otherwise received from such sale had it converted the PHP Convertible Note into equity. The Fallback Provision did not address what would happen if the DMHC required approval of the Minority Interest Transaction and then failed to approve that transaction.

114. As evidenced by the May 23, 2023 press release announcing the Restructuring Transactions (*see* next paragraph), the Restructuring Agreement was plainly a "material contract" under Item 601 of SEC's Regulation S-K since it was concededly "not made in the ordinary course of business," and was "to be performed in whole or in part" over time. Yet, MPW did not attach the Restructuring Agreement as an exhibit to its Q2 2023 Form 10-Q, even though the

Restructuring Agreement was executed on May 23, 2023, during Q2 2023. Nor did MPW attach the Restructuring Agreement to any of its subsequent Form 10-Qs or Form 10-Ks.

115. Had MPW attached the Restructuring Agreement to its Form 10-Q for Q2 2023 filed with the SEC on August 9, 2023, MPW investors would have learned that conversion of the PHP Convertible Note into equity was subject to the approval of the DMHC under Section 4.1(b) of the Restructuring Agreement. They would have also learned that MPW did *not* expect to require DMHC approval for the Minority Interest Transaction. The failure to attach the Restructuring Agreement as an exhibit to the Q2 2023 Form 10-Q thus evidences an intent to conceal information regarding DMHC approval from MPW investors.

**6. <u>MPW Announces the Restructuring Transactions</u>**

116. On May 23, 2023, via a Form 8-K, MPW issued the May 2023 Release announcing the Restructuring Transactions. According to the May 2023 Release, "MPT continues to have strong conviction in the embedded value of the Prospect platform and has structured its master leases and security agreements to provide collateral value in addition to its real estate interests, ***including interests in the equity of Prospect's managed care business***." The May 2023 Release further stated that MPW expected to "reconstitute" its Prospect-related assets, by among other things:

- A $457 million investment in MPT's Connecticut real estate which, as previously announced, Yale New Haven Health is expected to acquire in a transaction that is expected to close during 2023's third quarter. MPT's investment was expected to be fully recovered through cash proceeds of $355 million at closing, ***and equity interests in Prospect's managed care business valued at $103 million***;

- A first lien mortgage loan of $150 million, ***and equity interests in the managed care business valued at $100 million***, resulting from the transfer to Prospect of Pennsylvania real estate with a book value of $250 million; and

- Loans aggregating approximately $264 million, and accrued rent and interest of approximately $56 million, along with the previously announced $50 million convertible

loan to PHP Holdings (the managed care entity of Prospect) ***are expected to be recovered through equity interests in the managed care business***.

117. Based on the foregoing disclosures, the market value of MPW's equity interest in Prospect's managed care entity, PHP Holdings, as a result of the Restructuring Transactions, was estimated at $573 million (reduced from the face value of $721.6 million reflected in the Restructuring Agreement, based on a discount for lack of marketability that MPW never adequately explained):

| **Source of Equity Interest** | **Amount** |
| --- | --- |
| Proceeds from Connecticut Hospital Sale | $103M |
| Transfer of Pennsylvania real estate | $100M |
| Aggregated loans (i.e., $151M Mortgage Loan and $112M Term Loan) | $264M |
| Convertible loan | $50M |
| Accrued rent and interest (2022) | $56M |
| **Total** | **$573M**[12] |

118. The May 2023 Release, however, failed to disclose the existence of the Restructuring Agreement and its material terms, including the need for DMHC approval to convert the PHP Convertible Note into equity, and implementation of the Minority Interest Transaction without prior DMHC approval. The failure to disclose the Restructuring Agreement thus rendered the May 2023 Release materially false and misleading because reasonable MPW investors would have understood from its contents that the issuance of an equity interest in Prospect's managed care business to MPW was a "done deal" without any further requirements or conditions outside

[12] *See* footnote 2 above.

the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW.

119. On May 25, 2023, MPW filed a Form 8-K ("May 2023 Form 8-K") disclosing the Restructuring Transactions, which attached the May 2023 Release as an exhibit. The Restructuring Transactions were disclosed under Item 8.01 of the May 2023 Form 8-K, thus conceding the materiality of the Restructuring Transactions. But since the Restructuring Transactions were concededly material, the Restructuring Agreement governing the Restructuring Transactions was "a material definitive agreement," and thus MPW was obligated to describe the material terms of the Restructuring Agreement under Item 1.01 of the May 2023 Form 8-K. Instead, apparently to avoid disclosing anything about DMHC approval, MPW provided an incomplete description of the Restructuring Transactions under Item 8.01 of the May 2023 Form 8-K, and made no disclosure of the Restructuring Agreement under Item 1.01. That rendered the May 2023 Form 8-K materially misleading because reasonable MPW investors would have understood from the Form 8-K that the issuance of equity interests in Prospect's managed care business to MPW was a "done deal" without any further requirements or conditions outside the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW.

120. And that is in fact what reasonable MPW investors took away from the announcement of the Restructuring Transactions. For example, on May 25, 2023, the Motley Fool investment website published an article entitled "***<u>With a Major Tenant Issue Addressed</u>***, *Is Medical Properties Trust's Ultra-High-Yielding Dividend Finally Safe?*" The article observed that under the Restructuring Transactions, MPW was "making a big shift in its relationship with Prospect," essentially exchanging "rental income from hospital real estate for upside potential in the managed-care business," the value of which will ideally grow, and enable MPW "***to eventually***

***sell its equity interests at a profit***." In another article entitled "*Medical Properties Trust Got A Base Hit*," an investor opined that by virtue of the Restructuring Transactions, "it does appear that MPW management can now ***put the Prospect issues in the 'resolved' column*** so that management can now tackle more issues."

121. Plainly, reasonable MPW investors would have deemed it important to learn about the emergence of any regulatory risk to the Restructuring Transactions, including the Minority Interest Transaction. As discussed below, MPW failed to advise MPW investors about developing regulatory risk to the Minority Interest Transaction from the DMHC.

### 7. Prospect Plan Files the June 2023 NMM With the DMHC To Secure Approval of the Minority Interest Transaction

122. Prospect's managed care business, Prospect Plan, is regulated by the State of California. Under Section 1399.65(a)(1) of Article 10.2 of Chapter 2 of Division 2 of the California Health and Safety Code, a health care service plan like Prospect Plan that intends to "enter into an agreement resulting in its purchase, acquisition, ***or control by***, ***any entity***" must "***give notice to, and secure prior approval from***, the [director of the DMHC]."

123. Under Section 1399.65(a)(2), the relevant agreement may not be completed until the Director approves the transaction that is the subject of the agreement.

124. Under Section 1399.65(a)(3), a health care service plan like PHP Holdings' subsidiary, Prospect Plan, seeking approval of an agreement to consummate a transaction described in subsection (a)(1) must file "all the information necessary for the director to make the determination to approve, ***conditionally approve***, or ***disapprove***" the agreement.

125. Under Section 1352(b) of Article 3 of Chapter 2.2 of Division 2 of the California Health and Safety Code, requests for approval of a change in control are made by filing a notice of material modification with the DMHC: "[p]rior to a material modification of its plan or

operations, a plan shall give notice thereof to the director, who shall, within 20 business days or such additional time as the plan may specify, by order approve, disapprove, suspend, or postpone the effectiveness of the change."

126. As noted, the Restructuring Agreement did not contemplate that the Minority Interest Transaction would require DMHC approval. But as per the June 2023 NMM, at some point after execution of the Restructuring Agreement, the DMHC had "expressed a preference that the submission" of the Minority Interest Transaction "be processed as a notice of material modification." Although Prospect Plan disputed that the Minority Interest Transaction required DMHC approval under Section 1399.65, it agreed to "provide the information and documentation that would ordinarily be submitted in connection with a notice of material modification." Accordingly, on June 23, 2023, before the close of MPW's Q2 2023, Prospect Plan filed the June 2023 NMM (Filing No. 20232846) seeking DMHC approval of the Minority Interest Transaction, which it depicted in the following chart:



127. The June 2023 NMM contended that the Minority Interest Transaction was not a change of "control" requiring DMHC approval under Section 1399.65 since it transferred only a minority interest in PHP Holdings to MPT Picasso. The June 2023 NMM acknowledged, however, that (i) "MPT was not previously included in PHP's chain of ownership and the Minority Interest Transaction was not [merely] an internal restructuring," and (ii) pursuant to the Minority Interest Transaction, MPT Picasso had been granted "blocking rights with respect to certain major decisions of [PHP Holdings]." While the June 2023 NMM argued that these blocking rights "do not entitle [MPT Picasso] to exercise direction or control over the day-to-day business or governance of [PHP Holdings] or [Prospect Plan], the care of any subscribers or enrollees or any decisions regarding health plan contracting or provider networks, and that [MPT Picasso] is simply a passive investor in [PHP Holdings]," MPT Picasso's blocking rights subsequently became a subject of substantial concern for the DMHC.

128. As noted, Section 4.1(c) of the Restructuring Agreement obligated Prospect and its affiliates to provide representatives of the MPW affiliates that signed the Restructuring Agreement with at least three (3) business days to review and provide comments on the notice of material modification to be submitted to the DMHC. Due to this Three Business Day NMM Review Requirement, it is reasonable to infer that no later than June 20, 2023, Defendants would have been aware that the Minority Interest Transaction had unexpectedly become subject to regulatory risk insofar as the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or disapprove the Minority Interest Transaction altogether, which would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

**8. The DMHC Postpones the Effectiveness and Prohibits the Implementation of the Minority Interest Transaction Pending the DMHC's Further Regulatory Review**

129. On July 20, 2023, in response to the June 2023 NMM, the DMHC sent the July 2023 DMHC Letter to Prospect Plan postponing the effectiveness and prohibiting the implementation of the Minority Interest Transaction, until the Director issued an order approving the Minority Interest Transaction:

> Re: ***Notice of Material Modification Proposing Minority Interest Transaction Filed June 23, 2023***; Filing No. 20232846
>
> The Department of Managed Health Care (Department) reviewed information submitted in the above-referenced Notice of Material Modification (Notice) filed by Prospect Health Plan, Inc. (Plan) for compliance with the Knox-Keene Health Care Service Plan Act of 1975, as amended.
>
> * * *
>
> ***Enclosed is Order No. 20232846***, issued pursuant to Health and Safety Code section 1352(b), postponing the terms of the Notice. The Order incorporates by reference the Department's findings and comments as set forth in the attached Comment Table. ***The Order postpones the effectiveness of the material modification of the Plan or its operations as proposed in the Notice, and thereby prohibits the Plan from implementing the terms of the Notice until the Director issues a subsequent Order approving the Notice***.
>
> ***The Order is issued because at this time the Department finds the Notice does not demonstrate compliance with the Act and Rules and further amendment is necessary as set forth in the Department's attached comments***. Pursuant to Health and Safety Code section 1354, the Plan has a right to a hearing upon the issuance of an Order postponing a material modification if the Plan makes a written request within thirty (30) days after the date of mailing of the enclosed Order.

130. The "Comment Table" attached to the July 2023 DMHC Letter requested additional information concerning the Minority Interest Transaction, including (i) a thorough description of the blocking rights granted to MPT in connection with the Minority Interest Transaction; (ii) explanations concerning why MPT was granted blocking rights, the circumstances under which such blocking rights may be exercised, and the effects of MPT exercising the blocking rights; and (iii) copies of all relevant agreements related to the Minority Interest Transaction.

131. The July 2023 DMHC Order referenced in the July 2023 DMHC Letter stated that the Minority Interest Transaction constituted a change of "control" within the meaning of the statute:

> Pursuant to Health and Safety Code section 1352(b), the terms of the Notice of Material Modification filed on June 23, 2023, ***proposing a change of control resulting from a Minority Interest Transaction***, ***are postponed as of the date set forth below for the reasons stated in the letter attached hereto and incorporated herein by reference***. This Order shall remain in effect until revoked or superseded by further Order of the Director.

132. In sum, the July 2023 DMHC Order, and the July 2023 DMHC Letter and attached Comments Table (*see* Exhibit C), evidenced the intent of the DMHC to thoroughly investigate the circumstances of the Minority Interest Transaction (including the blocking rights granted to MPT Picasso), and thus heightened the regulatory risk already apparent no later than June 20, 2023, that the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or might not approve the Minority Interest Transaction altogether.

133. DMHC requested a response from Prospect Plan within thirty (30) days. On August 15, 2023, DMHC granted Prospect Plan's request to postpone its response to September 13, 2023.

### 9. MPW Reports Results for Q2 2023, Including $68 Million in Revenue From a Purported Increase in the Value of Equity in PHP Holdings Received by MPW

134. On August 8, 2023, via a Form 8-K, MPW issued a press release ("Q2 2023 Release") reporting a net loss of $0.07 per diluted share, and NFFO of $0.48 per diluted share, in Q2 2023 (which ended on June 30, 2023). Reducing the net loss, and boosting NFFO, was the $68 million Q2 2023 Prospect Gain. As the Q2 2023 Release explained:

> ***Included in 2023 second quarter NFFO is roughly $68 million ($0.11 per diluted share***) ***from the receipt of equity in PHP <u>in lieu of cash</u> for 2023 previously unrecorded but contractually owed rent and interest revenue from Prospect Medical Holdings, Inc. ("Prospect").*** In accordance with accounting requirements, the value of MPT's investment in PHP was established at roughly $655 million based on estimates from multiple independent third parties and the application of an appropriate marketability discount.

135. The Q2 2023 Release further advised that MPW was narrowing its 2023 calendar estimated range of (i) net income to $0.33 to $0.37 per share, and (ii) NFFO to $1.53 to $1.57 per share. According to the Q2 2023 Press Release, the ranges took into account "Prospect-related income from the expected resumption of partial California rental payments, ***recognition of the PHP equity value received in the second quarter*** and other amounts."

136. Recognizing the non-cash $68 million Q2 2023 Prospect Gain as revenue in Q2 2023 to boost NFFO was inconsistent with the accounting treatment of non-cash gain from Prospect-related assets previously described by Hamner on the Q1 2023 Call on April 27, 2023: "[as] we reported last quarter, we are currently recognizing prospect rental income ***only as cash is received, and prospect paid no rent or interest during the quarter***."

137. On August 8, 2023, MPW conducted the Q2 2023 Call to discuss Q2 2023 results. With respect to Prospect-related matters, Aldag advised analysts that the "managed care business continues to be profitable and on track to meet revenue and EBITDA targets and timelines. ***They are still planning for a monetization event of the managed care business in 2024***." Aldag further advised that the "Yale, Connecticut transaction is still progressing to close pursuant to the APA, [and] neither we nor Prospect are aware of any opposition to this transaction."

138. Later on the call, Hamner advised that MPW "***recognized about $68 million in Prospect rent and interest***. ***This is based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for interest in Prospect's managed care business***." Hamner then explained how the $82 million "increase" in the value of the "equity interest" issued to MPW in connection with the Restructuring Transactions enabled MPW to recognize the $68 million Q2 2023 Prospect Gain:

> In brief summary, you will recall our May 23rd announcement that as of the end of the first quarter, we carried these assets at approximately $573 million. After obtaining updated valuations and an appraisal to determine marketability discounts, ***the estimated value of our interest in managed care as of the May closing was approximately $655 million***. That's in addition to our roughly $515 million of leased California hospitals and $355 million of cash that we expect to collect from the sale to Yale of our Connecticut hospitals. ***<u>Accordingly</u>, we recognized in the second quarter the rent and interest that <u>would have been collected</u> in 2023 through the May closing date***.

139. Subsequently, during Q&A, an analyst asked why MPW had not revised its NFFO guidance in connection with the announcement of the Restructuring Transactions in May 2023. Hamner responded in relevant part:

> [T]he transaction happened on May 23rd and as I tried to point out earlier, we had multiple validations, multiple independent third parties who took different perspectives on the value of the managed care business. It's a private company.
>
> It's not uncomplicated that what Prospect has done is to extract various different operations and subsidiaries from across the Prospect ownership and put it into a single operating company and measure that and then provide that information to the appraisers and so forth, such that. We only got something that the auditors were able to look at and we were confident in the $655 million value. ***That didn't happen on May 23rd. <u>It didn't happen for six-plus weeks afterwards</u>*** . . . ***[W]e just simply didn't have the information until more recently.***[13]

[13] Notably, "six-plus" weeks after May 23, 2023, fell *after* the closing date for MPW's Q2 2023 on June 30, 2023. Yet, MPW recognized the $82 million increase in Q2 2023.

140. After the Q2 2023 Call, analysts at Jefferies, J.P Morgan and Truist observed in their reports that adding the extra $0.11 share to NFFO from the receipt of equity in PHP Holdings allowed MPW to handily beat prior analyst estimates for NFFO in Q2 2023 of between $0.36-$0.39 per share. The J.P Morgan analyst added that "we did not explicitly anticipate this sort of income to materialize, and we suspect that others on the Street did not either." A Hedgeye analyst was more blunt, denigrating the $68 million Q2 2023 Prospect Gain as "Bullsh*t PHP Equity Booked as Rent" that should be excluded when calculating FFO-related metrics since it was non-cash revenue:

**Medical Properties Trust, Inc. (MPW)**
Earnings Variances

Amounts in 000s, Except per Share Data

| Income Statement Variances | Actual | Modeled | Variances $ | Variances Per Share |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Rent Billed | 247,491 | 245,562 | 1,929 | 0.00 |
| Straight-Line Rent | (39,329) | 56,443 | (95,772) | (0.16) |
| Income from Financing Leases | 68,468 | 13,203 | 55,265 | 0.09 |
| Interest & Other Income | 60,765 | 38,994 | 21,771 | 0.04 |
| **Total Revenues** | 337,395 | 354,202 | (16,807) | (0.03) |
| **Expenses:** | | | | |
| Interest | 104,470 | 101,682 | (2,788) | (0.00) |
| Real Estate Depreciation & Amortization | 364,403 | 371,860 | | |
| Property-Related | 24,676 | 14,200 | (10,476) | (0.02) |
| Acquisition Expenses | - | - | - | - |
| Loan Impairment Charge | - | - | | |
| General & Administrative | 35,604 | 38,114 | 2,510 | 0.00 |
| **Total Expenses** | 529,153 | 525,857 | | |
| **GAAP Operating Income** | (191,758) | (171,654) | | |
| Other Income / (Expense): | | | | |
| Gain on Sale of Real Estate | 167 | - | | |
| Real Estate Impairment Charges | - | - | | |
| Earnings from Equity Interests | 12,224 | 11,216 | 1,008 | 0.00 |
| Debt Refinancing & Unutilized Financing Costs | (816) | - | | |
| Other (incl. MTM Adj. on Equity Securities) | (10,512) | - | (10,512) | (0.02) |
| Total Other | 1,063 | 11,216 | | |
| **Income Before Income Tax** | (190,695) | (160,438) | | |
| Income Tax Expense | 148,262 | (5,000) | 153,262 | 0.26 |
| **Net Income** | (42,433) | (165,438) | | |
| Discontinued Operations | - | - | | |
| Noncontrolling Interests | 396 | - | | |
| **Net Income Attributable to MPT Common** | (42,037) | (165,438) | | |
| Participating Securities | (469) | (500) | 31 | 0.00 |
| **Net Income Less Participating Securities** | (42,506) | (165,938) | | |
| Wtd. Avg. Shares / Units - Diluted | 598,344 | 598,344 | | - |

| Core FFO & AFFO Variances | Actual | Modeled | Variances $ | Variances Per Share |
|---|---|---|---|---|
| Net Income Less Participating Securities | (42,506) | (165,938) | | |
| Adjustments: | | | | |
| Real Estate Depreciation & Amortization | 364,403 | 371,860 | | |
| Real Estate Depreciation & Amortization - Disc. Ops. | - | - | | |
| JV Share of D&A | 17,841 | 18,100 | | |
| Gain on Sale of Real Estate | (167) | - | | |
| Real Estate Impairment Charges | - | - | | |
| **NAREIT FFO** | 339,571 | 224,022 | 115,549 | 0.19 |
| Write-Off (Recovery) of Straight-Line Rent & Other | 95,642 | - | | |
| Transaction Costs from Non-Real Estate Dispositions | - | - | | |
| Debt Refinancing Costs | - | - | | |
| Loan Impairment Charge | - | - | | |
| Acquisition Expenses | - | - | - | - |
| Release of Valuation Allowance | - | - | | |
| Litigation & Other | 2,502 | 5,000 | (2,498) | (0.00) |
| Non-Cash FV Adjustments | 8,374 | - | | |
| Tax Rate Change | (157,230) | - | | |
| Deferred Financing & Unutilized Financing Costs | 816 | - | | |
| **Core / Normalized FFO** | 289,675 | 229,022 | 60,653 | 0.10 |
| **Core FFO / Share - Diluted** | 0.48 | 0.38 | | 0.10 |
| Adjustments: | | | | |
| Share-Based Compensation | 10,800 | 11,888 | (1,088) | (0.00) |
| Debt Costs Amortization | 5,203 | 4,000 | | |
| Rent Deferral, Net | 2,380 | - | | |
| Straight-Line Rent Revenue & Other | (60,825) | (62,808) | | |
| **Reported Core / Normalized AFFO** | 247,233 | 182,102 | 65,131 | 0.11 |
| **Reported Core AFFO / Share - Diluted** | 0.41 | 0.30 | | 0.11 |
| Bullshit PHP Equity Booked as Rent | (68,000) | - | | |
| **Hedgeye Adjusted AFFO** | 179,233 | 182,102 | (2,869) | (0.00) |
| **Hedgeye Adjusted AFFO / Share - Diluted** | 0.30 | 0.30 | | (0.00) |

141. In a report issued several weeks later after disclosure of the July 2023 DMHC Order, a Wells Fargo analyst agreed with Hedgeye, questioning "***how the $68m of PHP equity made it into MPW's revenue line***," given that it was a non-cash gain that would not be converted into cash until MPW monetized its equity interest in Prospect's managed care business.

142. These criticisms were well-founded since MPW had stated in its 2022 Form 10-K that it expected to "record rent on our Prospect leases on ***a cash only basis*** for the foreseeable

future," and later clarified in its Q1 2023 Form 10-Q that interest on loans to Prospect were also only being recognized on a cash basis. Further, Hamner had stated on the Q1 2023 Call on April 27, 2023, that "[as] we reported last quarter, we are currently recognizing prospect rental income ***only as cash is received, and prospect paid no rent or interest during the quarter***." Yet, the $68 million Q2 2023 Prospect Gain was recognized as "revenue" in Q2 2023 even though it derived from an increase in the value of MPW's interest in Prospect that did not generate any cash.

143. On August 9, 2023, a day after the Q2 2023 Call, MPW filed its Q2 2023 Form 10-Q, which disclosed the following accounting for the Restructuring Transactions:

> On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third party lenders, we agreed to the following restructuring of our $1.7 billion investment in Prospect including . . . e) ***obtain[ing] a <u>non-controlling ownership interest</u> in PHP Holdings of approximately $654 million***, after applying a discount for lack of marketability, ***consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings*** . . . This non-controlling ownership interest [valued at $654 million] was received in exchange for unpaid rent and interest through December 2022, ***previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million***, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.[14]

[14] Concerning the valuation of MPW's investment in Prospect, the Q2 2023 Form 10-Q disclosed:

> [O]ur convertible loan and equity investment in PHP Holdings [is] recorded at fair value based on Level 3 inputs, by using a discounted cash flow model, which requires significant estimates of our investee such as projected revenue and expenses and appropriate consideration of the underlying risk profile of the forecasted assumptions associated with the investee. We classify our valuations of equity investments as Level 3, as we use certain unobservable inputs to the valuation methodology that are significant to the fair value measurement, and the valuations require management judgment due to the absence of quoted market prices. For the cash flow models, our observable inputs include use of a capitalization rate and discount rate (which is based on a weighted-average cost of capital) ***and our unobservable input includes an adjustment for a marketability discount ("DLOM")***. In regard to the underlying projections used in the discounted cash flow model, such projections are provided by the investees. However, we will modify such projections as needed based on our review and analysis of historical

144. While it reported the Restructuring Transactions, the Q2 2023 Form 10-Q failed to attach the Restructuring Agreement as an exhibit. This failure violated Item 601 of the SEC's Regulation S-K requiring publicly-traded companies to attach a "material contract . . . [that] is executed or becomes effective during [a] reporting period" as "an exhibit to the Form 10–Q or Form 10–K filed for the corresponding period" (17 C.F.R. § 229.601(a)(4)). Since the Restructuring Transactions was material, the Restructuring Agreement governing the Restructuring Transactions was also material, and had to be attached as an exhibit to the Q2 2023 Form 10-Q, since Q2 2023 was the period in which the Restructuring Agreement was executed and became effective. Because MPW failed to attach the Restructuring Agreement to the Q2 2023 Form 10-Q, MPW investors had no inkling whatsoever concerning the need for regulatory approval by the DMHC to consummate any aspect of the Restructuring Transactions.

145. The Q2 2023 Form 10-Q, as well as the Q2 2023 Release, and the statements on the Q2 2023 Call regarding the Restructuring Transactions, all failed to disclose the June 2023 NMM and the July 2023 DMHC Order, and thus the statements therein regarding the equity interest in PHP Holdings issued to MPW were rendered misleading by the omission of critical qualifying information concerning pending regulatory action posing a substantial risk to the validity of that equity interest, *i.e.*, that (i) on June 23, 2023, Prospect had submitted the June 2023 NMM seeking approval of the Minority Interest Transaction under Section 1399.65 in response to

---

> results, meetings with key members of management, and our understanding of trends and developments within the healthcare industry.

Based on the above disclosure, the *only* unobservable input applied by MPW was the adjustment for marketability (concerning which no calculations were disclosed). Thus, it is clear that when reporting Q2 2023 results, MPW failed to adjust the value of its investment in Prospect for risk and uncertainty related to DMHC approval of the Minority Interest Transaction.

the DMHC's unexpected request to process review and approval of the Minority Interest Transaction as a notice of material modification; and (ii) on July 20, 2023, the DMHC had issued the July 2023 DMHC Order, which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction pending the DMHC's further review of the circumstances of the Minority Interest Transaction. Disclosure of the June 2023 NMM and the July 2023 DMHC Order would have significantly altered the total mix of information for MPW investors by making them aware of pending regulatory action posing a substantial risk to the validity of the equity interest in PHP Holdings issued to MPW, *i.e.*, that the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or not approve the Minority Interest Transaction altogether, which would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement.

146. Recognition of the $68 million Q2 2023 Prospect Gain in Q2 2023 also violated GAAP because that $68 million was a "gain" subject to contingencies (*i.e.*, DMHC's approval of the Minority Interest Transaction, and the conversion of the PHP Convertible Note into equity in PHP Holdings). GAAP (specifically ASC 450-30-25-1) prohibits the recognition of a "gain" that is subject to a "contingency" until the contingency is resolved favorably.

147. Moreover, because it postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction, the July 2023 DMHC Order was a Type I subsequent event providing additional evidence concerning a condition (*i.e.*, uncertainty about DMHC's approval of the Minority Interest Transaction) of which Defendants were aware no later than June 20, 2023. Thus, GAAP (specifically ASC 855-10-25-1) obligated MPW to recognize the effect of the July 2023 DMHC Order in its Q2 2023 financial statements by not recognizing the contingent $68 million Q2 2023 Prospect Gain as revenue in Q2 2023. And because it violated

GAAP, recognition of the $68 million Q2 2023 Prospect Gain was presumptively misleading under 17 C.F.R § 210.4-01(a)(1), which states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles ***will be presumed to be misleading or inaccurate***."

148. Notwithstanding these GAAP violations, Defendant Hanna signed the Q2 2023 Form 10-Q, and Defendants Aldag and Hamner each falsely certified the Q2 2023 Form 10-Q as compliant with GAAP, and as not containing any materially false and misleading statements or omissions.

149. Finally, by including the $68 million Q2 2023 Prospect Gain in NFFO, MPW violated its own accounting policy concerning calculation of NFFO, which is supposed to exclude gain like the Q2 2023 Prospect Gain from non-core events like the Restructuring Transactions in order to avoid making comparison to "prior period results ***and market expectations less meaningful to investors and analysts***."

**10. The *WSJ* Reveals the Existence of the June 2023 NMM and the July 2023 DMHC Order**

150. On August 18, 2023, the *WSJ* published an article revealing the existence of the July 2023 DMHC Order postponing the effectiveness and prohibiting the implementation of the Minority Interest Transaction, noting among other things that MPW had (i) failed to disclose the need for regulatory approval when it disclosed the Restructuring Transactions on May 23, 2023, and (ii) failed to disclose the July 2023 DMHC Order in its Q2 2023 Form 10-Q, even as it reported $68 million in gain in Q2 2023 from the equity received in Prospect's managed care business. *See* Exhibit E. The *WSJ* article stated in relevant part:

> ***The nation's largest hospital landlord said an unusual transaction that provided crucial financial support for one of its biggest tenants was a done deal. It wasn't***.

The deal was good news for both companies, and for communities across the country concerned that their local hospitals could go broke. ***The landlord, Medical Properties Trust, announced the transaction in May. When it reported quarterly results on Aug. 8, it said the arrangement boosted its own revenue***.

***But a California state regulator on July 20 ordered that the transaction between MPT and Prospect Medical Holdings be put on hold, according to the order that the regulator sent to Prospect. MPT didn't disclose the regulator's order when it reported second-quarter results, or in its quarterly report filed the next day with the Securities and Exchange Commission***.

* * *

The Prospect deal was designed to alleviate financial stress for both it and MPT. Before the deal, Prospect had stopped paying rent, closed two hospitals near Philadelphia, and owed MPT hundreds of millions of dollars. MPT's own finances are under scrutiny by investors, its shares are down by half over the past year, and it has already suffered large losses on Prospect, its third-largest tenant. <u>***If the deal is killed by regulators, it would further pressure the two companies' finances***</u>.

* * *

MPT announced the deal with Los Angeles-based Prospect on May 23, saying it would receive equity in Prospect's managed-care business—PHP Holdings—in lieu of cash payment for $573 million of loans, unpaid rent and interest, and other amounts owed. PHP Holdings owns a small health insurer, Prospect Health Plan, as well as other businesses.

***MPT didn't disclose whether the transaction with closely held Prospect would require regulatory approval***. Last week MPT said it owned 49% of PHP Holdings.

***It isn't clear how Prospect would pay MPT if the regulator, the California Department of Managed Health Care, rejected the deal permanently***. The department oversees Prospect Health Plan.

* * *

MPT and Prospect have provided different descriptions, at different points in time, of the details of their deal. ***The California regulator appears to be concerned about how much control MPT would have over Prospect Health Plan***. The deal is unusual in part because MPT, a REIT, would get a big stake in a health insurer. When the deal was announced, MPT didn't say what its percentage ownership of PHP Holdings would be. Prospect Health Plan has about 73,000 managed-care enrollees in five Southern California counties. PHP Holdings' other businesses include physician-practice groups.

Prospect Health Plan notified the California regulator of the [Restructuring Transactions] in a June 23 filing that said an MPT subsidiary had "acquired a 49%

equity interest" in PHP Holdings, the health plan's parent, on May 23. The health plan said MPT acquired its stake by converting $370 million of loans, unpaid rent and interest, and other amounts owed by Prospect Medical Holdings into equity in PHP Holdings. The health plan called MPT a passive investor. It said the deal wasn't a change of control and didn't need the regulator's advance approval.

"The equity interests acquired by MPT are not 'voting' interests, although MPT was granted blocking rights with respect to certain major decisions" of PHP Holdings, the health plan said. The June 23 filing didn't provide details about the blocking rights.

***The [DMHC] on July 20 issued the [July 2023 DMHC Order] putting the deal on hold. It characterized the deal's terms as "proposing a change of control." The [DMHC] said the order would "remain in effect until revoked or superseded by further order of the director." In an accompanying letter, the regulator said the order "prohibits the plan from implementing the terms" until further notice, because the health plan's proposal "does not demonstrate compliance" with state law***.

The [DMHC] also sent the health plan a 12-page list of comments and requests for information. ***It asked for "a thorough description of the blocking rights," and an explanation of "the circumstances when MPT may exercise those blocking rights."*** The health plan's responses are due Sept. 13, after the regulator granted a deadline extension.

* * *

When MPT reported second-quarter results last week, its description of the equity deal differed significantly from its previous explanation in May—and from what Prospect Health Plan told the California regulator in June. When MPT last week said it had taken a 49% equity interest in PHP Holdings, that percentage figure matched what the health plan had said. MPT, however, said its "non-controlling ownership interest" was worth $654.5 million as of June 30—based on updated valuations—and consisted of "an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings." The valuation exceeded the $370 million of Prospect obligations that the health plan in its June 23 filing had said was converted into equity.

***The Prospect deal helped MPT's income statement, too. MPT said it recorded its receipt of the $68 million equity investment as revenue; that was 20% of its second-quarter revenue. Asked what MPT's rationale was for recognizing revenue in light of the regulator's July 20 order, [an MPT spokesperson] said "this is governed by accounting regulations."***

151. After publication of the *WSJ* article, MPW's stock price fell approximately 15% in intraday trading. Then, at approximately 1:50 P.M., the NYSE halted trading in MPW's stock

pending an announcement by MPW. Thereafter, at approximately 2:26 P.M, in an effort to reverse the decline, MPW issued a materially false and misleading press release ("August 2023 Release") attacking the legitimacy of the *WSJ* article. The August 2023 Release stated in relevant part:

> Medical Properties Trust, Inc. [MPT] today responded to the most recent of several false and misleading articles published by the Wall Street Journal, in this case related to the Company's May 23, 2023 transaction with Prospect Medical Holdings ("Prospect").
>
> * * *
>
> MPT believes it is important to clarify the following facts for the investment community:
>
> - The California Department of Managed Health Care's ("DMHC") hold sent to Prospect on July 20, 2023 is a ***standard, expected, and non-controversial part of the approval process*** for this transaction.
> - This hold indicates that certain additional information is required prior to the issuance of final approval from the DMHC, which the Company ***fully expects to obtain in due course*** as it has been advised it is highly unlikely the regulators would not approve a transaction following receipt of all required information.
> - In the unlikely event that the regulator does not grant approval for the transaction, MPT's investment in PHP would remain a ***convertible note with identical economics to equity ownership***.
> - As a result, DMHC's ***request was deemed immaterial*** to MPT's financials and thus did not require disclosure.
> - The Company's recording of its $68 million equity investment as revenue in the second quarter was ***fully consistent with accounting requirements*** and was entirely unrelated to the DMHC approval process. Mr. Weil's attempt to conflate the two matters has no basis in fact.

(emphasis in original)

152. The bolded italicized statements in the August 2023 Release above were materially false and misleading. *First*, MPW had *not* expected a "hold" on the Minority Interest Transaction as evidenced by the fact that the Restructuring Agreement did not condition the Minority Interest Transaction on DMHC approval. MPW investors would not have been aware of this nuance because MPW had never disclosed the material terms of the Restructuring Agreement.

153. *Second*, the "hold" imposed by DMHC was "controversial" given that it was contrary to the expectation that DMHC approval of the Minority Interest Transaction would not be required.

154. *Third*, MPW could not have expected DMHC to provide approval in due course. In fact, MPW would have had no idea when the Minority Interest Transaction might be approved since the July 2023 DMHC Order, and the July 2023 DMHC Letter (and the "Comments Table" annexed thereto) confirmed that the DMHC intended to thoroughly investigate the circumstances surrounding the Minority Interest Transaction, including the blocking rights granted to MPT Picasso (which blocking rights, as discussed below, became a central concern of the DMHC that prevented approval of the Minority Interest Transaction for months until it was addressed to the satisfaction of the DMHC in the April 2024 Undertakings signed by Defendant Hamner; *see* Exhibit D).

155. Ultimately, as discussed below, DMHC's review lasted for nearly ten months after submission of the June 2023 NMM until the DMHC finally approved the Minority Interest Transaction on April 18, 2024, but only after MPT Picasso agreed to the April 2024 Undertakings signed by Hamner. Absent agreement to the April 2024 Undertakings, the DMHC would not have approved the Minority Interest Transaction.

156. *Fourth*, while the Fallback Provision in the Restructuring Agreement attempted to replicate the economics of a conversion of the PHP Convertible Note into equity, the Fallback Provision did not address what would happen if the DMHC invalidated the Minority Interest Transaction. In fact, if the DMHC had disapproved the Minority Interest Transaction, it would have derailed the Restructuring Transactions by invalidating the issuance of equity in PHP

Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

157. *Fifth*, the recognition of the $68 million Q2 2023 Prospect Gain was *not* "fully consistent with accounting requirements" because, as noted above, such recognition violated GAAP by recognizing gain as revenue before resolution of a critical contingency (*i.e.*, DMHC approval of the Minority Interest Transaction).

158. After the publication of MPW's materially false and misleading press release purporting to rebut the *WSJ* article, MPW's stock price partially reversed its earlier decline, but still closed down at $6.93 per share on August 18, 2023, a decline of $0.57 per share, or 7.6%, from the prior close of $7.50 per share on August 17, 2023, resulting in a loss of $341 million in market capitalization (based on approximately 598 million MPW shares outstanding as of August 18, 2023).

159. The movement of MPW's stock price on August 18, 2023, is depicted in the following chart, which shows the initial decline, the halt, and then the partial reversal of the decline:



160. A Wells Fargo analyst offered this prophetic reaction to the *WSJ* article and MPW's rebuttal, which explains why investors reacted so negatively when the *WSJ* revealed the existence of the July 2023 DMHC Order:

> MPW was quick to refute the claims made in Friday's WSJ article regarding a regulatory snag in taking over equity of Prospect's managed care entity. ***We believe investors should continue to monitor developments related to this situation; regulatory snags have a tendency to drag on***. Moreover, ***we question how the $68m of PHP equity made it into MPW's revenue line***, and believe it should be backed out of AFFO insofar that it is viewed as a cash flow proxy until the equity stake is sold.

161. MPW did not, however, enable MPW investors to "continue to monitor developments related to" the DMHC's regulatory review. To the contrary, none of MPW's subsequent SEC filings provided any update to MPW investors concerning the status of the DMHC's regulatory review. The reason is simple: as described in the next section, that review was not going smoothly, and if MPW had disclosed the status of MPW's regulatory review in its Q3 2023 Form 10-Q as a "contingency," it could not have recognized any further 2023 Prospect Gain in Q3 2023, which would have reduced NFFO and EBITDA in 2023, which would have reduced the annual cash bonuses and equity awards to Aldag and Hamner based on those metrics.

### 11. The DMHC and Prospect Plan Engage in Months of Extensive Correspondence Culminating in DMHC Approval of the Minority Interest Transaction on April 18, 2024, On Condition That MPT Picasso Address the Blocking Rights and Not Increase Its Equity Stake in PHP Holdings Without Prior DMHC Approval

162. On September 11, 2023, Prospect Plan responded to the July 2023 DMHC Letter. The response submitted, among other things, a copy of the Restructuring Agreement (annexed hereto as Exhibit A), and an organizational chart explaining the relationship between MPW and MPT Picasso (annexed hereto as Exhibit B). Prospect Plan also sought to reassure the DMHC that the blocking rights granted to MPT Picasso did not include the right to make decisions concerning

day-to-day operational or governance matters, or decisions that could impact the delivery of care to members of Prospect Plan.

163. On October 11, 2023, DMHC responded. Among other questions, it asked whether the terms of the relevant LLC agreement governing MPT Picasso's rights as an investor in PHP Holdings would permit MPT Picasso to (i) "upstream funds" from Prospect Plan in violation of an "undertaking" ("20130836 Undertaking") that Prospect Plan had previously filed with the DMHC, and (ii) prevent "an infusion of cash" into Prospect Plan "if an infusion of cash were required for [Prospect Plan] to maintain the tangible net equity requirements" in certain applicable regulations and the 20130836 Undertaking.

164. On October 25, 2023, Prospect Plan responded. It advised that while MPT Picasso's rights as an investor in PHP Holdings would not permit it to require Prospect Plan to upstream funds in violation of the 20130836 Undertaking, such rights could "arguably permit MPT Picasso to prevent an infusion of cash into Prospect Plan if an infusion of cash were required for Prospect Plan to maintain the tangible net equity requirements." Prospect Plan sought to reassure the DMHC, however, that "(i) it is in MPT Picasso Investors TRS's best interests to ensure that [Prospect] Plan remains in compliance with applicable law and DMHC Undertakings, and (ii) ***MPT Picasso Investors TRS has reinforced the same and assured Plan that it has no intention or desire to be an impediment to Plan's continued compliance***." Prospect Plan's response on October 25, 2023, thus evidences that Prospect Plan had discussed the status of the DMHC approval process with representatives of MPW, and sought and received their input.

165. On December 22, 2023, Prospect Plan wrote to the DMHC to advise that, after further consideration, MPT Picasso had "determined not to pursue a full conversion of the convertible note, has no current plans to convert the remaining amount of its convertible note into

equity, and therefore no additional filing will be forthcoming." Based on that representation, Prospect Plan asked the DMHC to approve the Minority Interest Transaction.

166. On January 5, 2024, the DMHC responded to Prospect Plan's notification of MPT Picasso's decision not to pursue conversion of the PHP Convertible Note into equity:

> ***[E]xplain what happened to motivate MPT to discontinue its plan to convert the remaining amount of its convertible note into equity***. Explain why MPT discontinued its plan to convert the remaining amount of its convertible note into equity. Provide an accurate accounting of the value of the remaining amount of MPT's convertible note. Describe MPT's rights and authority to convert the remaining amount of its convertible note into equity and any conditions precedent to MPT exercising those rights to convert the remaining amount of its convertible note into equity in Plan or any of its affiliates.
>
> [E]xplain[] how MPT's decision not to currently pursue plans to convert the remaining amount of its convertible note into equity impacts Plan or any of Plan's affiliates' business and business plans.

167. On January 15, 2024, Prospect Plan explained that MPT Picasso had determined not to convert the PHP Convertible Note into equity in part because "***the continuing delays in approving the filings are resulting in undue expense and burden on the parties***." This statement further confirms that DMHC approval of the Minority Interest Transaction was material to MPW.

168. Three months later, the DMHC finally approved the Minority Interest Transaction on condition that MPT Picasso and various Prospect affiliates agree to the April 2024 Undertakings signed by Defendant Hamner on behalf of MPT Picasso to, among other things, (i) initiate a regulatory review before Prospect Plan engaged in any transaction that would result in its purchase or acquisition; (ii) not convert the PHP Convertible Note into equity in PHP Holdings, or otherwise issue additional equity interests in Prospect Plan or any of its affiliates to MPT Picasso, without the prior approval of the DMHC; and (iii) address the DMHC's concerns with respect to the blocking rights:

***Change of Control***

Plan will not merge, consolidate, or initiate a single or series of transactions resulting in its purchase, acquisition, or control by, any entity, including another health care service plan or a health insurer licensed under the Insurance Code, without first submitting a Pre-Filing Request Form (DMHC 10-195) and attending a Pre-Filing conference with the Department. After the Pre-Filing conference, the DMHC will determine whether the proposed transaction(s) require the Plan to file a Notice of Material Modification. This includes individual transactions which, when considered cumulatively with any other transactions within a three-year period, could impact ownership interest.

***Equity Interest***

Before MPT Picasso Investors TRS, LLC (MPTP) may take any additional equity interest in Plan or any of its affiliates, Plan will first file a Notice of Material Modification, in accordance with the standards set forth in Section 1352 of the Act and Rule 1300.52.4, requesting prior Department approval of MPTP taking additional equity interest in Plan or any of its affiliates and await an order from the Department before transferring any equity interest from Plan or any of its affiliates to MPTP.

***Phase II Transactions***

Plan will not initiate the transactions described as the Phase II Transactions in Article IV of the Amended and Restated Master Restructuring Agreement filed in eFile No. 20232846, without first filing a Notice of Material Modification, and securing approval from the director. The Notice will detail the total cumulative aggregation of ownership interests that will occur from all phases of transactions. This includes not only the Phase II Transactions but also any other transactions that, when combined with Phase II and any potential future transactions, impact ownership interest.

***Minimum Tangible Net Equity***

The Plan is required to maintain 200% of tangible net equity (TNE) at all times. Further, the Plan shall not use Secured Affiliate Receivables to meet the TNE requirements.

***Restrictions on Upstreaming of Funds***

The Plan shall not declare or pay dividends, make other distributions of cash or property or in any other way upstream any funds or property to its shareholders or any of the Parties' affiliates (collectively, "Affiliate Company Distributions") if such actions would cause any of the following:

(a) The Plan to fail to maintain, at all times, 200 percent of the minimum TNE (which annualized amount shall be calculated by multiplying the applicable current quarter revenues and expenditures by four) required by Rule 1300.76; or

(b) Result in insufficient working capital or insufficient cash flow necessary to provide for the retirement of existing or proposed indebtedness of the Plan, as required by Rule 1300.75.1(a);
or (c) Adversely affect the ability of the Plan to provide or arrange for health care services.

169. On April 10, 2024, Defendant Hamner signed the April 2024 Undertakings on behalf of MPT Picasso. *See* Exhibit D.

170. On April 18, 2024, after execution of the undertakings, the DMHC issued the April 2024 DMHC Order approving the Minority Interest Transaction (which it characterized as a "change of control"). A letter accompanying the April 2024 DMHC Order wrote that it was "subject to and conditioned upon the Plan's full compliance with the Undertakings attached to the Order." *See* Exhibit D.

**12. MPW Reports Results for Q3 2023, Including $13 Million in Additional Revenue From the Purported $82 Million Increase in the Value of MPW's "Equity Interest" in PHP Holdings**

171. On October 26, 2023, while the DMHC approval process remained ongoing, MPW issued a press release ("Q3 2023 Release") via a Form 8-K reporting "[n]et income of $0.19 and Normalized Funds from Operations ("NFFO") of $0.38 for the 2023 third quarter on a per diluted share basis and ***including approximately $0.02 per share from MPT's receipt of non-cash and non-recurring investment consideration in PHP Holdings ("PHP") in lieu of third quarter cash rent and interest contractually owed by Prospect Medical Holdings ("Prospect")***."

172. In other words, NFFO in Q3 2023 was boosted by "***roughly $13 million ($0.02 per diluted share) from the receipt of an investment in PHP in lieu of cash for third quarter contractually owed rent and interest revenue from Prospect***." The Q3 2023 Release advised that recognition of the $13 million Q3 2023 Prospect Gain "completes [MPW's] accounting for the

receipt of its investment in PHP," and that the "combined amount of approximately $82 million recorded in the second and third quarters is not intended to represent cash currently ***and is not expected to recur***." The Q3 2023 Release further advised that MPW was "narrowing its estimate of per share NFFO [for 2023] to $1.56 to $1.58," indicating that the "ranges include the recognition of PHP investment value received in the second and third quarters."

173. In sum, as in Q2 2023, recognition of revenue from the previously reported $82 million increase in the value of the equity interest issued to MPW under the Restructuring Transactions boosted NFFO, even though (i) the contingency relating to DMHC approval of the Minority Interest Transaction remained unresolved (thus again violating GAAP's bar against recognizing contingent gain), and (ii) the Restructuring Transactions generating the previously reported $82 million increase in value were not part of MPW's core operations (thus again violating MPW's internal accounting policy regarding calculation of NFFO, which excludes gain derived from non-core events like the Restructuring Transactions).

174. The Q3 2023 Release separately announced "an approximate $30 million fair market value adjustment due to updated assumptions related to the value of MPT's investment received in the second quarter of 2023." Yet, inconsistently, even though this newly reported $30 million increase in value—like the previously reported $82 million in increase in value—resulted from a purported increase in the value of the equity issued to MPW under the Restructuring Transactions, it was *not* recognized as revenue.

175. On October 26, 2023, MPW conducted an earnings call ("Q3 2023 Call"). On that call, Hamner addressed the recognition of $13 million Q3 2023 Prospect Gain from "contractually owed rent and interest revenue" as a result of MPW's receipt of an "equity interest" in PHP Holdings:

> ***[S]imilar to our second quarter results***, we recognized about $13 million or $0.02 per share in noncash prospect rent and interest. As a reminder, ***this is an accounting requirement resulting from the recapitalization transactions that we announced in May of this year, which included MPT's exchange of certain real estate and other assets for interest in prospects managed care business, PHP Holdings LLC***. This noncash and prospect nonrecurring $13 million recognized as a portion of the rent and interest that would have been collected in 2023's third quarter.
>
> Moving forward, ***we do not expect to be required*** to book any additional rent and interest in connection with the May recapitalization. Just to be clear, our year-to-date statement of cash flows will not reflect either this or the $68 million recognized last quarter.
>
> Third, the approximate $47 million in noncash fair value adjustments is primarily comprised of about a $20 million adjustment to our investment in Swiss Medical and ***about a $30 million adjustment to our interest in PHP holding*** . . . ***To be clear, the PHP fair value adjustment is separate from the $13 million that I just described*** . . . this [$30 million] is an estimate of fair value, and there is no assurance that any such estimate will ultimately be realized. Prospect expects to begin marketing the company soon, and we continue to expect a transaction in 2024.

176. Hamner's statement that recognition of the Q2 2023 Prospect Gain and Q3 2023 Prospect Gain as revenue was an "accounting requirement" was materially false. To the contrary, as shown, GAAP (specifically ASC 450-30-25-1 and ASC 855-10-25-1) prohibited recognition of the Q2 2023 Prospect Gain and Q3 2023 Prospect Gain as revenue because such gain remained subject to a contingency (*i.e.*, DMHC approval of the Minority Interest Transaction).

177. On November 9, 2023, MPW filed its Form 10-Q for Q3 2023 ("Q3 2023 Form 10-Q"). Concerning MPW's investment in Prospect it stated:

> [MPW] obtain[ed] a non-controlling ownership interest in PHP Holdings of approximately $654 million, after applying a discount for lack of marketability, consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings (collectively, the "Prospect Transaction"). This non-controlling ownership interest was received in exchange for unpaid rent and interest through December 2022, ***previously unrecorded rent and interest revenue in 2023 totaling approximately $82 million (including approximately $13 million that was recorded as revenue in the 2023 third quarter)***, our $151 million

> mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.[15]

178. The Q3 2023 Form 10-Q, however, failed to disclose the June 2023 NMM and the July 2023 DMHC Order, even though *both* occurred well before the end date of Q3 2023 on September 30, 2023. That is, as of September 30, 2023, it remained uncertain whether the DMHC would approve the Minority Interest Transaction. Yet, in the Q3 2023 Form 10-Q, Defendants continued to violate GAAP by ignoring the contingency created by the June 2023 NMM and the July 2023 DMHC Order, and instead recognized another $13 million in gain from the previously reported $82 million increase in the value of the equity interests issued to MPW under the Restructuring Transactions. Notwithstanding these GAAP violations, Defendant Hanna signed the Q3 2023 Form 10-Q, and Defendants Aldag and Hamner each falsely certified the Q3 2023 Form 10-Q as compliant with GAAP, and as not materially false and misleading.

### 13. MPW Beats Guidance for NFFO in 2023, But Only Because of the Improper Recognition of $82 Million in Prospect Gain in 2023 in Violation of GAAP

179. As noted above, when reporting Q3 2023 results, MPW had guided for FY 2023 NFFO of $1.56 to $1.58 per share. On February 21, 2024, MPW announced its Q4 2023 and FY 2023 results, including NFFO of $1.59 per share for FY 2023, which beat the high end of the guidance for FY 2023 NFFO of $1.58 per share.

180. After MPW reported Q4 2023 and FY 2023 results, including NFFO beating guidance, MPW's stock price closed up 5.56%. Thus, boosting NFFO in 2023 by recognizing the $68 million Q2 2023 Prospect Gain also boosted MPW's stock price.

[15] While the Q2 2023 Prospect Gain was reported as approximately $68 million, and the Q3 2023 Prospect Gain was reported as approximately $13 million, the combined total was reported as approximately $82 million since the actual amount of the Q2 2023 Prospect Gain was $68.8 million.

181. According to MPW's Form 10-K, the NFFO of $1.59 per share in 2023 represented total NFFO in 2023 of $951,066,000. That $951,066,000 of NFFO in 2023, however, was boosted by the approximately $82 million in Prospect Gain improperly recognized in Q2 and Q3 2023 in violation of GAAP, as explained above. If that $82 million is excluded, the NFFO in 2023 drops to $869,066,000, or $1.45 per share based on approximately 598,991,000 shares outstanding as of December 31, 2023.

182. Thus, had MPW adhered to GAAP, NFFO for 2023 would have been $1.45 per share, and *missed* the low end of guidance for NFFO for 2023 of $1.56 per share by $0.11 per share. Instead, because Defendants violated GAAP, they reported NFFO for 2023 of $1.59 per share, which beat the high end of guidance for NFFO for 2023 of $1.58 per share by $0.01 per share.

**14. Defendants Aldag and Hamner Were Economically Incentivized to Conceal the June 2023 NMM and the July 2023 DMHC Order, and to Improperly Recognize the $68 Million Q2 2023 Prospect Gain and $13 Million Q3 2023 Prospect Gain**

183. Aldag and Hamner had a strong economic incentive to conceal the June 2023 NMM, and the July 2023 DMHC Order, and to prematurely recognize as much Prospect Gain as possible in 2023—to boost their annual cash bonuses, and Performance-Based Share awards.

184. Under MPW's 2022 executive compensation program, Aldag was eligible for an annual cash bonus equal to 100%, 200%, or 300% of his annual base salary, and Hamner was eligible for an annual cash bonus equal to 100%, 150%, and 225% of his annual base salary, depending on whether certain performance metrics were met or exceeded. Two of those metrics were NFFO and EBITDA.

185. The 2022 executive compensation program ("2022 Comp Program") assigned a weighting of 50% to NFFO when calculating annual cash bonuses—the highest weighting among

all of the relevant performance metrics. The 2022 Comp Program also assigned a weighting of (i) 20% to a leverage ratio calculated as EBITDA/Interest Expense when determining annual cash bonuses, and (ii) 40% to EBITDA when determining Performance-Based Share awards.

186. As per MPW's 2024 Annual Proxy filed on April 17, 2024, disclosing executive compensation in 2023, the formula for calculating annual cash bonuses in 2022 was retained for the 2023 Comp Program for Defendants Aldag and Hamner, while the formula for calculating Performance-Based Share awards was tweaked to increase the EBITDA weighting to 50%, as per the following chart:

| Element | Description | Objective | Pay Philosophy Element |
|---|---|---|---|
| Base Salary | Based on duties, experience, and internal pay equity | Provides a fixed level of cash compensation to attract and retain talented executives | |
| Annual Cash Bonus[1] | 50% Normalized FFO per Share<br>20% EBITDA/Interest Expense<br>10% ESG Initiatives<br>20% Qualitative Performance | Aligns our executives with near-term financial goals and strategic priorities, which for 2023 included Normalized FFO growth and managing leverage<br>As we remained focused on the importance of ESG for both internal and external stakeholders, we continued to include the achievement of ESG initiatives in our annual cash bonus program as standalone assessment criteria<br>Given that the majority of our compensation is based on pre-established metrics and goals, allows for a subjective assessment of performance on a more holistic basis and considers factors that may not be quantifiable | |
| Time-Based Shares | Vest ratably over 3 years | Promotes retention and aligns executives with stockholders | |
| Performance-Based Shares | 50% Strategic Transactions<br>50% EBITDA<br>Absolute and Relative TSR Modifier[2] | Rewards executives for completing transactions aligned with the Company's current goal of paying down debt and reducing leverage, while also giving credit for strategic capital deployment<br>Ensures that executives are focused on profitability and stockholder value creation through EBITDA growth in both the short-term and long-term periods<br>Adjusts payouts to align with long-term stockholder returns on both an absolute and relative basis | |
| 2023 Stock Price Performance Award[3] | One-time award granted to SVPs that vests only if specified stock price hurdles are achieved | Award granted in December 2023 to SVPs to promote retention and further alignment with stockholders and incentivize stock price appreciation | |

187. In connection with awarding annual cash bonuses, the 2023 Comp Program set three benchmarks for NFFO: Threshold ($1.42 per share), Target ($1.46 per share), and Maximum ($1.50 per share), and awarded Aldag and Hamner increasing percentages of their annual base

salary for hitting each benchmark (100%, 200% and 300% for Aldag, and 100%, 150%, and 225% for Hamner), as per the following charts:

**Annual Cash Bonus Plan**

**Annual Cash Bonus Opportunities**

For 2023, cash bonus opportunities for our NEOs as a percent of base salary were as follows:

| Named Executive Officer | Threshold | Target | Maximum |
|---|---|---|---|
| **Edward K. Aldag, Jr.** | 100% | 200% | 300% |
| **R. Steven Hamner** | 100% | 150% | 225% |

**Annual Cash Bonus Plan Metrics**

The cash bonus plan metrics are reviewed annually by the Compensation Committee to ensure continued alignment with our strategic goals for the upcoming year. These goals are critical to our long-term success and are designed to be challenging and rigorous to ensure that we remain focused on differentiated growth and our overall business strategy.

The 2023 cash bonus plan metrics that applied to Mr. Aldag, Mr. Hamner and Mr. McLean are set forth in the following chart:

| Performance Metric | Weighting | Threshold | Target | Maximum | 2023 Achievement |
|---|---|---|---|---|---|
| **Normalized FFO Per Share**<br>Encourages focus on profitability as measured by the most frequently used REIT earnings measurement on a per share basis; mitigates the risk of non-profitable acquisitions or other low-quality growth<br>*Targets consistent with the Company's 2023 guidance.* | 50% | $1.42 | $1.46 | $1.50 | **$1.59** |
| **EBITDA[(1)]/Interest Expense Ratio**<br>Motivates management to maintain financial health and a low cost of capital<br>*The 3.2x target ratio was established based on our historical strategies and debt levels as publicly disclosed during recent years.* | 20% | 3.0x | 3.2x | 3.4x | **3.47x** |
| **Environmental, Social and Corporate Governance**<br>Encourages management to prioritize and execute on annual ESG initiatives<br>*ESG accomplishments include (i) ranked by Modern Healthcare as one of the best places to work and (ii) recognized with a 2022-2023 Green Lease Leaders Silver Certification by the Institute for Market Transformation and the Department of Energy Better Building Alliance.* | 10% | Compensation Committee's Assessment | | | **Achieved Annual ESG Initiatives** |
| **Qualitative Performance Review**<br>Represents indicators of the executive's success in fulfilling his or her responsibilities to the Company and in executing its strategic business plan<br>*See below for additional detail on the Compensation Committee's review of qualitative performance.* | 20% | Compensation Committee's Assessment | | | **Target (see below)** |

188. Improperly recognizing the $68 million Q2 2023 Prospect Gain boosted NFFO in Q2 2023 by $0.11 per share. Had MPW not recognized the additional NFFO of $0.11 per share attributable to the Q2 2023 Prospect Gain, MPW's reported NFFO in 2023 would have dropped from $1.59 per share to $1.48 per share. Moreover, as noted above, in Q3 2023 (ending on September 30, 2023), MPW "doubled down" on its improper recognition of gain subject to a contingency, and recognized the $13 million Q3 2023 Prospect Gain, even though it remained

uncertain as of September 30, 2023, whether the DMHC would approve the Minority Interest Transaction.

189. Combined, the Q2 2023 Prospect Gain and Q3 2023 Prospect Gain resulted in the improper recognition of $82 million in 2023 Prospect Gain. Had the $82 million in Prospect Gain been excluded from revenue in 2023, NFFO in 2023 would have totaled only $1.45 per share. By improperly recognizing the $82 million in 2023 Prospect Gain, MPW boosted its NFFO in 2023 to $1.59 per share—an increase of $0.14 per share.[16]

190. In turn, by boosting NFFO in 2023 by $0.14 per share, improper recognition of the 2023 Prospect Gain allowed Aldag and Hamner to maximize their annual cash bonuses in 2023. Specifically, in 2023, Aldag had a base salary of $1 million, and Hamner had a base salary of $675,000. Given those base salaries, and the calculation of annual cash bonuses under the formula explained above, boosting NFFO in 2023 by $0.14 per share to $1.59 per share enabled Aldag and Hamner to exceed the "Maximum" benchmark of NFFO of $1.50 per share under the formula for calculating annual cash bonuses. As per the tables below, exceeding the "Maximum" benchmark in 2023 of NFFO of $1.50 per share—instead of excluding $0.14 per share, and falling below the "Target" benchmark for NFFO of $1.46 per share—enabled (i) Aldag to boost the 50% of his annual cash bonus attributable to the NFFO metric from $500,000 to $1,500,000—an increase of $1 million, which is equal to his entire annual base salary, and 35.7% of his total annual cash bonus in 2023 of $2.8 million, and (ii) Hamner to boost the 50% of his annual cash bonus attributable to

[16] The math is as follows. According to MPW's Form 10-K, MPW had approximately 598,991,000 shares outstanding as of December 31, 2023. Total NFFO in 2023 was $951,066,000, or $1.59 per share. If the improperly recognized $82 million in 2023 Prospect Gain is excluded, MPW's NFFO in 2023 drops to $869,066,000, or $1.45 per share—a difference of $0.14 per share.

the NFFO metric from $337,500 to $759,375—an increase of $422,000, which is 62.5% of his entire base salary, and 28.7% of his total annual cash bonus in 2023 of $1,417,500:

| **Calculation of Annual Cash Bonus Contribution from Reporting NFFO of $1.59 Per Share in 2023 and Exceeding the "Maximum" Benchmark of NFFO of $1.50 Per Share** | | | | |
|---|---|---|---|---|
| **Executive** | **Base Salary** | **50% NFFO Weighting** | **Percentage If Exceed "Maximum" Threshold for NFFO** | **Annual Cash Bonus Contribution From NFFO** |
| Aldag | $1,000,000 | $500,000 | 300% | $1,500,000 |
| Hamner | $675,000 | $337,500 | 225% | $759,375 |

| **Calculation of Annual Cash Bonus Contribution If NFFO Per Share in 2023 Was Only $1.45 Per Share and Missed the "Target" Benchmark of NFFO of $1.46 Per Share** | | | | |
|---|---|---|---|---|
| **Executive** | **Base Salary** | **50% NFFO Weighting** | **Percentage If Miss "Target" Threshold for NFFO** | **Annual Cash Bonus Contribution From NFFO** |
| Aldag | $1,000,000 | $500,000 | 100% | $500,000 |
| Hamner | $675,000 | $337,500 | 100% | $337,500 |

191. Beyond boosting NFFO in 2023, improperly recognizing the 2023 Prospect Gain in 2023 also boosted EBITDA—another performance metric used to calculate annual cash bonuses (with a 20% weighting), as well as the issuance of Performance-Based Share awards (with a 50% weighting), as per the chart above in paragraph 186.

192. In connection with awarding annual cash bonuses, the 2023 Comp Program set three benchmarks for a ratio calculated as EBITDA/Interest Expense (as per the chart above in paragraph 187): Threshold (3.0x), Target (3.2x), and Maximum (3.4x). The 2023 Prospect Gain would have boosted the EBITDA number used in the numerator of the ratio, and thus made it easier to hit the "Maximum" benchmark. And indeed, as per the chart above in paragraph 187, the

EBITDA/Interest ratio was purportedly 3.47x in 2023, which beat the "Maximum" benchmark. Because the EBITDA/Interest Expense ratio was assigned a 20% weighting when calculating the annual cash bonus, exceeding the "Maximum" benchmark for the EBITDA/Interest ratio in 2023 ratio added another $600,000 to Aldag's annual cash bonus, and another $304,000 to Hamner's annual cash bonus, as per the following table:

| **Calculation of Annual Cash Bonus Contribution Because EBITDA/Interest Ratio Exceeded "Maximum" Benchmark of 3.4x in 2023** | | | | |
|---|---|---|---|---|
| **Executive** | **Base Salary** | **20% Weighting** | **Percentage If Exceed "Target" Threshold for Ratio of 3.4x** | **Annual Cash Bonus Contribution From NFFO** |
| Aldag | $1,000,000 | $200,000 | 300% | $600,000 |
| Hamner | $675,000 | $135,000 | 225% | $304,000 |

193. Further, in 2023, MPW issued Performance-Based Share awards to Aldag and Hamner with calculated values of $8.25 million, and $4.125 million, respectively, based in part on meeting certain targets for EBITDA (which is weighted 50% for purposes of granting such awards, as noted).[17]

### 15. MPW Sharply Decreases the Value of MPW's Investment in PHP Holdings After Entry of the April 2024 DMHC Order

194. As noted, on December 22, 2023, Prospect Plan advised DMHC that, after further consideration, MPT Picasso had "determined not to pursue a full conversion of the convertible note, has no current plans to convert the remaining amount of its convertible note into equity, and therefore no additional filing will be forthcoming."

---

[17] MPW's SEC filings did not directly report EBITDA in 2023 (and instead reported a related metric known as "EBITDARM" in its Quarterly Supplemental Filings that is calculated using different inputs than EBITDA). Thus, it is impossible to determine based on public information the extent to which the annual cash bonuses and Performance-Based Share awards granted to Aldag and Hamner in 2023 would have declined if 2023 EBITDA was adjusted to exclude the $68 million Q2 2023 Prospect Gain, and $13 million Q3 2023 Prospect Gain.

195. On January 15, 2024, Prospect Plan explained that MPT Picasso reached this decision because, among other things, "***the continuing delays in approving [the Minority Interest Transaction] are resulting in undue expense and burden on the parties***."

196. Three months later, on April 18, 2024, the DMHC issued the April 2024 DMHC Order, but only after execution of the April 2024 Undertakings by Defendant Hamner (on behalf of MPT Picasso) and representatives of various Prospect affiliates agreeing, among other things, to (i) initiate a regulatory review before entering into any sale of Prospect Plan; (ii) not issue any additional equity to MPT Picasso without first securing DMHC approval (by way of filing a new notice of material modification); (iii) not convert the PHP Convertible Note into equity without first securing DMHC approval (by way of filing a new notice of material modification); and (iv) address concerns related to the blocking rights. *See* Exhibit D hereto.

197. In the two quarters after execution of the April 2024 Undertakings and entry of the April 2024 DMHC Order, MPW recorded a sharp drop in the value of MPW's interest in Prospect. Specifically, on May 29, 2024, just over a month after execution of the April 2024 Undertakings and entry of the April 2024 DMHC Order, MPW filed its Form 10-Q for Q1 2024. The Q1 2024 Form 10-Q stated that MPW had adjusted the value of its investment in Prospect downward by $201 million as of March 31, 2024, based on updated "indications of interests" from potential bidders for PHP Holdings:

> In regard to PHP Holdings, we account for our investment (both the equity investment and convertible loan) using the fair value option method. ***On May 23, 2024, Prospect's investment bankers informed us that they had received updated indications of interest from prospective bidders for PHP Holdings***. Based on our consideration of information in the updated indications, along with consultations with our third party appraisers, ***we recorded as of March 31, 2024, a $201 million <u>unfavorable fair value adjustment</u>, resulting in a total investment in PHP Holdings of approximately <u>$500 million</u> at March 31, 2024***. Each quarter, we mark such investment to fair value as more fully described in Note 7 to the condensed consolidated financial statements.

198. The $500 million valuation of MPW's interest in Prospect as of March 31, 2024, constituted a 50% drop in the $1 billion valuation that Aldag had previously projected during the Q4 2022 Call.

199. Then in its Q2 2024 Form 10-Q filed on August 9, 2024, MPW stated that it had adjusted the value of its investment in Prospect downward by another $160 million as of June 30, 2024, based on updated "indications of interests" from potential bidders for PHP Holdings:

> In regard to PHP Holdings, we account for our investment (both the equity investment and convertible loan) using the fair value option method. Prospect's investment bankers continue to work through the latest indications of interest from prospective bidders for PHP Holdings. ***Based on our consideration of information in the indications of interest and discussions with the investment bankers, along with consultations with our third party appraisers, we recorded an additional approximate $160 million unfavorable fair value adjustment in the second quarter of 2024 (total unfavorable fair value adjustment in 2024 of $360 million), resulting in a total investment in PHP Holdings of approximately $340 million at June 30, 2024.*** Each quarter, we mark such investment to fair value as more fully described in Note 7 to the condensed consolidated financial statements.

200. The $340 million valuation of MPW's interest in Prospect as of June 30, 2024, constituted a 66% drop in the $1 billion valuation that Aldag had previously projected during the Q4 2022 Call.

201. Based on timing, it is reasonable to infer that the April 2024 Undertakings and the April 2024 DMHC Order contributed to the sharp reduction in the value of MPW's interest in Prospect's managed care business in Q1 and Q2 2024—MPW's investment bankers advised MPW about the reduced bids on ***May 23, 2024***, just over a month after execution of the April 2024 Undertakings and entry of the April 2024 DMHC Order. Moreover, the total reduction in value reported in Q1 and Q2 2024—$360 million—closely matched the drop in value that occurred (approximately $340 million) when the *WSJ* revealed the existence of the June 2023 NMM and the July 2023 DMHC Order on August 18, 2023.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### 1. Materially False and Misleading Statements and Omissions in the May 2023 Release

202. On May 23, 2023, via a Form 8-K, MPW issued the May 2023 Release announcing the Restructuring Transactions. The May 2023 Release stated in relevant part:

> Medical Properties Trust, Inc. (the "Company" or "MPW") (NYSE: MPW) today announced that affiliates of Prospect Medical Holdings ("Prospect") have completed $375 million in new financings from third-party lenders, the proceeds of which will be used to provide Prospect's hospital operations with liquidity and capitalize its managed care business for continued growth and value creation in a vibrant market for such businesses.
>
> * * *
>
> MPW continues to have strong conviction in the embedded value of the Prospect platform and has structured its master leases and security agreements to provide collateral value in addition to its real estate interests, ***including interests in the equity of Prospect's managed care business***. As of the end of the first quarter of 2023, MPW holds $1.6 billion in total assets related to Prospect that are expected to be reconstituted as follows:
>
> - An approximately $513 million investment in six leased California hospitals, subject to a master lease scheduled to resume partial rent payments in September and full rent payments at an 8.44% cash yield in March of 2024;
>
> - A $457 million investment in MPW's Connecticut real estate which, as previously announced, Yale New Haven Health is expected to acquire in a transaction that is expected to close during 2023's third quarter. MPW's investment is expected to be fully recovered through cash proceeds of $355 million at closing and ***equity interests in Prospect's managed care business valued at $103 million***;
>
> - A first lien mortgage loan of $150 million ***and equity interests in the managed care business valued at $100 million***, resulting from the transfer to Prospect of Pennsylvania real estate with a book value of $250 million;
>
> - Loans aggregating approximately $264 million and accrued rent and interest of approximately $56 million, along with the previously announced $50 million convertible loan to the managed care entities are expected to be recovered ***through equity interests in the managed care business***.

203. The bolded and italicized statements in the May 2023 Release in the preceding paragraph touting that MPW expected to receive "equity interests" in Prospect's managed care business valued at $573 million were materially false and misleading because reasonable MPW investors would have understood from those statements that the Restructuring Transactions were a "done deal" without any further requirements or conditions outside the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW. In reality, unbeknownst to MPW investors, (i) the Restructuring Transactions were governed by the Restructuring Agreement; and (ii) under the Restructuring Agreement, the issuance of equity in PHP Holdings to MPW was not a "done deal," but was contingent on the DMHC approving the conversion of the PHP Convertible Note into equity. Disclosure of the need for DMHC approval to convert the PHP Convertible Note into equity would have significantly altered the total mix of information for MPW investors by making them aware of the potential for regulatory risk from the DMHC with respect to the Restructuring Transactions.

**2. Materially False and Misleading Statements and Omissions in <u>the May 2023 Form 8-K</u>**

204. On May 25, 2023, MPW filed the May 2023 Form 8-K disclosing the Restructuring Transactions under Item 8.01, and attaching the May 2023 Release as an exhibit, which was incorporated by reference:

> On May 23, 2023, the Company issued a press release announcing that Prospect Medical Holdings has completed certain recapitalization transactions. A copy of the press release is furnished as Exhibit 99.1 hereto and incorporated herein by reference.

205. The statements from the May 2023 Form 8-K in the preceding paragraph concerning the Restructuring Transactions were rendered materially misleading by the failure to disclose the Restructuring Agreement as a "material definitive agreement" under Item 1.01 of

Form 8-K since, unbeknownst to MPW investors, (i) the Restructuring Transactions were governed by the Restructuring Agreement; and (ii) under the Restructuring Agreement, the issuance of equity in PHP Holdings to MPW was not a "done deal," but was contingent on the DMHC approving the conversion of the PHP Convertible Note into equity. Disclosure of the need for DMHC approval to convert the PHP Convertible Note into equity would have significantly altered the total mix of information for MPW investors by making them aware of the potential for regulatory risk from the DMHC with respect to the Restructuring Transactions.

### 3. Omissions That Rendered Misleading Statements in the Q2 2023 Release, During the Q2 2023 Call, and in the Q2 2023 Form 10-Q

206. Defendants made numerous statements in the Q2 2023 Release issued on August 8, 2023, during the Q2 2023 Call held on August 8, 2023, and in the Q2 2023 Form 10-Q filed on August 9, 2023, concerning the issuance of an equity interest in PHP Holdings to MPW in connection with the Restructuring Transactions, the value of that equity interest, and the monetization of that equity interest, as if the issuance of equity in PHP Holdings to MPW was a "done deal" without any further requirements or conditions outside the control of MPW that had to be fulfilled before monetizable equity interests could be issued to MPW. As alleged below, those statements were rendered misleading by the failure to disclose the June 2023 NMM and the July 2023 DMHC Order in the Q2 2023 Release, during the Q2 2023 Call, and in the Q2 2023 Form 10-Q.

207. The Q2 2023 Release stated in relevant part:

> Net loss for the second quarter ended June 30, 2023 was ($42 million) (($0.07) per diluted share) compared to net income of $190 million ($0.32 per diluted share) in the year earlier period. Included in 2023 second quarter net loss is the . . . recognition of $68 million of 2023 previously unrecorded but contractually owed rent and interest revenue ***from the receipt of equity in PHP Holdings LLC ("PHP")***.

> NFFO for the second quarter ended June 30, 2023 was $285 million ($0.48 per diluted share) compared to $275 million ($0.46 per diluted share) in the year earlier period. Included in 2023 second quarter NFFO is roughly $68 million ($0.11 per diluted share) ***from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue from Prospect Medical Holdings, Inc. ("Prospect")***. In accordance with accounting requirements, the value of MPT's investment in PHP was established at roughly $655 million based on estimates from multiple independent third parties and the application of an appropriate marketability discount.
>
> The Company is narrowing its 2023 calendar estimate of per share net income to $0.33 to $0.37 to account for second quarter results and is also narrowing its estimate of per share NFFO to $1.53 to $1.57. The ranges include Prospect-related income from the expected resumption of partial California rental payments, ***recognition of the PHP equity value received in the second quarter*** and other amounts.

208. During the Q2 2023 Call, Defendant Aldag advised analysts that the "managed care business continues to be profitable and on track to meet revenue and EBITDA targets and timelines. ***They are still planning for a monetization event of the managed care business in 2024***."

209. Later during the Q2 2023 Call, Hamner advised that MPW "***recognized about $68 million in Prospect rent and interest***. ***This is based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for [an equity] interest in Prospect's managed care business***." Hamner then explained how the $82 million "increase" in the value of the "equity interest" issued to MPW in connection with the Restructuring Transactions enabled MPW to recognize the $68 million in Q2 2023 Prospect Gain:

> In brief summary, ***you will recall our May 23rd announcement that as of the end of the first quarter, we carried these assets at approximately $573 million***. After obtaining updated valuations and an appraisal to determine marketability discounts, ***the estimated value of our interest in managed care as of the May closing was approximately $655 million***. That's in addition to our roughly $515 million of leased California hospitals and $355 million of cash that we expect to collect from the sale to Yale of our Connecticut hospitals. ***Accordingly, we recognized in the second quarter the rent and interest that would have been collected in 2023 through the May closing date***.

210. Subsequently, during Q&A, an analyst asked why MPW had not revised its NFFO guidance in connection with the announcement of the Restructuring Transactions in May 2023, if such transactions purportedly gave rise to a gain. Hamner responded in relevant part:

> [T]he transaction happened on May 23rd and as I tried to point out earlier, we had multiple validations, multiple independent third parties who took different perspectives on the value of the managed care business. It's a private company.
>
> It's not uncomplicated that what Prospect has done is to extract various different operations and subsidiaries from across the Prospect ownership and put it into a single operating company and measure that and then provide that information to the appraisers and so forth, such that. ***We only got something that the auditors were able to look at and we were confident in the $655 million value***. ***That didn't happen on May 23rd. It didn't happen for six-plus weeks afterwards*** . . . ***[W]e just simply didn't have the information until more recently.***

211. The Q2 2023 Form 10-Q stated in relevant part:

> On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third party lenders, we agreed to the following restructuring of our $1.7 billion investment in Prospect including . . . e) ***obtain[ing] a non-controlling ownership interest in PHP Holdings of approximately $654 million***, after applying a discount for lack of marketability, ***consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings*** . . . This non-controlling ownership interest [valued at $654 million] was received in exchange for unpaid rent and interest through December 2022, ***previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million***, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.

212. The bolded and italicized portions in each of the statements in paragraphs 207-211 above appearing in the Q2 2023 Release or the Q2 2023 Form 10-Q, or made during the Q2 2023 Call, were misleading "half-truths." Specifically, the bolded and italicized portions in each of the statements above advised MPW investors that (i) MPW had received an equity interest in PHP Holdings pursuant to the Restructuring Transactions, (ii) such equity interest had purportedly increased in value by $82 million to $655 million since May 23, 2023, resulting in the recognition

of $68 million in "revenue" in Q2 2023, or (iii) such equity interest would eventually be monetized. Those statements, however, were rendered misleading by the omission of critical qualifying information concerning pending regulatory action by the DMHC posing a substantial risk to the validity of that equity interest, *i.e.*, that (i) on June 23, 2023, Prospect had submitted the June 2023 NMM seeking approval the Minority Interest Transaction under Section 1399.65 in response to the DMHC's unexpected request to process review and approval of the Minority Interest Transaction as a notice of material modification; and (ii) on July 20, 2023, the DMHC had issued the July 2023 DMHC Order, which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction pending the DMHC's fulsome review of the circumstances of the Minority Interest Transaction. Disclosure of the June 2023 NMM and the July 2023 DMHC Order that MPW held back would have significantly altered the total mix of information for MPW investors by making them aware of pending regulatory action by the DMHC posing a substantial risk to the validity of the equity interest in PHP Holdings issued to MPW, *i.e.*, that the DMHC might subject approval of the Minority Interest Transaction to onerous conditions, or not approve the Minority Interest Transaction altogether, which would derail the Restructuring Transactions by invalidating the issuance of equity in PHP Holdings to MPW under the Restructuring Agreement (which was the central premise of the Restructuring Transactions).

### 4. Materially False and Misleading Statements in the Q2 2023 Release

213. The Q2 2023 Press Release stated in relevant part:

> NFFO for the second quarter ended June 30, 2023 was $285 million ($0.48 per diluted share) compared to $275 million ($0.46 per diluted share) in the year earlier period. ***Included in 2023 second quarter NFFO is roughly $68 million ($0.11 per diluted share) from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue from Prospect Medical Holdings, Inc. ("Prospect")***. In accordance with accounting requirements, the value of MPW's investment in PHP was established at roughly $655 million based on estimates from multiple independent third parties and the application of an appropriate marketability discount.

> The Company is narrowing its 2023 calendar estimate of per share net income to $0.33 to $0.37 to account for second quarter results and is also narrowing its estimate of per share NFFO to $1.53 to $1.57. The ranges include Prospect-related income from the expected resumption of partial California rental payments, ***recognition of the PHP equity value received in the second quarter*** and other amounts. The estimates are based on an existing portfolio which includes the impact of binding disposition and leasing transactions and excludes expected future contributions from development and other capital projects.

214. The bolded and italicized statements in the Q2 2023 Release in the preceding paragraph that (i) "***[i]ncluded in 2023 second quarter NFFO is roughly $68 million*** . . . ***from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue***" from Prospect," and (ii) estimated NFFO of $1.53 to $1.57 per share for 2023 included "***recognition of the PHP equity value received in the second quarter***" ("Q2 2023 Release Statements"), were materially false and misleading because they violated GAAP. Specifically, (i) the risk that the DMHC might not approve the Minority Interest Transaction was a regulatory risk of which Defendants would have become aware no later than June 20, 2023 (due to the Three Business Day NMM Review Requirement); and (ii) the subsequent issuance of the July 2023 DMHC Order (which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction) provided additional evidence concerning that regulatory risk. In turn, the existence of that regulatory risk made any gain from the Minority Interest Transaction subject to a "contingency" (*i.e.*, uncertainly concerning whether the DMHC would approve the Minority Interest Transaction) no later than June 23, 2023, which "contingency" was confirmed by a Type 1 subsequent event (i.e., the July 2023 DMHC Order). Because of that contingency, GAAP (specifically ASC 450-30-25-1 and ASC 855-10-25-1) prohibited MPW from recognizing as revenue any gain in Q2 2023 from MPW's receipt of equity in PHP Holdings under the Restructuring Agreement until the contingency was resolved (since an unfavorable resolution

would have invalidated the issuance of equity to MPW under the Restructuring Agreement). Nevertheless, while the contingency remained unresolved, MPW violated GAAP by prematurely recognizing the $68 million Q2 2023 Prospect Gain as revenue in Q2 2023 on account of its receipt of equity in PHP Holdings under the Restructuring Agreement. Under the SEC's regulations (17 C.F.R § 210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in accordance with GAAP are "***presumed*** to be misleading or inaccurate."

215. The Q2 2023 Release Statements were also materially false and misleading because they violated MPW's internal accounting policy providing that calculation of NFFO should exclude any gain from non-core events in order to avoid making "comparison to prior period results and market expectations ***less meaningful to investors and analysts***." Nevertheless, even though the $68 million Q2 2023 Prospect Gain derived from a concededly non-core event (i.e., the Restructuring Transactions), MPW did not exclude the $68 million Q2 2023 Prospect Gain from the calculation of NFFO for Q2 2023, thus concededly misleading MPW investors concerning the magnitude of NFFO for Q2 2023. As noted above, for this reason, Hedgeye added back the $68 million when calculating FFO-related metrics.

**5. <u>Materially False and Misleading Statements During the Q2 2023 Call</u>**

216. On August 8, 2023, MPW conducted the Q2 2023 Call to discuss Q2 2023 results. On that call, Defendant Hamner stated in relevant part:

> ***[W]e recognized about $68 million in Prospect rent and interest. This is based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for [an] interest in Prospects managed care business***.
>
> In brief summary, you will recall our May 23rd announcement that as of the end of the first quarter, we carried these assets at approximately $573 million. After obtaining updated valuations and an appraisal to determine marketability discounts, the estimated value of our interest in managed care as of the May closing was approximately $655 million. That's in addition to our roughly $515 million of leased California hospitals and $355 million of cash that we expect to collect from

> the sale to Yale of our Connecticut hospitals. ***Accordingly, we recognized in the second quarter the rent and interest that would have been collected in 2023 through the May closing date***.

217. The bolded and italicized statements made by Hamner during the Q2 2023 Call in the preceding paragraph that (i) "***we recognized about $68 million in Prospect rent and interest . . . based on the previously disclosed Prospect recapitalization transactions that included our exchange of certain real estate and other assets for interest in Prospects managed care business***" and (ii) "***we recognized in the second quarter the rent and interest that would have been collected in 2023 through the May closing date***" ("Q2 2023 Call Statements") were materially false and misleading because they violated GAAP. Specifically, (i) the risk that the DMHC might not approve the Minority Interest Transaction was a regulatory risk of which Defendants would have become aware no later than June 20, 2023 (due to the Three Business Day NMM Review Requirement); and (ii) the subsequent issuance of the July 2023 DMHC Order (which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction) provided additional evidence concerning that regulatory risk. In turn, the existence of that regulatory risk made any gain from the Minority Interest Transaction subject to a "contingency" (*i.e.*, uncertainly concerning whether the DMHC would approve the Minority Interest Transaction) no later than June 23, 2023, which "contingency" was confirmed by a Type 1 subsequent event (i.e., the July 2023 DMHC Order). Because of that contingency, GAAP (specifically ASC 450-30-25-1 and ASC 855-10-25-1) prohibited MPW from recognizing as revenue any gain in Q2 2023 from MPW's receipt of equity in PHP Holdings under the Restructuring Agreement until the contingency was resolved (since an unfavorable resolution would have invalidated the issuance of equity to MPW under the Restructuring Agreement). Nevertheless, while the contingency remained unresolved, MPW violated GAAP by prematurely recognizing the $68 million Q2 2023 Prospect Gain as

revenue in Q2 2023 on account of its receipt of equity in PHP Holdings under the Restructuring Agreement. Under the SEC's regulations (17 C.F.R § 210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in accordance with GAAP are "***presumed*** to be misleading or inaccurate."

### 6. Materially False and Misleading Statements in the Q2 2023 Form 10-Q

218. On August 9, 2023, MPW filed the Q2 2023 Form 10-Q with the SEC reporting its financial and operational results for Q2 2023 ending on June 30, 2023. That filing stated, in relevant part:

> On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third party lenders, we agreed to the following restructuring of our $1.7 billion investment in Prospect including . . . e) ***obtain[ing] a non-controlling ownership interest in PHP Holdings of approximately $654 million***, after applying a discount for lack of marketability, ***consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings . . . This non-controlling ownership interest [valued at $654 million] was received in exchange for*** unpaid rent and interest through December 2022, ***previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million***, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.[18]

[18] The Q2 2023 Prospect Gain was 20.3% of MPW's revenue in Q2 2023.

219. The recognition of the $68 million Q2 2023 Prospect Gain as revenue was incorporated into the "Revenues" section of MPW's income statement for Q2 2023 under "Income from financing leases" and "Interest and other income":

Condensed Consolidated Statements of Net Income
(Unaudited)

| (In thousands, except per share amounts) | For the Three Months Ended June 30, 2023 | 2022 |
|---|---|---|
| **Revenues** | | |
| Rent billed | $ 247,491 | $ 241,209 |
| Straight-line rent | (39,329) | 58,518 |
| Income from financing leases | 68,468 | 51,873 |
| Interest and other income | 60,765 | 48,626 |
| Total revenues | 337,395 | 400,226 |
| **Expenses** | | |
| Interest | 104,470 | 87,730 |
| Real estate depreciation and amortization | 364,403 | 84,334 |
| Property-related | 24,676 | 21,135 |
| General and administrative | 35,604 | 38,858 |
| Total expenses | 529,153 | 232,057 |
| **Other income (expense)** | | |
| Gain on sale of real estate | 167 | 16,355 |
| Real estate and other impairment charges | — | — |
| Earnings from equity interests | 12,224 | 14,785 |
| Debt refinancing and unutilized financing costs | (816) | (619) |
| Other (including fair value adjustments on securities) | (10,512) | 2,031 |
| Total other income (expense) | 1,063 | 32,552 |
| (Loss) income before income tax | (190,695) | 200,721 |
| Income tax benefit (expense) | 148,262 | (10,657) |
| **Net (loss) income** | (42,433) | 190,064 |

220. The (i) bolded and italicized statement made in the Q2 2023 Form 10-Q in paragraph 218 above that "***[t]his non-controlling ownership interest was received in exchange for . . . previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million***" ("Q2 2023 Form 10-Q Statement"), and (ii) income statement in paragraph 219 above with the $68 million Q2 2023 Prospect Gain included in "income from financing leases" and "interest and other income," were materially false and misleading because they violated GAAP. Specifically, (i) the risk that the DMHC might not approve the Minority Interest Transaction was a regulatory risk of which Defendants would have become aware no later than June 20, 2023 (due

to the Three Business Day NMM Review Requirement); and (ii) the subsequent issuance of the July 2023 DMHC Order (which postponed the effectiveness and prohibited the implementation of the Minority Interest Transaction) provided additional evidence concerning that regulatory risk. In turn, the existence of that regulatory risk made any gain from the Minority Interest Transaction subject to a "contingency" (*i.e.*, uncertainly concerning whether the DMHC would approve the Minority Interest Transaction) no later than June 23, 2023, which "contingency" was confirmed by a Type 1 subsequent event (i.e., the July 2023 DMHC Order). Because of that contingency, GAAP (specifically ASC 450-30-25-1 and ASC 855-10-25-1) prohibited MPW from recognizing as revenue any gain in Q2 2023 from MPW's receipt of equity in PHP Holdings under the Restructuring Agreement until the contingency was resolved (since an unfavorable resolution would have invalidated the issuance of equity to MPW under the Restructuring Agreement). Nevertheless, while the contingency remained unresolved, MPW violated GAAP by prematurely recognizing the $68 million Q2 2023 Prospect Gain as revenue in Q2 2023 on account of its receipt of equity in PHP Holdings under the Restructuring Agreement. Under the SEC's regulations (17 C.F.R § 210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in accordance with GAAP are "***presumed*** to be misleading or inaccurate."

221. The Q2 2023 Form 10-Q also contained the following table ("NFFO Table") displaying the calculation of NFFO in Q2 2023:

| | For the Three Months Ended | |
|---|---|---|
| | June 30, 2023 | June 30, 2022 |
| **FFO information:** | | |
| Net (loss) income attributable to MPT common stockholders | $ (42,037) | $ 189,597 |
| Participating securities' share in earnings | (469) | (345) |
| Net (loss) income, less participating securities' share in earnings | $ (42,506) | $ 189,252 |
| Depreciation and amortization | 382,244 | 101,976 |
| Gain on sale of real estate | (167) | (16,355) |
| Real estate impairment charges | — | — |
| Funds from operations | $ 339,571 | $ 274,873 |
| Write-off (recovery) of unbilled rent and other | 95,642 | 1,943 |
| Other impairment charges | — | — |
| Litigation and other | 2,502 | — |
| Share-based compensation adjustments | (4,363) | (966) |
| Non-cash fair value adjustments | 8,374 | (943) |
| Tax rate changes and other | (157,230) | (825) |
| Debt refinancing and unutilized financing costs | 816 | 619 |
| Normalized funds from operations | $ 285,312 | $ 274,701 |

222. The NFFO Table in the preceding paragraph was materially false and misleading because it violated MPW's internal accounting policy providing that calculation of NFFO should exclude any gain from non-core events in order to avoid making "comparison to prior period results and market expectations ***less meaningful to investors and analysts***." Nevertheless, even though the $68 million Q2 2023 Prospect Gain derived from a concededly non-core event (i.e., the Restructuring Transactions), MPW did not exclude the $68 million Q2 2023 Prospect Gain from the calculation of NFFO for Q2 2023, thus concededly misleading MPW investors concerning the magnitude of NFFO in Q2 2023. As noted above, for this reason, Hedgeye added back the $68 million when calculating FFO-related metrics.

223. The Q2 2023 Form 10-Q also contained a certification ("Aldag Certification") signed by Defendant Aldag stating:

> I, Edward K. Aldag, Jr., certify that:
>
> 1) I have reviewed this quarterly report on Form 10-Q of Medical Properties Trust, Inc.;
>
> 2) Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements***

> ***made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3) Based on my knowledge, ***the financial statements, and other financial information included in this report***, ***fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;
>
> 4) The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . and have . . . b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding reliability of financial reporting and the preparation of financial statements for external purposes ***in accordance with generally accepted accounting principles***.

224. The bolded and italicized statements in the Aldag Certification above that (i) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading with respect to the period covered by this report;" (ii) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; and (iii) Q2 2023 Form 10-Q was prepared "in accordance with generally accepted accounting principles," were materially false and misleading statements because, as alleged above, the Q2 2023 Form 10-Q violated GAAP, and contained materially false and misleading statements and omissions. Moreover, given the reasonable inference that Aldag was aware of the June 2023 NMM, and the July 2023 DMHC Order (since he closely monitored the Restructuring Transactions), and that Aldag would have known that neither document was disclosed in the Q2 2023 Form 10-Q, Aldag could not have legitimately believed his statement that the Q2 2023 Form 10-Q did not omit any material fact necessary to make statements in the Q2 2023 Form 10-Q not misleading. As noted above, omission of the June 2023 NMM and the July 2023 DMHC Order from the Q2 2023 Form 10-Q rendered

misleading multiple statements therein concerning the equity interests in PHP Holdings issued to MPW.

225. The Q2 2023 Form 10-Q also contained a certification ("Hamner Certification") signed by Defendant Hamner stating:

> I, R. Steven Hamner, certify that:
>
> 1) I have reviewed this quarterly report on Form 10-Q of Medical Properties Trust, Inc.;
>
> 2) Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3) Based on my knowledge, ***the financial statements, and other financial information included in this report***, ***fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;
>
> 4) The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . and have . . . b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding reliability of financial reporting and the preparation of financial statements for external purposes ***in accordance with generally accepted accounting principles***.

226. The bolded and italicized statements in the Hamner Certification that (i) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading with respect to the period covered by this report;" (ii) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; and (iii) Q2 2023 Form 10-Q was prepared "in accordance with generally accepted accounting principles," were materially false and misleading statements because, as alleged above, the Q2 2023 Form 10-Q violated GAAP, and contained

materially false and misleading statements and omissions. Moreover, given the reasonable inference that Hamner was aware of the June 2023 NMM, and the July 2023 DMHC Order (since he closely monitored the Restructuring Transactions, including signing the Restructuring Agreement, which entitled him to review the June 2023 NMM before its submission to the DMHC), and that Hamner would have known that neither document was disclosed in the Q2 2023 Form 10-Q, Hamner could not have legitimately believed his statement that the Q2 2023 Form 10-Q did not omit any material fact necessary to make statements in the Q2 2023 Form 10-Q not misleading. As noted above, omission of the June 2023 NMM and the July 2023 DMHC Order from the Q2 2023 Form 10-Q rendered misleading multiple statements therein concerning the equity interests in PHP Holdings issued to MPW.

## LOSS CAUSATION

227. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased MPW securities at artificially inflated prices and were damaged thereby. The price of MPW securities declined when the concealed risks materialized and/or when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

228. Specifically, artificial inflation in the price of MPW securities was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions, as detailed above, was partially revealed to the public on August 18, 2023 by the WSJ article, as alleged herein.

229. In response to the *WSJ* article, the price of MPW's common stock fell to a closing price of $6.93 per share on August 18, 2023, a decline of $0.57 per share, or 7.6%, from the closing price of $7.50 on August 17, 2023.

## ADDITIONAL SCIENTER ALLEGATIONS

230. The allegations herein establish a strong inference of scienter on the part of the Defendants with respect to the materially false and misleading statements and omissions alleged herein for the following non-exclusive reasons. *First*, Prospect was MPW's third largest tenant on a "total asset basis" with assets attributable to MPW's relationship with Prospect valued at $1.48 billion, or 7.5% of MPW's total assets, as of December 31, 2022. Additionally, MPW disclosed as a "Concentration of Credit Risk" that revenue from Prospect represented more than 10% of MPW's total revenue in 2022. Thus, under the "core operations doctrine," MPW's challenges with respect to Prospect were an ongoing material concern for Aldag and Hamner, as evidenced by their detailed updates and explanations concerning MPW's restructuring efforts with respect to Prospect shared with analysts on quarterly conference calls before, during and after the Class Period, as alleged above.

231. *Second*, the specificity of the updates and explanations concerning MPW's restructuring efforts with respect to Prospect that Aldag and Hamner shared with analysts on quarterly conference calls before, during and after the Class Period, demonstrates that both Aldag and Hamner received specific information concerning MPW's ongoing restructuring efforts with respect to Prospect, and closely monitored those efforts, and thus would have been aware of the regulatory snags with the DMHC. That is especially true with respect to Hamner who signed both the Restructuring Agreement in May 2023, and then the April 2024 Undertakings to secure DMHC approval of the Minority Interest Transaction. Thus, it is reasonable to infer that Hamner was well aware of the status and progress of the DMHC approval process from start to finish.

232. *Third*, Aldag and Hamner benefited economically from the improper and premature recognition of the $68 million in Prospect Gain in Q2 2023 and $13 million in Prospect Gain in Q3 2023 in violation of GAAP because their annual cash bonuses and Performance-Based Share

awards were tied in part to NFFO and EBITDA, both of which were boosted by the improper and premature recognition of Prospect Gain in 2023, as alleged above.

233. *Fourth*, both Defendants Aldag and Hamner signed Sarbanes-Oxley certifications attached to the Q2 2023 (as specified above), and Defendant Hanna signed the Q2 2023 Form 10-Q, even though the Q2 2023 Form 10-Q violated GAAP, and contained materially false and misleading statements and omissions, as alleged above.

234. *Fifth,* by reporting the non-cash $68 million Q2 2023 Prospect Gain as revenue during Q2 2023, based on the reported $82 million increase in the value of MPW's interest in Prospect, Defendants adopted a position that was inconsistent with recent prior public statements that MPW would be recognizing rent and income from Prospect on a "cash only" basis. And then in Q3 2023, MPW reported a $30 million increase in the value of MPW's interest in Prospect, but inconsistently did *not* recognize this increase as revenue. As noted, multiple analysts sharply criticized Defendants for these blatantly inconsistent accounting shenanigans. Moreover, as noted, in an April 2024 letter to Aldag, Senators Warren and Markey accused MPW of playing accounting games with rent with respect to a different tenant to "bolster its stock price, and report lucrative cash flows." Thus, multiple third parties have perceived that Defendants deliberately manipulated MPW's accounting to derive economic benefits.

235. *Sixth*, in violation of Item 601 of the SEC's Regulation S-K requiring publicly-traded companies to attach a "material contract . . . [that] is executed or becomes effective during [a] reporting period" as "an exhibit to the Form 10–Q or Form 10–K filed for the corresponding period" (17 C.F.R. § 229.601(a)(4)), MPW failed to attach the Restructuring Agreement as an exhibit to its Q2 2023 Form 10-Q, despite disclosing the Restructuring Transactions in the Q2 2023 Form 10-Q. This failure was particularly significant for Hamner who (i) signed the

Restructuring Agreement on behalf of MPT Picasso and other MPW affiliates, and was thus personally aware of the material terms of the Restructuring Agreement, and (ii) certified the Q2 2023 Form 10-Q, despite the failure to attach the Restructuring Agreement as an exhibit to the Q2 2023 Form 10-Q. The failure to attach the Restructuring Agreement as an exhibit to MPW's Q2 2023 Form 10-Q—or to *any other* SEC filing by MPW—evidences an intent to conceal the material terms of the Restructuring Agreement from MPW investors.

## CLASS ACTION ALLEGATIONS

236. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all individuals who and entities that purchased or otherwise acquired MPW securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

237. The members of the Class are so numerous that joinder of all members is impracticable. As noted, MPW had approximately 598,991,000 shares outstanding as of December 31, 2023. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MPW or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

238. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

239. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

240. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants violated the federal securities laws by the acts and omissions alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of MPW, so as to render such statements materially false and misleading;
- whether the Individual Defendants caused MPW to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of MPW securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

241. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**PRESUMPTION OF RELIANCE**

242. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- MPW securities are traded in an efficient market on the NYSE;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold MPW securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

243. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

244. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

245. The protections applicable to forward-looking statements do not apply to any of the false or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made. No cautionary language could, or did, protect Defendants' material misstatements of present and historical fact.

246. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures the Company or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of the Company who knew that the statement was untrue or misleading when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

247. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

248. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

249. As specified above, during the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs

and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MPW securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire MPW securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

250. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MPW securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MPW's finances and business prospects.

251. By virtue of their positions at MPW, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants

were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

252. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of MPW, the Individual Defendants had knowledge of the details of MPW's internal affairs.

253. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of MPW. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MPW's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of MPW securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning MPW's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired MPW securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon materially false and misleading statements disseminated by Defendants, and were damaged thereby.

254. During the Class Period, MPW securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of MPW securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of MPW securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of MPW securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and other Class members.

255. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating materially false and misleading statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

257. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

258. During the Class Period, the Individual Defendants participated in the operation and management of MPW, and conducted and participated, directly and indirectly, in the conduct

of MPW's business affairs. Because of their senior positions, they knew the adverse non-public information about MPW's misstatement of income and expenses and false financial statements.

259. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MPW's financial condition and results of operations, and to correct promptly any public statements issued by MPW which had become materially false or misleading.

260. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MPW disseminated in the marketplace during the Class Period concerning MPW's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MPW to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of MPW within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MPW securities.

261. Each of the Individual Defendants, therefore, acted as a controlling person of MPW. By reason of their senior management positions and/or being directors of MPW, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, MPW to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of MPW and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

262. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MPW.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives, and Lead Counsel as Class Counsel;

B. Requiring Defendants to pay all damages sustained by Plaintiffs and the Class by reason of the acts and omissions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 30, 2024

Respectfully submitted,

POMERANTZ LLP

*/s/ Jonathan D. Park*
Jeremy A. Lieberman
Jonathan D. Park
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jpark@pomlaw.com

*Lead Counsel for the Proposed Class*

WOHL & FRUCHTER LLP
Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773

jfruchter@wohlfruchter.com

*Additional Counsel for Plaintiffs*

# EXHIBIT A

Execution Version

**AMENDED AND RESTATED**
**MASTER RESTRUCTURING AGREEMENT**
**(Vista Investment)**

**THIS AMENDED AND RESTATED MASTER RESTRUCTURING AGREEMENT** (this "Agreement") is made and entered into effective as of this 23rd day of May, 2023, by and among **PROSPECT MEDICAL HOLDINGS, INC.**, a Delaware corporation ("Prospect Medical"), **PHP HOLDINGS, LLC**, a Delaware limited liability company ("PHP Holdings"), **PROSPECT HEALTHCARE FACILITIES MANAGEMENT, LLC** f/k/a PHC HoldCo, Inc., a Delaware limited liability company ("ManageCo"), and each of their respective undersigned Affiliates (such Affiliates, together with Prospect Medical, PHP Holdings, and ManageCo, collectively, the "Prospect Parties") on the one hand, and **MPT PICASSO INVESTORS TRS, LLC**, a Delaware limited liability company ("MPT Picasso TRS"), and its undersigned Affiliates (such Affiliates, together with MPT Picasso TRS, collectively, the "MPT Parties") on the other hand. The Prospect Parties and the MPT Parties are herein sometimes referred to individually as a "Party" and collectively, as the "Parties".

**W I T N E S E T H:**

**WHEREAS**, the capitalized terms used in these recitals and throughout this Agreement have the respective meanings ascribed to them in the Glossary of Defined Terms attached hereto as ***ANNEX A***;

**WHEREAS**, (a) the Master Lease I Lessors and Master Lease I Lessees are parties to Master Lease I, pursuant to which such Master Lease I Lessors lease to such Master Lease I Lessees certain real property and improvements consisting of multiple healthcare facilities, as more particularly described in Master Lease I; (b) the Master Lease II Lessors and Master Lease II Lessees are parties to Master Lease II, pursuant to which such Master Lease II Lessors lease to such Master Lease II Lessees certain real property and improvements consisting of multiple healthcare facilities, as more particularly described in Master Lease II; (c) the MPT Foothill Lender, Alta Newport, and Foothill Propco (as assignee) are parties to the Foothill Mortgage Loan Agreement, pursuant to which the MPT Foothill Lender made certain mortgage loans to Alta Newport, as evidenced by the Foothill Mortgage Loan Note and secured by, among other things, the Foothill Mortgage (and Alta Newport assigned all of its rights, title, and interest to the Foothill Facility (and certain related realty assets described therein) to Foothill Propco as described in Section 3.1(c) hereof); (d) the MPT TRS Lender made a term loan to Prospect Medical in the amount of One Hundred Twelve Million Nine Hundred Thirty Seven Thousand Two Hundred Four and No/100 Dollars ($112,937,204.00), which term loan is evidenced by the TRS Note; and (e) MPT Picasso TRS made a convertible term loan to PHP Holdings in the amount of Fifty Million and No/100 Dollars ($50,000,000.00), which convertible term loan is evidenced by the MPT Advance Convertible Note;

**WHEREAS**, the Released Defaults of certain of the Prospect Parties currently exist under the foregoing documents and certain other agreements entered into by certain of the Prospect Parties in connection therewith, each being subject to the Forbearance Agreement;

**WHEREAS**, pursuant to the terms of that certain Term Sheet dated March 30, 2023 between MPT Picasso TRS and Prospect Medical (as amended or modified from time to time, the "Restructuring Term Sheet"), the Parties now desire: (a) that the MPT Parties agree to release, waive, and refrain from exercising available rights and remedies against the Prospect Parties and their respective Affiliates with respect to, the Released Defaults, and (b) that the Parties engage in the Equity Rollover Transactions and the Restructuring Transactions herein described, it being the intent of the Parties that PHP Holdings obtained prior hereto, and will hereafter own at all times, all of the Managed Care Business which will be operated separately from the portfolio of other entities previously owned and controlled by Prospect Medical;

**WHEREAS**, in connection therewith, the Parties desire to amend and restate the Original Restructuring Agreement in order to effect the Equity Rollover Transactions and the Restructuring Transactions as further described herein; and

**WHEREAS**, as a result of the direct and indirect benefits (financial and otherwise) that each of the Prospect Parties and the MPT Parties has derived, and will continue to derive, from the transactions described in this Agreement, as a condition to the release and waiver of the Released Defaults and consummation of the Equity Rollover Transaction and the Restructuring Transactions as described herein, the Parties desire to enter into this Agreement and the other Restructuring Documents, to reflect certain additional rights, covenants, and obligations of the Parties.

**NOW, THEREFORE**, in consideration of the promises and mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby amend and restate the Original Restructuring Agreement as set forth herein and agree as follows:

## ARTICLE I
## DEFINED TERMS; INTERPRETATION

**1.1.** **Certain Defined Terms**. Capitalized terms used herein shall have the respective meanings ascribed to them in the Glossary of Defined Terms attached hereto as ***ANNEX A***.

**1.2.** **Interpretation; Terms Generally**. The definitions set forth in Section 1.1 and elsewhere in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless otherwise indicated, the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The words "herein", "hereof" and "hereunder" and words of similar import shall be deemed to refer to this Agreement (including the Schedules and Exhibits) in its entirety and not to any part hereof, unless the context shall otherwise require. All references herein to parties, Articles, Sections, Schedules and Exhibits shall be deemed to refer to parties, Articles, Sections and Schedules of, and Exhibits to, this Agreement, unless the context shall otherwise require. Unless the context shall otherwise require, any references to any agreement or other instrument or statute or regulation are to it as amended and supplemented from time to time (and, in the case of a statute or regulation, to any corresponding provisions of successor statutes or regulations). Any reference in this Agreement to a "day" or number of "days" that does not refer explicitly to a "Business Day" or "Business Days" shall be interpreted as a reference to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice shall be deferred until, or may be taken or given on, the next Business Day.

## ARTICLE II
## ACKNOWLEDGMENTS; RELEASES AND WAIVERS

**2.1.** **General Inducement**. The Outstanding Obligations represent valid and enforceable, secured, cross-collateralized, and cross-defaulted indebtedness obligations of substantial value of Prospect Medical owed to the MPT Parties. The preferred financial rights granted to the holder of PHPH Series A-1 Preferred Units, together with the consent rights related to major decisions granted to the holder of PHPH Series A-1 Preferred Units (including, without limitation, the right of MPT Picasso TRS to consent to any bankruptcy, dilutive events, incurrence of debt, insolvency, liquidation or dissolution of PHP Holdings), are a material inducement to the applicable MPT Parties to enter into this Agreement, to waive, release and

refrain from exercising the MPT Parties' rights and remedies with respect to the Released Defaults, and to participate in the Equity Rollover Transaction and the Restructuring Transactions contemplated herein.

**2.2. Outstanding Obligations**. The Prospect Parties hereby acknowledge that the amount of each of the Outstanding Obligations as of the date hereof is the amount set forth in the attached ***EXHIBIT A***, and that certain of the Outstanding Obligations are cross-collateralized and guaranteed by Prospect Medical pursuant to, and to the extent provided in, the Master Lease I, Master Lease II, the Foothill Mortgage Loan Documents, the TRS Note, the MPT Advance Convertible Note, and any other related agreements and security documents entered into by certain of the Prospect Parties in connection therewith.

**2.3. Financial and Structural Matters**. The Parties hereby acknowledge and agree that the transactions contemplated herein are being entered into by each of them based upon the following assumptions:

(a) the ownership and structure of the Prospect Parties and their respective Subsidiaries as reflected on the Organizational Chart attached hereto as ***EXHIBIT B*** (the "Prospect Organizational Chart") are complete, true, and correct in all respects on the date hereof, effective immediately following the closing of the Phase I Transactions;

(b) the aggregate *net equity value* of PHP Holdings and its Subsidiaries is equal to One Hundred Fifty-Three Million Six Hundred Sixty-Two Thousand Four Hundred Two Dollars Twenty-Six Cents ($153,662,402.26) (the "PHPH Net Equity Value") and, for the purposes of issuance of any of PHP Holdings' Equity Interests or any convertible notes (including, as applicable, the PHPH Series A-1 Preferred Units issued upon conversion of such convertible notes) to MPT Picasso TRS as contemplated herein on the date hereof, the PHPH Net Equity Value of PHP Holdings shall be used for purposes of determining the amount and value of such PHP Holdings' Equity Interests or convertible notes received by MPT Picasso TRS;

(c) on the date hereof, PhysicianCo Term Loan Lenders have made a term loan to PHPH MidCo and Physician Holdings (collectively, the "PhysicianCo Term Loan Borrowers") in the aggregate original principal amount of Three Hundred Seventy-Five Million and No/100 Dollars ($375,000,000.00) ( the "PhysicianCo Term Loan");

(d) on the date hereof, MPT Picasso TRS provided a delayed draw term loan facility to Prospect Medical in the maximum principal amount of Seventy-Five Million and No/100 Dollars ($75,000,000.00), pursuant to the terms of the HospitalCo Term Loan Agreement; and

(e) PHP Holdings shall conduct its business as a Bankruptcy Remote Entity at all times after the date hereof in accordance with the terms hereof.

**2.4. Satisfaction of Released Defaults**.

(a) Immediately upon consummation of the Phase I Transactions contemplated in this Agreement, each of the Released Defaults shall, without further action by the MPT Parties, for themselves and their heirs, personal representatives, administrators, successors, and assigns (collectively, including the MPT Parties, the "MPT Releasing Parties"), be forever expressly released, cured, discharged, and waived, unconditionally and irrevocably as against the Prospect Parties and their respective Affiliates, and each of their heirs, personal representatives, officers, directors, managers, employees, administrators, agents, successors, and assigns (collectively, the "Prospect Released Parties").

(b) Each MPT Releasing Party, for itself and on behalf of any other MPT Releasing Party, acknowledges that the legal requirements of many states provide substantially the following:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The MPT Parties for itself and on behalf of any MPT Releasing Parties understand that the foregoing gives the MPT Releasing Parties the right not to release existing claims of which the MPT Releasing Parties are not aware, unless the MPT Releasing Parties voluntarily choose to waive this right. Having been so apprised, but subject in all respects to Section 2.4(e) hereof, the MPT Parties for itself and on behalf of any MPT Releasing Parties nevertheless hereby voluntarily elect to and waive the rights described above solely with respect to the Released Defaults (or such other comparable statute, rule, regulation or order), and elect to assume all risks for claims that exist, existed or may hereafter exist in its favor, known or unknown, suspected or unsuspected, solely arising out of or related to the Released Defaults, in each case, effective upon the date hereof. The MPT Parties for itself and on behalf of any MPT Releasing Parties acknowledge and agree that the foregoing waiver is an essential and material term of the release of the Released Defaults by the MPT Releasing Parties and that, without such waiver, the Prospect Released Parties would not have agreed to the terms of this release.

(c) The MPT Parties hereby represent and warrant to the Prospect Parties that the MPT Parties have no actual knowledge (and without inquiry by any such MPT Party) that any "Event of Default" (as defined in the applicable Obligation Documents) exists as of the date hereof other than the Released Defaults and the Uncured Defaults.

(d) At least two (2) days prior to the Closing Date of each of the Phase II Transactions and the Phase III Transactions, each of the MPT Parties, on the one hand, and Prospect Parties, on the other hand, will (i) provide to one another an updated list of Events of Default then in existence as of such date that are actually known by such Parties, and (ii) represent and warrant to one another that such Parties have no actual knowledge (and without inquiry by any such Party) that any Event of Default exists as of such Closing Date other than such updated Events of Defaults described per clause (i) hereof (collectively, the "Default Representation").

(e) Notwithstanding the foregoing, the MPT Parties are not waiving or refraining from exercising any rights or remedies with respect to any default or Event of Default that is not a Released Default *as of the date hereof* (including any future Event of Default), and expressly reserve the right to exercise all such rights and remedies with respect to any such other default or Event of Default (including any Uncured Defaults) in accordance with the applicable agreements (including, without limitation, any failure to pay rents, interests, or other amounts payable after the date hereof in accordance with their applicable terms). The existence of any new Events of Default, if any, occurring after the date hereof shall not effect or delay the closing of the Phase II Transactions or the Phase III Transactions. This is not a waiver, release, or extension of any future requirement or other obligation under any of Master Lease I, Master Lease II, the Foothill Mortgage Loan Documents, the TRS Note, the MPT Advance Convertible Note, the Phase I Convertible Note, the Pennsylvania Restructuring Documents, the Amended and Restated Security Agreements, or any other related agreements, and this provision is without prejudice to, and the MPT Parties expressly reserve any and all rights and remedies thereunder, under applicable law, or otherwise with respect to any such future requirements or other obligations.

(f) Without limiting the generality of the foregoing subsection, the Prospect Parties hereby acknowledge the existence of the Uncured Defaults and shall take all actions reasonably necessary to cure such defaults in all respects within thirty (30) Business Days following the date hereof; provided, however, the Prospect Parties may enter into a payment plan or other arrangement, which would be deemed to satisfy the Prospect Parties' obligations in this Section 2.4(f), so long as such payment plan or other arrangement is approved in advance by the MPT Parties (which shall be in the MPT Parties' sole discretion but not to be unreasonably delayed). Any failure to cure any of such Uncured Defaults within the specified time period shall be deemed an Event of Default under the applicable Obligation Documents.

**2.5. Release and Waiver of MPT Parties**. Contemporaneously herewith, each of the Prospect Parties has executed and delivered to the MPT Parties a Release and Waiver Agreement in the form attached hereto as ***EXHIBIT C***. As of the Closing Date of each of the Phase II Transactions and the Phase III Transactions, the Prospect Parties shall simultaneously execute and deliver to the MPT Parties an additional Release and Waiver Agreement, to be effective as of each such Closing Date.

**2.6. Termination of Forbearance Agreement**. The Forbearance Agreement is hereby terminated, and shall be of no further force or effect after the date hereof.

**2.7. Termination of Collateral Assignments of Assignable Option Agreement**. The Collateral Assignments are hereby terminated, and shall be of no further force or effect after the date hereof.

## ARTICLE III
## PHASE I TRANSACTIONS

The Phase I Transactions are comprised of the events provided in this ARTICLE III, which Phase I Transactions are occurring as of the Closing Date of the Phase I Transactions (unless expressly otherwise provided):

**3.1. PhysicianCo Term Loan; Transfer and Leaseback of Foothill Facility; Redemption of Series A-2 Preferred Units**. As a condition to the MPT Parties entering into this Agreement and effecting the transactions contemplated herein, on the date hereof:

(a) PhysicianCo Term Loan. The PhysicianCo Term Loan Lenders and the PhysicianCo Term Loan Borrowers have entered into the PhysicianCo Term Loan Agreement, pursuant to which the PhysicianCo Term Loan Lenders have made a term loan to the PhysicianCo Term Loan Borrowers in the original principal amount of Three Hundred Seventy-Five Million and No/100 Dollars ($375,000,000.00), of which the sum of One Hundred Thirty-One Million Four Hundred Sixty-Nine Thousand Four Hundred Eighty-Nine Dollars Fifty-Three Cents ($131,469,489.53) will be distributed by PHPH Midco to PHP Holdings and Fifty-Six Million Four Hundred Sixty-Nine Thousand Four Hundred Eighty-Nine Dollars Fifty-Three Cents ($56,469,489.53) will be distributed by PHP Holdings to Prospect Medical (immediately prior to MPT Picasso TRS acquiring any Equity Interests in PHP Holdings).

(b) Intercreditor Agreements. The PhysicianCo Term Loan Lenders and certain of the MPT Parties (and their Affiliates) have entered into the PhysicianCo Intercreditor Agreement and the HospitalCo Intercreditor Agreement, pursuant to which they have agreed upon (i) the priority of their Encumbrances on certain collateral securing their respective obligations and liabilities from certain of the Prospect Parties, and (ii) certain of their other respective rights and remedies, as set forth therein.

(c) Transfer and Leaseback of Foothill Facility. Prior to the consummation of the Phase I Transactions, (i) Alta Newport transferred, assigned, and conveyed all of its rights, title, and interest to the Foothill Facility (and certain related realty assets described therein) to Foothill Propco (subject in all respects to the Foothill Mortgage and all obligations owed by Alta Newport to the MPT Foothill Lender under the other Foothill Mortgage Loan Documents), and (ii) Foothill Propco leased the Foothill Facility to Alta Newport pursuant to that certain Hospital Lease Agreement, dated May 16, 2023 ("Foothill Lease"), and which Foothill Lease is secured as set forth therein. Contemporaneously with the closing of the balance of the Phase I Transactions, the Foothill Mortgage and all obligations owed by Alta Newport and Foothill Propco to the MPT Foothill Lender under the other Foothill Mortgage Loan Documents will be released in accordance with Section 3.5(a).

(d) Redemption of Outstanding Series A-2 Preferred Units. Prior to the date hereof, PHP Holdings issued 32,402,885 Series A-2 Preferred Units as follows: (i) 29,795,354 PHPH Series A-2 Preferred Units to Prospect Provider Group, LLC ("PPG"), and (ii) 2,607,531 PHPH Series A-2 Preferred Units to PHS Holdings, LLC ("PHS"). Prior to the consummation of the Phase I Transactions, PHP Holdings redeemed all of such 32,402,885 Series A-2 Preferred Units from PPG and PHS pursuant to the Redemption Agreements and, as a result thereof, there are no PHPH Series A-2 Preferred Units issued and outstanding as of the date hereof.

**3.2. Issuance of Preferred Units and Convertible Notes for Certain Outstanding Obligations.**

(a) PHPH Series A-1 Preferred Units. Immediately following the consummation of the transactions contemplated in Section 3.1, on the date hereof:

(i) Pursuant to the Series A-1 Subscription Agreement, MPT Picasso TRS has received PHPH Series A-1 Preferred Units comprising Forty-Nine Percent (49%) of the outstanding Equity Interest in PHP Holdings, which the Parties hereby agree the value of which equals Seventy-Five Million Two Hundred Ninety-Four Thousand Five Hundred Seventy-Seven Dollars Eleven Cents ($75,294,577.11) (based upon the PHPH Net Equity Value);

(ii) each of PHP Holdings, MPT Picasso TRS, and Prospect Medical has entered into the PHP Holdings LLC Agreement (pursuant to which ManageCo shall serve as the manager thereof following the date hereof); and

(iii) in accordance with the terms of the PHP Holdings LLC Agreement, each of the Subsidiaries of PHP Holdings (but not including Prospect Health Plan, Inc. solely to the extent prohibited by applicable laws or regulations), has amended (or, no later than ten (10) days following the Closing Date of the Phase I Transactions will, amend) its respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents to include certain provisions and protections for the benefit of MPT Picasso TRS (collectively, the "PHPH Subsidiary Amendments").

(b) PHP Convertible Notes. Contemporaneously herewith, PHP Holdings has issued MPT Picasso TRS the "Phase I Convertible Note" in the original principal amount of Six Hundred Forty-Six Million Three Hundred Thirty-Seven Thousand Five Hundred Ninety-Seven Dollars Seventy-Four Cents ($646,337,597.74), which amount the Parties intend to equal the following:

(i) the Phase I Outstanding Obligations described in Section 3.2(c) hereof, *less*

(ii) the agreed upon value of the PHPH Series A-1 Preferred Units issued to MPT Picasso TRS as set forth above in Section 3.2(a) hereof.

(c) Phase I Outstanding Obligations. MPT Picasso TRS is accepting the Phase I Convertible Note in lieu of additional PHPH Series A-1 Preferred Units because issuance of any additional PHPH Series A-1 Preferred Units to MPT Picasso TRS on the date hereof beyond those described in Section 3.2(a) hereof requires certain regulatory notices and approvals (as described in Section 4.1 hereof) and, thus, the issuance of such PHPH Series A-1 Preferred Units and Phase I Convertible Note, on a combined basis, are intended to be in full and complete satisfaction of the following Outstanding Obligations (collectively, the "Phase I Outstanding Obligations"):

(i) the outstanding balance (if any) of the MPT Advance Convertible Note described in Section 3.3 hereof;

(ii) the Deferred Amounts and Outstanding Property Insurance described in Section 3.4 hereof;

(iii) the outstanding balance of the Foothill Mortgage Loan Note described in Section 3.5(a) hereof;

(iv) the outstanding balance of the TRS Note described in Section 3.6 hereof;

(v) the Agreed Pennsylvania Shortfall Amount as described in Section 3.7 hereof; and

(vi) the Agreed Connecticut Shortfall Amount as described in Section 5.1 hereof.

Subject to the specific terms and conditions of this Agreement, the priority of payment and amounts allocated to the Phase I Outstanding Obligations shall be allocated and applied in accordance with, as applicable, Master Lease I, Master Lease II, the Foothill Mortgage Loan Documents, the TRS Note, any other existing Obligation Documents, and as otherwise determined by the MPT Parties in their sole and absolute discretion, provided however, such allocation shall in no event result in less than the full and complete satisfaction of the Phase I Outstanding Obligations.

**3.3. MPT Advance Convertible Note**. MPT Picasso TRS hereby notifies PHP Holdings, pursuant to Section 5(a)(i) of the MPT Advance Convertible Note, of MPT Picasso TRS's election to convert the outstanding aggregate principal amount of the MPT Advance Convertible Note and any accrued but unpaid interest thereon as of the date hereof, in full, into PHPH Series A-1 Preferred Units, which PHPH Series A-1 Preferred Units have been authorized and reserved for issuance pursuant to the PHP Holdings LLC Agreement. Notwithstanding anything to the contrary set forth in the MPT Advance Convertible Note, contemporaneously herewith: (a) the original principal amount of Fifty Million and No/100 Dollars ($50,000,000.00) of the MPT Advance Convertible Note and accrued but unpaid interest thereon in the amount of Five Hundred Eighty-Eight Thousand Eight Hundred Eighty-Eight and 89/100 Dollars ($588,888.89) have been fully satisfied by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof, and (b) as a result of the full satisfaction of all amounts owed under the MPT Advance Convertible Note pursuant to the Phase I Transactions, (i) the MPT TRS Lender has cancelled the MPT Advance Convertible Note and returned the same to Prospect Medical, (ii) the MPT Advance Convertible Note shall be deemed terminated and of no further force or effect, and (iii) PHPH shall have no further obligations thereunder and all obligations set forth thereunder shall be immediately deemed satisfied in full and extinguished in their entirety, including with respect to any interest amounts accrued prior to the date hereof. The Parties

acknowledge that: (1) prior to the closing of the Phase I Transactions, PHP Holdings is a wholly-owned and controlled Subsidiary of Prospect Medical, (2) MPT Picasso TRS is a wholly-owned and controlled Subsidiary (directly or indirectly) of MPT Op, and (3) the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note are being made to MPT Picasso TRS for the respective benefit of the Parties. MPT Picasso TRS represents and warrants that immediately prior to the conversion of the MPT Advance Convertible Note, MPT Picasso TRS is the sole owner of and sole beneficiary under the MPT Advance Convertible Note and has not transferred, pledged, hypothecated or otherwise encumbered the MPT Advance Convertible Note or any amounts due thereunder.

**3.4. Deferred Amounts and Outstanding Property Insurance**. The aggregate outstanding amounts of: (i) the Deferred Base Rent, (ii) the Deferred Interest, (iii) the accrued but unpaid base interest under the Foothill Mortgage Loan Note, and the TRS Note through the date hereof, and (vi) to the extent not included in the foregoing clauses, all Deferred Base Rent and Deferred Interest that may hereafter be deferred as described in the Term Sheet (collectively, the "Deferred Amounts"), are equal to One Hundred Ninety-Three Million Nine Hundred Seventy-Five Thousand One Hundred Seventy-Five Dollars Ninety-Six Cents ($193,975,175.96). The aggregate amount of Outstanding Property Insurance is Seven Hundred Eight-Three Thousand Seven Hundred Eight and No/100 Dollars ($783,708.00).

(a) Satisfaction of Deferred Amount and Outstanding Property Insurance. At the closing of the Phase I Transactions contemporaneously herewith, all of the Deferred Amounts and Outstanding Property Insurance have been satisfied by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof.

(b) Acknowledgements. The Parties acknowledge that as of immediately prior to the closing of the Phase I Transactions: (i) Alta Newport, the Master Lease I Lessees, and the Master Lease II Lessees are wholly-owned and controlled Subsidiaries (directly or indirectly) of Prospect Medical, and PHP Holdings is owned by Prospect Medical, PPG and PHS, (ii) Prospect Medical guarantees their respective obligations to the MPT Parties pursuant to certain of the Obligation Documents, (iii) the MPT Foothill Lender, the Master Lease I Lessors, the Master Lease II Lessors, and MPT Picasso TRS are wholly-owned and controlled Subsidiaries (directly or indirectly) of MPT Op, and (iv) the satisfaction in full, of the Deferred Amounts and Outstanding Property Insurance by Prospect Medical as set forth in this agreement, to the applicable MPT Parties, and the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note to MPT Picasso TRS, are being made for the respective benefit of the Parties.

**3.5. Foothill Transaction**.

(a) Mortgage Payment. Contemporaneously herewith, Prospect Medical has paid the sum of One Hundred Sixty Million Four Hundred Four Thousand Two Hundred and No/100 Dollars ($160,404,200.00), which amount is comprised of the sum of (and full satisfaction of) (i) the Tranche I Advance, (ii) the Tranche 2 Advances, and (iii) the Tranche 2 Additional Interest (in each case owed by Alta Newport and Foothill Propco and to the MPT Foothill Lender), by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof. Contemporaneously therewith, the MPT Foothill Lender has caused the Foothill Mortgage to be terminated and released in the official records of Orange County, California.

(b) Acknowledgements. The Parties acknowledge that as of immediately prior to the closing of the Phase I Transactions: (i) Alta Newport, the Master Lease I Lessees, and the Master Lease II Lessees are wholly-owned and controlled Subsidiaries (directly or indirectly) of Prospect Medical, and PHP Holdings

is owned by Prospect Medical, PPG and PHS, (ii) Prospect Medical guarantees their respective obligations to the MPT Parties pursuant to certain of the Obligation Documents, (iii) the MPT Foothill Lender, the Master Lease I Lessors, the Master Lease II Lessors, and MPT Picasso TRS are wholly-owned and controlled Subsidiaries (directly or indirectly) of MPT Op, and (iv) the satisfaction in full, of the Deferred Amounts by Prospect Medical as set forth in this agreement, to the applicable MPT Parties, and the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note to MPT Picasso TRS, are being made for the respective benefit of the Parties.

**3.6. TRS Note**. Contemporaneously herewith, (a) the original principal amount of One Hundred Twelve Million Nine Hundred Thirty Seven Thousand Two Hundred Four and No/100 Dollars ($112,937,204.00) of the TRS Note has been fully satisfied by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof, and (b) as a result of the full satisfaction of all amounts owed under the TRS Note pursuant to the Phase I Transactions, the MPT TRS Lender has cancelled the TRS Note and returned the same to Prospect Medical. The Parties acknowledge that: (1) as of immediately prior to the closing of the Phase I Transactions PHP Holdings is owned by Prospect Medical, PPG and PHS, (2) both the MPT TRS Lender and MPT Picasso TRS are wholly-owned and controlled Subsidiaries (directly or indirectly) of MPT Op, and (3) the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note are being made to MPT Picasso TRS for the respective benefit of the Parties.

**3.7. Pennsylvania Transaction**.

(a) Purchase and Sale; Intercompany Lease.

(i) Contemporaneously herewith: (A) the Pennsylvania Lessors and Prospect CCMC have entered into the Pennsylvania Purchase Agreement, pursuant to which the Pennsylvania Lessors have sold and conveyed to Prospect CCMC, and Prospect CCMC has purchased and accepted from the Pennsylvania Lessors, all of the Pennsylvania Lessors' respective right, title and interest in and to the Pennsylvania Facilities (and certain related assets described therein) for an aggregate purchase price of Two Hundred Fifty Million and No/Dollars ($250,000,000.00) (the "Pennsylvania Purchase Price"), of which amount has been contemporaneously paid as set forth in Section 3.7(b) below, and (B) each of the Pennsylvania Facilities, Pennsylvania Lessors, and Pennsylvania Lessees have been severed and removed from Master Lease I and Master Lease II, as applicable.

(ii) Immediately after the transactions described in clause (i) hereof: (A) Prospect CCMC leased the Pennsylvania Facility commonly known as "Delaware County Memorial Hospital" to Prospect DCMH pursuant to a lease agreement between them, and (B) Prospect DCMH joined in the execution and delivery of the Amended and Restated Security Documents, and (C) Prospect DCMH delivered that certain Subordination and Attornment Agreement, dated of even date herewith, to the Pennsylvania Mortgage Lenders (as described below) and their Affiliates (the "Pennsylvania Subordination and Attornment Agreement").

(b) Payment of the Pennsylvania Purchase Price. The Pennsylvania Purchase Price is being paid as follows:

(i) *Pennsylvania Mortgage Loan*. One Hundred Fifty Million and No/100 Dollars ($150,000,000.00) of the Pennsylvania Purchase Price has been satisfied by the issuance of a

mortgage loan in such amount (plus an additional Five Million Two Hundred Twenty-Two Thousand Five Hundred Seventeen Dollars and Fifty-Four Cents ($5,222,517.54) for transfer taxes, as contemplated in Section 11.15(b) hereof) made by the Pennsylvania Lessors (hereinafter also referred to as the Pennsylvania Mortgage Lenders) to Prospect CCMC (hereinafter also referred to as the Pennsylvania Mortgage Borrower) in accordance with that certain Real Estate Loan Agreement, dated of even date herewith, by and among the Pennsylvania Mortgage Borrower and the Pennsylvania Mortgage Lenders (the "Pennsylvania Mortgage Loan Agreement"), and which:

(A) is evidenced by a Promissory Note, dated of even date herewith, made by the Pennsylvania Mortgage Borrower in favor of the Pennsylvania Mortgage Lenders (the "Pennsylvania Mortgage Loan Note"), with a term of five (5) years, and which will bear interest at: (1) a per annum rate of Nine Percent (9%), to be paid in kind from March 1, 2024 thru May 31, 2025 (which shall be added to the principal balance of the Pennsylvania Mortgage Loan Note), and (2) a per annum rate of Twelve Percent (12%), payable in cash thereafter, and

(B) will be cross-defaulted and cross-collateralized in the same manner as the obligations under Master Lease I and Master Lease II, and otherwise secured by, among other things, that certain Mortgage, Security Agreement and Fixture Filing, dated of even date herewith, made by Prospect CCMC in favor of the Pennsylvania Mortgage Lenders (the "Pennsylvania Mortgage") and the Amended and Restated Security Documents.

(ii) *PHPH Series A-1 Preferred Units or Convertible Note*. One Hundred Million and No/100 Dollars ($100,000,000.00) (the "Agreed Pennsylvania Shortfall Amount") of the Pennsylvania Purchase Price has been satisfied by the issuance to MPT Picasso TRS of the PHPH Series A-1 Preferred Units and the Phase I Convertible Note, each as more particularly described in Section 3.2 hereof. The Parties acknowledge that: (i) the Pennsylvania Mortgage Borrower is a wholly-owned and controlled Subsidiary (directly or indirectly) of Prospect Medical, and as of immediately prior to the closing of the Phase I Transactions PHP Holdings is owned by Prospect Medical, PPG and PHS, (ii) Prospect Medical guarantees their respective obligations to the MPT Parties pursuant to certain of the Obligation Documents, (iii) both the Pennsylvania Mortgage Lenders and MPT Picasso TRS are wholly-owned and controlled Subsidiaries (directly or indirectly) of MPT Op, and (iv) the issuances of such PHPH Series A-1 Preferred Units and the Phase I Convertible Note are being made to MPT Picasso TRS for the respective benefit of the Parties.

(iii) *Remaining Pennsylvania Purchase Price*. In lieu of any further consideration for the Pennsylvania Purchase Price, MPT Picasso TRS has received a right to receive certain distributions on an accelerated, profits-interest basis under the distribution provisions of the PHP Holdings LLC Agreement.

(c) Taxes, Insurance, Utilities. All utility charges, insurance, and real and personal property taxes related to the Pennsylvania Facilities: (i) for any periods (or portions thereof) ending on or prior to the date hereof shall be the responsibility of the Pennsylvania Lessees and their Affiliates pursuant to the terms of Master Lease I and Master Lease II, and (ii) for any periods (or portions thereof) ending after the date hereof, shall be the responsibility of Pennsylvania Mortgage Borrower and their Affiliates pursuant to the terms of the Pennsylvania Mortgage Loan Agreement. In no event shall any of the MPT Parties have any responsibility for payment of such amounts, *provided*, *however*, for the avoidance of doubt, MPT Parties

must pay the amounts owed by it pursuant to Section 11.15 of this Agreement (which shall be added to the Pennsylvania Mortgage Loan Note).

**3.8. Connecticut Master Agreement**. In connection with the transactions contemplated above, on the date hereof: (i) the applicable Prospect Parties and the applicable MPT Parties have entered into that certain Amendment to Connecticut Master Agreement, dated of even date herewith (the "Amendment to Connecticut Master Agreement"), pursuant to which the parties have modified the Connecticut Master Agreement to address the transactions to be consummated in accordance with this Agreement (including ARTICLE V hereof), and (ii) such Prospect Parties have delivered to such MPT Parties the written consent from Yale New Haven Health Services Corporation to such Amendment to Connecticut Master Agreement, as required pursuant to the terms and conditions of the Underlying Acquisition Agreement (as defined in the Connecticut Master Agreement) (the "Yale Consent").

**3.9. Phase I Deliverables**.

(a) Deliverables by Prospect Parties. Prior to or contemporaneously herewith, the applicable Prospect Parties have delivered (or caused to be delivered) to the MPT Parties the following:

(i) Copies of the PhysicianCo Term Loan Agreement, and all other loan documents entered into or delivered by any of the Prospect Parties or any of their Affiliates in connection therewith, duly executed by the applicable Prospect Parties and the PhysicianCo Term Loan Lenders;

(ii) PhysicianCo Intercreditor Agreement, duly executed by the PhysicianCo Term Loan Lenders and the applicable Prospect Parties;

(iii) Evidence reasonably satisfactory to the MPT Parties of repayment in full of the indebtedness and other obligations outstanding under the ABL Credit Agreement dated as of February 22, 2018 among PMH, as borrower, JPMorgan Chase Bank, N.A, as administrative agent and issuing bank, the lenders party thereto and the other agents, arrangers and bookrunners identified therein, as amended from time to time .

(iv) Master Lease I Amendment, duly executed by the Master Lease I Lessees;

(v) Master Lease II Amendment, duly executed by the applicable Master Lease II Lessees;

(vi) the Amended and Restated Security Documents, duly executed by the applicable Prospect Parties and their applicable Affiliates;

(vii) the PHP Holdings Pledge Agreement, duly executed by PHP Holdings;

(viii) the Intercompany Subordination Agreement, duly executed by the applicable Prospect Parties and their applicable Affiliates;

(ix) Amendments to each of the existing Memoranda of Lease relating to Master Lease I, Master Lease II, the termination of the Foothill Mortgage Loan Agreement, and the addition of Obligation Documents contemplated herein, each duly executed by the applicable Prospect Parties;

(x) Amendments to each of the existing Assignment of Rents and Leases relating to Master Lease I, Master Lease II, the termination of the Foothill Mortgage Loan Agreement, and the

addition of Obligation Documents contemplated herein, each duly executed by the applicable Prospect Parties;

(xi) Redemption Agreements, duly executed by PHP Holdings, Prospect Medical, and each of PPG and PHS (respectively);

(xii) Series A-1 Subscription Agreement, duly executed by PHP Holdings and Prospect Medical;

(xiii) PHP Holdings LLC Agreement, duly executed by PHP Holdings, and Prospect Medical;

(xiv) PHPH Subsidiary Amendments, duly executed by PHP Holdings and its applicable Subsidiaries (to the extent available, it being understood that certain PHPH Subsidiary Amendments may be delivered no more than ten (10) days following the closing of the Phase I Transactions);

(xv) Service Mark Assignment Agreement, duly executed by Prospect Medical and Prospect Medical Systems, LLC;

(xvi) Trademark License Agreement, duly executed by Prospect Medical and PMH;

(xvii) Phase I Convertible Note, duly executed by PHP Holdings;

(xviii) An amendment to the Support Services Agreement, duly executed by PHP Holdings and Prospect Medical;

(xix) Termination of Foothill Loan Agreement and Foothill Mortgage, duly executed by Alta Newport and Prospect Medical;

(xx) Copies of the Foothill Lease and any other documents entered into by any of the Prospect Parties or their Affiliates in connection therewith, duly executed by the applicable Prospect Parties;

(xxi) Pennsylvania Purchase Agreement, the Pennsylvania Mortgage Loan Agreement, the Pennsylvania Mortgage Loan Note, the Pennsylvania Subordination and Attornment Agreement, and each of the other Pennsylvania Restructuring Documents, duly executed by the applicable Pennsylvania Lessees and their applicable Affiliates;

(xxii) Amendment to Connecticut Master Agreement, duly executed by the applicable Prospect Parties;

(xxiii) Copy of the Yale Consent (to the Amendment to Connecticut Master Agreement);

(xxiv) Evidence of Letter of Credit (if available, or within 30 days hereafter);

(xxv) A Release and Waiver Agreement, duly executed by all of the Prospect Parties;

(xxvi) Resolutions or consents of the respective governing bodies of each of the Prospect Parties authorizing their respective execution, delivery, and performance of this Agreement and all other documents or agreements to be executed by any of them in connection herewith (including, without

limitation, any such documents and agreements to be entered into by any of the Prospect Parties after the date hereof) (collectively, the "Prospect Parties' Resolutions");

(xxvii) An Officers' Certificate in form and substance reasonably satisfactory to the MPT Parties and executed by a duly authorized executive officer of Prospect Medical on behalf of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries (other than PHP Holdings and its Designated Subsidiaries):

> (A) certifying to the MPT Parties on behalf of all of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries that: (1) all of the representations and warranties of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries set forth in this Agreement and the other Restructuring Documents are true and correct as of the date hereof, and (2) Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries, as applicable, have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be delivered, performed, observed and complied with by Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries as of the date hereof;
>
> (B) certifying to the MPT Parties on behalf of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries that: (1) with respect to Prospect Medical, as to the Certificate of Incorporation and Bylaws, each as in effect from the date of this Agreement, (2) with respect to each of Prospect Medical's Designated Subsidiaries and Other Applicable Subsidiaries, as to their respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect from the date of this Agreement, and (3) a copy of each of the applicable Prospect Parties' Resolutions from Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries; and
>
> (C) providing specimen signatures of the officers or authorized agents of each of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries;

(xxviii) An Officers' Certificate in form and substance reasonably satisfactory to the MPT Parties and executed by a duly authorized executive officer of PHP Holdings on behalf of PHP Holdings and its Designated Subsidiaries:

> (A) certifying to the MPT Parties on behalf of all of PHP Holdings and such Designated Subsidiaries that: (1) all of the representations and warranties of PHP Holdings and such Designated Subsidiaries set forth in this Agreement (subject to the disclosures made in the Disclosure Schedules) and the other Restructuring Documents are true and correct as of the date hereof, and (2) PHP Holdings and such Designated Subsidiaries, as applicable, have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be delivered, performed, observed and complied with by PHP Holdings and such Designated Subsidiaries as of the date hereof;

(B) certifying to the MPT Parties on behalf of PHP Holdings and such Designated Subsidiaries that: (1) with respect to PHP Holdings, as to the Certificate of Formation and the PHP Holdings LLC Agreement, each as in effect from the date of this Agreement, (2) with respect to each of PHP Holdings' Designated Subsidiaries, as to their respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect from the date of this Agreement, and (3) a copy of each of the applicable Prospect Parties' Resolutions from PHP Holdings and such Designated Subsidiaries; and

(C) providing specimen signatures of the officers or authorized agents of each of PHP Holdings and such Designated Subsidiaries;

(xxix) Certificates of existence and good standing of each of the Prospect Parties, their respective Designated Subsidiaries, and the Other Applicable Subsidiaries, dated within thirty (30) days prior to the date hereof, from each such entity's State of incorporation or formation and, to the extent in which the character of its properties or in which the transaction of its business makes such qualification necessary, from the States of California and Connecticut and the Commonwealth of Pennsylvania;

(xxx) A closing statement in form and substance mutually satisfactory to the Parties, duly executed by each of the applicable Prospect Parties; and

(xxxi) Such other amendments, certificates, financing statements, tax filings, instruments and documents as any of the MPT Parties reasonably deems necessary to effectuate the transactions contemplated hereby.

(b) Deliverables by MPT Parties. Contemporaneously herewith, the applicable MPT Parties have delivered (or caused to be delivered) to the Prospect Parties the following:

(i) PhysicianCo Intercreditor Agreement, duly executed by the applicable MPT Parties;

(ii) Series A-1 Subscription Agreement, duly executed by MPT Picasso TRS;

(iii) PHP Holdings LLC Agreement, duly executed by MPT Picasso TRS;

(iv) Cancelled Foothill Mortgage Loan Note;

(v) Termination of Foothill Loan Agreement and Foothill Mortgage, duly executed by MPT Foothill Lender;

(vi) Cancellation of TRS Note;

(vii) Cancellation of the MPT Advance Convertible Note;

(viii) Pennsylvania Purchase Agreement, the Pennsylvania Mortgage Loan Agreement, the Pennsylvania Mortgage Loan Note, the Pennsylvania Subordination and Attornment Agreement, and each of the other Pennsylvania Restructuring Documents, duly executed by the applicable Pennsylvania Lessors and their applicable Affiliates;

(ix) Master Lease I Amendment, duly executed by the applicable Master Lease I Lessors;

(x) Master Lease II Amendment, duly executed by the applicable Master Lease II Lessors;

(xi) the Amended and Restated Security Documents, duly executed by the applicable MPT Parties and their applicable Affiliates;

(xii) the PHP Holdings Pledge Agreement, duly executed by MPT Picasso TRS;

(xiii) [Intentionally Omitted];

(xiv) Amendments to each of the existing Memoranda of Lease relating to Master Lease I, Master Lease II, the termination of the Foothill Mortgage Loan Agreement, and the addition of Obligation Documents contemplated herein, each duly executed by the applicable Prospect Parties;

(xv) Amendments to each of the existing Assignment of Rents and Leases relating to Master Lease I, Master Lease II, the termination of the Foothill Mortgage Loan Agreement, and the addition of Obligation Documents contemplated herein, each duly executed by the applicable Prospect Parties;

(xvi) Amendment to Connecticut Master Agreement, duly executed by the applicable MPT Parties;

(xvii) Resolutions or consents of the respective governing bodies of each of the MPT Parties authorizing their respective execution, delivery, and performance of this Agreement and all other documents or agreements to be executed by any of them in connection herewith (including, without limitation, any such documents and agreements to be entered into by any of the MPT Parties after the date hereof) (collectively, the "MPT Parties' Resolutions");

(xviii) An Officers' Certificate in form and substance reasonably satisfactory to the Prospect Parties and executed by a duly authorized executive officer of MPT OP:

(A) certifying to the Prospect Parties on behalf of all of the MPT Parties that: (1) all of the representations and warranties of the MPT Parties set forth in this Agreement and the other Restructuring Documents are true and correct as of the date hereof, and (2) the applicable MPT Parties have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be delivered, performed, observed and complied with by such MPT Parties as of the date hereof;

(B) certifying to the Prospect Parties on behalf of all of the MPT Parties that: (1) with respect to each of the MPT Parties, as to each of such MPT Parties' respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect from the date of this Agreement, and (2) a copy of each of the MPT Parties' Resolutions; and

(C) providing specimen signatures of the officers or authorized agents of each of the MPT Parties;

(xix) Certificates of existence and good standing of each of the MPT Parties, dated within thirty (30) days prior to the date hereof, from each such entity's State of incorporation or formation and, to the extent in which the character of its properties or in which the transaction of its business makes such qualification necessary, from the States of California and Connecticut and the Commonwealth of Pennsylvania;

(xx) A closing statement in form and substance mutually satisfactory to the Parties, duly executed by each of the applicable MPT Parties; and

(xxi) Such other amendments, certificates, financing statements, tax filings, instruments and documents as any of the Prospect Parties reasonably deems necessary to effectuate the transactions contemplated hereby (it being acknowledged by the Prospect Parties that certain affidavits typically provided by owners of real property may be limited due to the Prospect Parties' sole use and possession of the Facilities prior to the date hereof).

## ARTICLE IV
## PHASE II TRANSACTIONS

The Phase II Transactions are comprised of the events provided in this ARTICLE IV, which Phase II Transactions are occurring as of the Closing Date of the Phase II Transactions (unless expressly otherwise provided):

**4.1. Regulatory Consents and Approvals.**

(a) Promptly following the date hereof, Prospect Medical and the other applicable Prospect Parties shall take all actions necessary to obtain any approval or consent of, or to provide written notification to, any Governmental Body or any other Person that is required in connection with the Prospect Parties' (and their respective Affiliates') consummation and performance of the Phase II Transactions, including, without limitation: (i) filing all reports or other documents required or requested by any Governmental Bodies concerning the transactions contemplated hereby (including without limitation, the health care regulatory filings set forth in Section 4.1(b)), (ii) comply within the timeframe set forth in such request or if no timeframe is requested then within a commercially reasonable time period after receiving the request (recognizing that time is of the essence), and any other requests by any Governmental Body for additional information concerning such Phase II Transactions, (iii) take all actions necessary to obtain any approval or consent of, or to provide written notification to, any other Governmental Body or any other Person described in Section 7.3 hereof and (iv) take any other actions required by Governmental Bodies or any other Person to approve such Phase II Transactions, to allow the applicable Governmental Body or Person to approve the Phase II Transactions as promptly as possible. Notwithstanding anything in this Section 4.1 to the contrary, the MPT Parties acknowledge and agree that the Prospect Parties will not be required to incur unreimbursed costs, be deemed to be in breach of this Section 4.1 or agree to conditions not currently known, or anticipated, by any of the Prospect Parties as of the date hereof (whether in kind or magnitude) if any conditions imposed on the Prospect Parties by the Governmental Body or non-approval by a Governmental Body of any approval required under this Agreement is a direct result of the information provided or omission of information by the MPT Parties, or the structure required by the MPT Parties to

comply with applicable REIT requirements (and the MPT Parties shall be responsible for all costs associated with such changes).

(b) The Prospect Parties shall promptly: (i) submit a notice of material modification by or on behalf of Prospect Health Plan, Inc. to the DMHC, which notifies and requests the approval the DMHC of the Phase II Transactions, (ii) submit an application and request for the issuance of a temporary pharmacy license (and subsequently the issuance of a permanent license) with the California Board of Pharmacy in connection with the pharmacy license issued to Alta Newport for the operations of its pharmacy, which license will allow the continued operation of the pharmacy at its current location, and (iii) submit an application with the CDPH as required by applicable Law.

(c) The Prospect Parties shall permit the MPT Parties and their representatives to review and provide comments within five (5) Business Days after receipt by the applicable MPT Parties to any documents to be submitted to any Governmental Bodies or any other Person in connection with any material regulatory consents or approvals. Notwithstanding the foregoing, for the filings set forth in Section 4.1(b), the MPT Parties will provide comments within three (3) Business Days after receipt of such documents. Subject to the last sentence of Section 4.1(a), the Prospect Parties shall (i) incorporate any comments from the MPT Parties with respect to (A) the MPT Parties' legal, tax, accounting, or financial status which comments shall be limited to changes the MPT Parties required to comply with applicable REIT requirements or PHP Holdings' operation as a Bankruptcy Remote Entity, or (B) known to the Prospect Parties of the date hereof and directly related to the structure and subsequent documentation of the Phase I Transactions or Phase II Transactions and which comments are not inconsistent with the terms of this Agreement, and (ii) consider any other comments provided by the MPT Parties, in good faith, which are received within the timeframes set forth in this Section 4.1(c).

(d) To the extent any information is necessary or required by law from any of the MPT Parties for the submission, processing, and/or granting of any such notices or approvals, the applicable MPT Parties will cooperate with the applicable Prospect Parties and promptly provide such information to the applicable Prospect Parties. The Parties intend that the foregoing conditions are to be completed and all such regulatory approvals, consents and confirmations shall be obtained by the Prospect Parties no later than November 30, 2023, to the extent that each applicable Governmental Body is able to provide such consent, approval or confirmation prior to such date, and shall act in good faith and cooperate in all material respects to meet such intended deadline.

(e) Notwithstanding anything to the contrary in this Agreement, in the event of an Organic Change (as defined in the Phase I Convertible Note) or similar event, if:

(i) Prospect Medical and the other applicable Prospect Parties are unable to obtain the approvals or consents of any Governmental Body and other Persons contemplated by this Section 4.1 that are necessary to allow MPT Picasso TRS to convert the Phase I Convertible Note (as described in Section 4.4 below) (the "Required Consents") prior to the occurrence of any Organic Change or similar event; and

(ii) as a result of the inability to convert due to the circumstances described in Section 4.1(e)(i) above:

(A) the aggregate amount that MPT Picasso TRS would receive at the time of such Organic Change from the sum of (1) the Convertible Amounts (as defined in the Phase I Convertible

Note) payable under the Phase I Convertible Note as of the date of such Organic Change, and (2) the distributions of "Available Cash" pursuant to the PHP Holdings LLC Agreement in connection with such Organic Change or similar event, is *less than*

(B) the aggregate amount that MPT Picasso TRS would have received solely from distributions of Available Cash pursuant to the PHP Holdings LLC Agreement had MPT Picasso TRS fully converted the Phase I Convertible Note prior to such Organic Change or similar event,

(such difference, a "Conversion Shortfall"), then the Convertible Amount due and payable under the Phase I Convertible Note immediately prior to the occurrence of such Organic Change or similar event in accordance with the terms of the Phase I Convertible Note shall automatically be increased by an amount equal to such Conversion Shortfall and, for all other purposes to the fullest extent permitted by applicable laws, MPT Picasso TRS shall be treated as if the Phase I Convertible Note has been fully converted as of the occurrence of such Organic Change or similar event. It is hereby understood and agreed that the Parties intend that MPT Picasso TRS' economic and financial rights shall not be diminished for any reason due to Prospect Medical's and the other applicable Prospect Parties' failure to obtain the Required Consents prior to such Organic Change or similar event, and that each of the Parties shall act in good faith, take all actions reasonably necessary, and otherwise reasonably cooperate in all material respects to fulfill such intent of the Parties, including providing one another reasonable access to financial and other information reasonably necessary to determine and agree upon the amount of any Conversion Shortfall. Nothing in this subsection is intended to limit or modify the Parties' rights to bring an action for breach of contract or for specific performance (and to seek other equitable relief) in connection with any breach or violation, or any attempted breach or violation, of the provisions of this Article.

**4.2. Transfer of Alta Newport to PHP Holdings**. Immediately following the receipt of all requisite approvals from Governmental Bodies in accordance with Section 4.1 hereof, the Prospect Parties shall cause: (a) Alta Newport to be merged with and into Foothill Propco, with Alta Newport being the surviving entity that will thereafter be owned by PHPH MidCo (the "Merger"), and (b) Alta Newport and Foothill Propco to terminate the Foothill Lease (and any related security documents). As consideration for the Merger of Alta Newport with and into Foothill Propco, Prospect Medical shall exchange the number of Class A-1 Units held by Prospect Medical representing reasonable value for Alta Newport, as mutually agreed to by the Parties, into PHPH Series A-2 Preferred Units, and will transfer such PHPH Series A-2 Preferred Units to Alta Hospitals System, LLC, a California limited liability company ("ALTA"). PHP Holdings will record such transfer and issuance of PHPH Series A-2 Preferred Units to ALTA, which such units shall at all times prior to the Merger be reserved by PHPH for issuance pursuant to this Section 4.2. The MPT Parties hereby approve the exchange, transfer and issuance of PHPH Series A-2 Preferred Units to ALTA.

**4.3. Joinder to Management Agreement**. Contemporaneously with the transactions contemplated in Section 4.2 hereof, PHP Holdings, ManageCo and Alta Newport shall enter into the Management Agreement with ManageCo, pursuant to which ManageCo shall serve as an "eligible independent contractor" as defined in Section 856(d)(9)(A) of the Code (an "EIK") to manage and operate any and all Health Care Facilities now or hereafter owned or leased by PHP Holdings and its Subsidiaries (but, for sake of clarity, any such Management Agreement will not cover the regulated operations of Prospect Health Plan, Inc. as conducted on the date hereof) during the term of the Management Agreement, and which Management Agreement shall provide that, at all times that MPT Picasso TRS, or any of its Affiliates shall own any Equity Interest (or securities convertible into Equity Interest) in PHP Holdings: (a) ManageCo shall remain an EIK and manage all aspects of operating such Health Care Facilities, including control of

Case 1:24-cv-05976-JSB Document 28-1 Filed 08/14/24 Page 142 of 247

day-to-day operations, (b) the Management Agreement may not be terminated, amended, modified or supplemented without the prior written consent of MPT Picasso TRS and any of its Affiliates which then directly hold any Equity Interests (or securities convertible into Equity Interests) in PHP Holdings, and (c) ManageCo will earn an arm's-length management fee for services rendered under the Management Agreement.

**4.4. Conversion of Phase I Convertible Note**. Following the receipt of all requisite approvals or confirmations from Governmental Bodies in accordance with Section 4.1 hereof, if MPT Picasso TRS determines in its reasonable discretion that all principal, interests and other amounts payable under the Phase I Convertible Note, as applicable may then be converted on a dollar-for-dollar basis into the applicable Equity Interests provided therein (based upon the PHPH Net Equity Value) in compliance with all applicable laws (including, without limitation, any provisions of the Code relating to real estate investment trusts), then MPT Picasso TRS may deliver written notice at any time thereafter of such conversions (in whole or in part) to PHP Holdings, which conversions shall be effective immediately upon receipt of such written notice by PHP Holdings. PHP Holdings, Prospect Medical, and MPT Picasso TRS shall execute and deliver to one another such documents and instruments as may be reasonably necessary to: (a) evidence the issuance of such PHPH Series A-1 Preferred Units by PHP Holdings to MPT Picasso TRS in connection with any such whole or partial conversion, and (b) make all such PHPH Series A-1 Preferred Units subject to the PHP Holdings LLC Agreement (which shall be amended and modified by the applicable Parties if and to the extent necessary to complete such issuance).

**4.5. Phase II Deliverables**.

(a) Deliverables by Prospect Parties. On or prior to the Closing Date of the Phase II Transactions, each of the applicable Prospect Parties shall deliver (or cause to be delivered) to the MPT Parties the following:

(i) Copies or evidence of all material regulatory notices, consents and approvals required from each such Governmental Body pursuant to the terms of Section 4.1 (or confirmation from such a Governmental Body that the closing of the Phase II Transactions will not cause a lapse in the applicable license or permit), to the extent such Governmental Body is able to provide such notice, consent, approval or confirmation prior to the Closing Date;

(ii) Management Agreement, duly executed by ManageCo, PHP Holdings, and all of its applicable Subsidiaries (including Alta Newport) that constitute "Operators" as such term is defined in the Management Agreement;

(iii) Copies of all Merger documents entered into by the applicable Prospect Parties as contemplated in Section 4.2 hereof, including, without limitation, the Certificate of Merger filed with the California Secretary of State which provides for a merger date as of the Closing Date of the Phase II transactions, the applicable Agreement and Plan of Merger (or similar instrument), all applicable governing body approvals from the Prospect Parties approving the Merger, and evidence of all applicable notices provided to Governmental Bodies;

(iv) To the extent applicable, amendments to the PHP Holdings LLC Agreement and any other documents reasonably necessary to evidence the issuance of the PHPH Series A-1 Preferred Units, duly executed by PHP Holdings, Prospect Medical, and any other members of PHP Holdings (other than MPT Picasso TRS);

(v) A Release and Waiver Agreement, duly executed by all of the Prospect Parties in favor of the MPT Parties;

(vi) A Default Representation, duly executed by all of the Prospect Parties;

(vii) An Officers' Certificate in form and substance reasonably satisfactory to the MPT Parties and executed by a duly authorized executive officer of Prospect Medical on behalf of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries (other than PHP Holdings and its Designated Subsidiaries):

(A) certifying to the MPT Parties on behalf of all of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries that: (1) all of the representations and warranties of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries set forth in this Agreement (subject to the disclosures made in the Disclosure Schedules, as updated pursuant to Section 11.10) and the other Restructuring Documents are true and correct as of such Closing Date, and (2) Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries, as applicable, have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be delivered, performed, observed and complied with by Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries as of such Closing Date;

(B) certifying to the MPT Parties on behalf of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries that: (1) with respect to Prospect Medical, as to its Certificate of Incorporation and Bylaws, each as in effect on such Closing Date, (2) with respect to each of Prospect Medical's Designated Subsidiaries and the Other Applicable Subsidiaries as to their respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect on such Closing Date, and (3) a copy of each of the applicable Prospect Parties' Resolutions from Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries; and

(C) providing specimen signatures of the officers or authorized agents of each of Prospect Medical, its Designated Subsidiaries, and the Other Applicable Subsidiaries;

(viii) An Officers' Certificate in form and substance reasonably satisfactory to the MPT Parties and executed by a duly authorized executive officer of PHP Holdings on behalf of PHP Holdings and its Designated Subsidiaries:

(A) certifying to the MPT Parties on behalf of all of PHP Holdings and such Designated Subsidiaries that: (1) all of the representations and warranties of PHP Holdings and such Designated Subsidiaries set forth in this Agreement and the other Restructuring Documents are true and correct as of such Closing Date, and (2) PHP Holdings and such Designated Subsidiaries, as applicable, have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring

Documents to be delivered, performed, observed and complied with by PHP Holdings and such Designated Subsidiaries as of such Closing Date;

(B) certifying to the MPT Parties on behalf of PHP Holdings and such Designated Subsidiaries that: (1) with respect to PHP Holdings, as to the Certificate of Formation and the PHP Holdings LLC Agreement, each as in effect on such Closing Date, (2) with respect to each of PHP Holdings' Designated Subsidiaries, as to their respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect on such Closing Date, and (3) a copy of each of the applicable Prospect Parties' Resolutions from PHP Holdings and such Designated Subsidiaries; and

(C) providing specimen signatures of the officers or authorized agents of each of PHP Holdings and such Designated Subsidiaries;

(ix) Certificates of existence and good standing of each of the Prospect Parties, their respective Designated Subsidiaries, and the Other Applicable Subsidiaries, dated within thirty (30) days prior to such Closing Date, from each such entity's State of incorporation or formation and, to the extent in which the character of its properties or in which the transaction of its business makes such qualification necessary, from the States of California and Connecticut and the Commonwealth of Pennsylvania;

(x) A closing statement in form and substance mutually satisfactory to the Parties, duly executed by each of the applicable Prospect Parties; and

(xi) Such other amendments, certificates, financing statements, tax filings, instruments and documents as any of the MPT Parties reasonably deems necessary to effectuate the transactions contemplated hereby.

(b) <u>Deliverables by MPT Parties</u>. On or prior to the applicable Closing Date of the Phase II Transactions each of the applicable MPT Parties shall deliver (or cause to be delivered) to the Prospect Parties the following:

(i) Amendments to the PHP Holdings LLC Agreement and any other documents reasonably necessary to evidence the issuance of the PHPH Series A-1 Preferred Units, duly executed by MPT Picasso TRS, if applicable;

(ii) A Default Representation, duly executed by the MPT Parties;

(iii) An Officers' Certificate in form and substance reasonably satisfactory to the Prospect Parties and executed by a duly authorized executive officer of MPT OP:

(A) certifying to the Prospect Parties on behalf of all of the MPT Parties that: (1) all of the representations and warranties of the MPT Parties set forth in this Agreement and the other Restructuring Documents are true and correct as of such Closing Date, and (2) the applicable MPT Parties have delivered, performed, observed and complied in all material respects with all of the items, instruments, documents, covenants, agreements and conditions required by this Agreement and the other Restructuring Documents to be

delivered, performed, observed and complied with by such MPT Parties as of such Closing Date;

(B) certifying to the Prospect Parties on behalf of all of the MPT Parties that: (1) with respect to each of the MPT Parties, as to each of such MPT Parties' respective articles or certificate of incorporation, bylaws, operating agreements, limited liability company agreements, partnership agreements, and other similar organizational and governing documents, each as in effect on such Closing Date, and (2) each of the MPT Parties' Resolutions remain true, correct and in full force and effect as of such Closing Date; and

(C) providing specimen signatures of the officers or authorized agents of each of the MPT Parties;

(iv) Certificates of existence and good standing of each of the MPT Parties, dated within thirty (30) days prior to such Closing Date, from each such entity's State of incorporation or formation and, to the extent in which the character of its properties or in which the transaction of its business makes such qualification necessary, from the States of California and Connecticut and the Commonwealth of Pennsylvania;

(v) A closing statement in form and substance mutually satisfactory to the Parties, duly executed by each of the applicable Prospect Parties; and

(vi) Cancellation of the Phase I Convertible Note (if and only to the extent that it is fully converted); and

(vii) Such other amendments, certificates, financing statements, tax filings, instruments and documents as any of the Prospect Parties reasonably deems necessary to effectuate the transactions contemplated hereby.

## ARTICLE V
## PHASE III TRANSACTIONS

The Phase III Transactions are comprised of the events provided in this ARTICLE V, which Phase III Transactions are occurring as of the Closing Date of the Phase III Transactions (unless expressly otherwise provided):

**5.1. Connecticut Transaction**. The aggregate purchase price (the "Connecticut Purchase Price") for the "Acquired Assets" (as defined in the Connecticut Master Agreement) is Four Hundred Fifty-Seven Million Nine Hundred Forty-Two Thousand Nine Hundred Ninety-Eight and No/100 Dollars ($457,942,998.00). The Parties intend that the Connecticut Transaction and the other transactions described in this Article shall be consummated no later than September 30, 2023, and shall act in good faith and cooperate in all material respects to meet such intended deadline. The Parties have amended the Connecticut Master Agreement contemporaneously with this Agreement in order to evidence the obligations of the Parties hereunder.

(a) Satisfaction of Shortfall. At the Closing of the Connecticut Transaction in accordance with the Connecticut Master Agreement, the applicable Prospect Parties shall pay (or cause to be paid) to the applicable MPT Parties an amount equal to the Net Transaction Proceeds (as defined in the Master Connecticut Agreement) of Three Hundred Fifty-Five Million and No/100 Dollars

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers on the date first written above.

**MPT PARTIES:**

**MPT PICASSO INVESTORS TRS, LLC**

By: MPT Operating Partnership, L.P.
Its: Sole Member

By: ______________________
Name: R. Steven Hamner
Title: Executive VP & CFO

**MPT TRS LENDER PMH, LLC**

By: MPT Development Services, Inc.
Its: Sole Member

By: ______________________
Name: R. Steven Hamner
Title: Executive VP & CFO

**MPT OF UPPER DARBY PMH, LLC**
**MPT OF MANCHESTER PMH, LLC**
**MPT OF ROCKVILLE PMH, LLC**
**MPT OF SPRINGFIELD PMH, LLC**
**MPT OF RIDLEY PARK PMH, LLC**
**MPT OF UPLAND PMH, LLC**
**MPT OF WATERBURY PMH, LLC**

By: MPT Operating Partnership, L.P.
Its: Sole Member of each above-referenced entity

By:____________________
Name: R. Steven Hamner
Title: Executive VP & CFO

**MPT OF VAN NUYS PMH, L.P.**

By: MPT of Van Nuys PMH GP, LLC
Its: General Partner

**MPT OF HOLLYWOOD PMH, L.P.**
By: MPT of Hollywood PMH GP, LLC
Its: General Partner

**MPT OF LOS ANGELES PMH, L.P.**
By: MPT of Los Angeles PMH GP, LLC
Its: General Partner

**MPT OF CULVER CITY PMH, L.P.**
By: MPT of Culver City PMH GP, LLC
Its: General Partner

**MPT OF BELLFLOWER PMH, L.P.**
By: MPT of Bellflower PMH GP, LLC
Its: General Partner

**MPT OF NORWALK PMH, L.P.**
By: MPT of Norwalk PMH GP, LLC
Its: General Partner

**MPT OF TUSTIN PMH, L.P.**
By: MPT of Tustin PMH GP, LLC
Its: General Partner

By: MPT Operating Partnership, L.P.
Its: Sole Member of each above-referenced General Partner entity.

By:____________________
Name: R. Steven Hamner
Title: Executive VP & CFO

**PROSPECT PARTIES:**

**PROSPECT MEDICAL HOLDINGS, INC.**

By:______________________________
Name: Samuel Lee
Title: Chief Executive Officer

**PROSPECT HEALTHCARE FACILITIES MANAGEMENT, LLC**

By:______________________________
Name: Samuel Lee
Title: Chief Executive Officer

**PHP HOLDINGS, LLC**

By: Prospect Healthcare Facilities Management, LLC
Title: Manager

By:______________________________
Name: Samuel Lee
Title: Chief Executive Officer

**PROSPECT INTERMEDIATE HOLDINGS, LLC**

By: PHP Holdings, LLC
Title: Sole Member

By: Prospect Healthcare Facilities Management, LLC
Title: Manager

By:______________________________
Name: Samuel Lee
Title: Chief Executive Officer

**PROSPECT DCMH, LLC**

By:______________________________
Name: Samuel Lee
Title: Senior Vice President

**PROSPECT CCMC, LLC**

By:______________________________
Name: Samuel Lee
Title: Senior Vice President



FS

**PROSPECT MANCHESTER HOSPITAL, INC.**

By:______________________________
Name: Samuel Lee
Title: Senior Vice President

**PROSPECT ROCKVILLE HOSPITAL, INC.**

By:______________________________
Name: Samuel Lee
Title: Senior Vice President

**SOUTHERN CALIFORNIA HEALTHCARE SYSTEM, INC.**

By:______________________________
Name: Samuel Lee
Title: President

**ALTA LOS ANGELES HOSPITALS, INC.**

By:______________________________
Name: Samuel Lee
Title: President

**PROSPECT WATERBURY, INC.**

By:______________________________
Name: Samuel Lee
Title: Senior Vice President

**ALTA NEWPORT HOSPITAL, LLC**

By:______________________________
Name: Samuel Lee
Title: President

**FRMC HOSPITAL PROPERTY, LLC**

By:______________________________
Name: Samuel Lee
Title: Senior Vice President

# ANNEX A

## GLOSSARY OF DEFINED TERMS

The following terms (whether or not capitalized and whether used in the singular or plural) shall have the following meanings as used in this Agreement:

"Affiliate" with respect to any Person, (i) any Person that, directly or indirectly, controls or is controlled by or is under common control with such Person, or (ii) any other Person that owns, beneficially, directly or indirectly, 25% or more of the outstanding capital stock, shares or Equity Interests of such Person; *provided, however*, that (i) none of Green Equity Investors Side V, LP, Green Equity Investors V, LP or Ivy LGP Co-Invest LLP shall be considered to be "Affiliates" of any of the Prospect Parties for purposes of this definition, (ii) none of MPT Picasso TRS or the other MPT Parties shall be considered to be "Affiliates" of PHP Holdings (or any of the Prospect Parties) following consummation of the Phase I Transactions, and (iii) PHP Holdings and its Subsidiaries, and following the consummation of the Merger, Alta Newport, shall not be considered to be "Affiliates" of any of Prospect Medical and its other Subsidiaries. For the purposes of this definition, "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities or otherwise.

"Agreed Connecticut Shortfall Amount" has the meaning set forth in Section 5.1(a).

"Agreed Pennsylvania Shortfall Amount" has the meaning set forth in Section 3.7(b)(ii).

"Agreement" has the meaning set forth in the preamble hereof.

"ALTA" has the meaning set forth in Section 4.2.

"Alta Newport" means Alta Newport Hospital, LLC, a California limited liability company.

"Amended and Restated Environmental Indemnity" means that certain Amended and Restated Environmental Indemnification Agreement, dated of even date herewith, by and among certain of the Prospect Parties and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Guaranty" means that certain Amended and Restated Guaranty Agreement, dated of even date herewith, made by Prospect Medical and certain of the Prospect Parties in favor of certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Noncompetition Agreement" means that certain Amended and Restated Noncompetition Agreement, dated of even date herewith, by and among certain of the Prospect Parties and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Pledge Agreement" means that certain Amended and Restated Pledge Agreement, dated of even date herewith, by and among certain of the Prospect Parties and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Security Agreement" means that certain Amended and Restated Security Agreement, dated of even date herewith, by and among certain of the Prospect Parties and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time.

"Amended and Restated Security Documents" means, collectively: (i) the Amended and Restated Security Agreement, (ii) the Amended and Restated Pledge Agreement, (iii) the Amended and Restated Guaranty, (iv) the Amended and Restated Environmental Indemnity, (v) the Amended and Restated Noncompetition Agreement, (vi) Omnibus Amendment of Collateral Lease Assignments, and (vii) any other documents securing any obligations of any of the Prospect Parties (or their respective Affiliates) to any of the MPT Parties (or their respective Affiliates) entered into in connection herewith.

"Amendment to Connecticut Master Agreement" has the meaning set forth in Section 3.8.

"Audited Balance Sheet" has the meaning set forth in Section 7.4(a).

"Audited Financials" has the meaning set forth in Section 7.4(a).

"Balance Sheet Date" has the meaning set forth in Section 7.4(a).

"Bankruptcy Remote Entity" means, with respect to PHP Holdings, an entity that: (a) generally operates in a manner intended to isolate all financial risks to the fullest extent reasonably practicable, and to minimize the risk of being involved in any voluntary or involuntary bankruptcy proceedings (including any initiated by the PhysicianCo Term Loan Lenders or any other creditors); (b) has implemented governance procedures, organizational structure or other arrangements designed to make PHP Holdings less likely to become the subject of a bankruptcy or insolvency event or to become consolidated into a bankruptcy proceeding of Prospect Medical or its other Affiliates (or any other Person); (c) has implemented arrangements that ensure that the assets of PHP Holdings and its Subsidiaries will not be available to the creditors of, or otherwise be consolidated with, any of Prospect Medical or its other Affiliates (or any other Person); (d) exist solely for the purpose of owning and operating the Subsidiaries that control the Managed Care Business (as reflected on the Prospect Organizational Chart) and activities incidental thereto; (e) engages (directly or indirectly) in no other business or activity other than the Managed Care Business and activities incidental thereto; (f) conducts business only in its own name (or a state-approved fictitious name); (g) does not hold, directly or indirectly, any ownership interest (legal or equitable) in any entity or any real or personal property other than the Equity Interest which it owns as reflected in the Prospect Organizational Chart and the other assets incident to the Managed Care Business (subject to the transfer of Alta Newport as contemplated in this Agreement) without the prior written consent of the MPT Parties; (h) does not have any debt, or guarantee or otherwise obligate itself, with respect to the debts of any other Person (other than its Subsidiaries in connection with the Managed Care Business), including, without limitation, Prospect Medical or its other Affiliates; (i) maintains its own separate books, records and financial statements (subject to consolidation with its Subsidiaries); (j) holds itself out as being a legal entity that is not part of any other legal entity (promptly corrects any known misunderstanding regarding its separate legal identity), and (k) maintains all entity formalities independent of any other entity (including Prospect Medical and its other Affiliates).

"Benefit Plans" has the meaning set forth in Section 7.9(a).

"Business Day" means any day other than Saturday, Sunday, or any day on which the principal commercial banks in the State of New York are authorized or obligated to close under applicable law.

"Capital Transaction" means any transaction (or series of transactions) that involves aggregate consideration of One Million and No/100 Dollars ($1,000,000.00) or more (whether in cash, securities, or other property), involving (i) the sale or transfer of all or substantially all of the assets of Prospect Medical or any of its Affiliates, (ii) the sale or transfer of any direct or indirect Equity Interests in Prospect Medical or any of its Affiliates, (iii) the sale or transfer of any direct or indirect Equity Interests owned or held by Prospect Medical or any of its Affiliates (including any joint venture interests), or (iv) any other sale, transfer, merger, reorganization, or consolidation or other transaction that would result in any Person who is not currently an Affiliate of Prospect Medical operating or otherwise having voting control over Prospect Medical or any such Affiliates.

"Capital Transaction Covenants" has the meaning set forth in Section 6.4.

"Capital Transaction Covenant Conditions" means, collectively, the occurrence of all of the following events:

(i) if any payment obligations under the Pennsylvania Mortgage Loan Note (and related Pennsylvania Mortgage Loan Agreement and Pennsylvania Mortgage) remain outstanding, then:

(A) all such payment obligations then due have been paid through the then current date;

(B) if, for two (2) consecutive trailing calendar quarters, "Consolidated EBITDAR" (as defined in the Pennsylvania Mortgage Loan Agreement) of Prospect Medical and its Subsidiaries shall greater than Three Hundred Percent (300%) of the Realty Payments (as defined in the Pennsylvania Mortgage Loan Agreement) (as determined utilizing the trailing twelve (12) month operating and financial results of Prospect Medical and its Subsidiaries and measured on a calendar quarterly basis); and

(C) if, for two (2) consecutive trailing calendar quarters, "Consolidated EBITDAR" (as defined in the Pennsylvania Mortgage Loan Agreement) of the Borrowers (under and as defined in the Pennsylvania Mortgage Loan Agreement) shall greater than One Hundred Twenty-Five Percent (125%) of the Realty Payments (as defined in the Pennsylvania Mortgage Loan Agreement) (as determined utilizing the trailing twelve (12) month operating and financial results of such Borrowers and measured on a calendar quarterly basis);

(ii) Prospect Medical and its applicable Subsidiaries are in full compliance with the financial covenants contained in Section 16.1(j) and (k) of Master Lease I and Master Lease II at the time of the Capital Transaction;

(iii) Prospect Medical and its applicable Subsidiaries have paid all amounts then due and owing by any of them to any of the MPT Parties or their Affiliates; and

(iv) if all of the foregoing conditions are satisfied in full, no uncured Event of Default then exists under any of the then existing Obligation Documents.

"CDPH" means the California Department of Public Health.

"Closing Date" means, as applicable: (a) with respect to the Phase I Transactions, the effective date of this Agreement, (b) with respect to the Phase II Transactions, the date of the closing of Phase II Transactions as contemplated in ARTICLE IV, and (c) with respect to the Phase III Transactions, the date of the closing of Phase III Transactions as contemplated in ARTICLE V.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral Assignment I" means that certain Collateral Assignment of Fifth Amended and Restated Assignable Option Agreement, dated March 30, 2023, made by Prospect Medical Systems, LLC, a Delaware Limited Liability Company, to and for the benefit of MPT of Upper Darby PMH, LLC, MPT of Manchester PMH, LLC, MPT of Rockville PMH, LLC, MPT of Springfield PMH, LLC, MPT of Ridley Park PMH, LLC, MPT of Upland PMH, LLC, MPT of Waterbury PMH, LLC, MPT TRS Lender PMH, LLC, each a Delaware limited liability company, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, L.P., MPT of Los Angeles PMH, L.P., MPT OF Culver City PMH, L.P., MPT of Bellflower PMH, L.P., MPT of Tustin PMH, L.P., and MPT of Norwalk PMH, L.P., each a Delaware limited partnership.

"Collateral Assignment II" means that certain Collateral Assignment of Ninth Amended and Restated Assignable Option Agreement ("Collateral Assignment B"), dated March 30, 2023, made by Prospect Medical Systems, LLC, a Delaware Limited Liability Company, to and for the benefit of MPT of Upper Darby PMH, LLC, MPT of Manchester PMH, LLC, MPT of Rockville PMH, LLC, MPT of Springfield PMH, LLC, MPT of Ridley Park PMH, LLC, MPT of Upland PMH, LLC, MPT of Waterbury PMH, LLC, MPT TRS Lender PMH, LLC, each a Delaware limited liability company, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, L.P., MPT of Los Angeles PMH, L.P., MPT OF Culver City PMH, L.P., MPT of Bellflower PMH, L.P., MPT of Tustin PMH, L.P., and MPT of Norwalk PMH, L.P., each a Delaware limited partnership.

"Collateral Assignments" means Collateral Assignment I and Collateral Assignment II.

"Collective Bargaining Agreement" has the meaning set forth in Section 7.10(a).

"Connecticut Closing Payment" has the meaning set forth in Section 5.1(a).

"Connecticut Master Agreement" means that certain Master Agreement (Connecticut Property Dispositions), dated as of October 5, 2022, entered into by certain of the Prospect Parties and certain of the MPT Parties named therein, as the same has been or may be modified, amended, or restated from time to time.

"Connecticut Properties" means the Manchester Property, the Rockville Property, and the Waterbury Property, each as defined in the Connecticut Master Agreement.

"Connecticut Transaction" means the applicable MPT Parties sale of the Connecticut Properties to the applicable Prospect Parties (or to such Person designated by the Prospect Parties) pursuant to the terms of the Connecticut Master Agreement and the other transactions contemplated therein and in the Underlying Acquisition Agreement (as defined in the Connecticut Master Agreement).

"Contracts" means all written contractual agreements relating to or affecting the assets or the operation of the Facilities to which any of the Prospect Parties or their respective Subsidiaries is a party, and all contracts or agreements with regard to the development and construction of any additional Health Care Facilities.

"Conversion Shortfall" has the meaning set forth in Section 4.1(e).

"Default Representation" has the meaning set forth in Section 2.4(d) hereof.

"Deferred Amounts" has the meaning set forth in Section 3.3.

"Deferred Base Rent" has the meaning set forth in Master Lease I and Master Lease II, respectively (and including past due amounts, together with overdue interests and late payment penalties on all past due amounts).

"Deferred Interest" has the meaning set forth in the Foothill Mortgage Loan Note and the TRS Note, respectively (and including past due amounts, together with overdue interests and late payment penalties on all past due amounts).

"Designated Subsidiaries" means:

(a) with respect to Prospect Medical, each of (i) ManageCo, (ii) Prospect DCMH, LLC, (iii) Prospect CCMC, LLC, (iv) Prospect Manchester Hospital, Inc., (v) Prospect Rockville Hospital, Inc., (vi) Southern California Healthcare System, Inc., (vii) Alta Los Angeles Hospitals, Inc., (viii) Prospect Waterbury, Inc., and (ix) Alta Newport Hospital, Inc., and

(b) with respect to PHP Holdings, all of its Subsidiaries (including Foothill Propco).

"Disclosure Schedules" means the Disclosure Schedules delivered by the Prospect Parties concurrently with the execution and delivery of this Agreement.

"Distribution" means any dividend or distribution (whether in cash, securities or other property) made by Prospect Medical to any Person with respect to any direct or indirect Equity Interest in Prospect Medical or any of its Affiliates.

"DMHC" means the California Department of Managed Health Care, together with any successor agency thereto.

"EIK" has the meaning set forth in Section 4.3.

"Electronic Transmission" means any form of communication (including, without limitation, by electronic mail) not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient of such record, and that may be directly reproduced in paper form by such a recipient through an automated process.

"Encumbrance" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, lien (statutory or otherwise) or preference, security interest, restrictions or easements or other encumbrance of any kind or nature whatsoever.

"Equity Interests" means with respect to any Person, the voting power, ownership, or other equitable interests of such Person, including any interest represented by any capital stock, convertible or participating debt instruments, membership interest, partnership interest, or any similar interest therein.

"Equity Rollover Transactions" means the applicable MPT Parties exchanging certain of the Outstanding Obligations for PHPH Series A-1 Preferred Units in PHP Holdings as described in this Agreement.

"Facility" has the meaning set forth in Master Lease I, Master Lease II, and the Foothill Mortgage Loan Agreement, as applicable.

"Financial Statements" has the meaning set forth in Section 7.4(a).

"Foothill Facility" has the meaning ascribed thereto in the Foothill Mortgage Loan Agreement.

"Foothill Lease" has the meaning set forth in Section 3.1(c).

"Foothill Mortgage" means that certain Deed of Trust, Security Agreement and Fixture Filing, dated August 23, 2019, and filed of record on August 29, 2019 under Document Number 2019000324068 in the official records of Orange County, California, and amended pursuant to that certain Amendment to Deed of Trust, Security Agreement and Fixture Filing, dated July 26, 2022, and filed of record on August 9, 2022 under Document Number 2022000272512 in the official records of Orange County, California, as the same have been or shall be further amended, modified, or restated from time to time.

"Foothill Mortgage Loan Agreement" means, collectively, that certain Real Estate Loan Agreement, dated August 23, 2019, as amended by that certain Amendment to Real Estate Loan Agreement (Tranche 2 Advances), dated July 26, 2022, as further modified, amended, or restated from time to time.

"Foothill Mortgage Loan Documents" means, collectively, the Foothill Mortgage Loan Agreement, the Foothill Mortgage Loan Note, the Foothill Mortgage, and all of the other documents entered into in connection therewith, as each of the same may be as modified, amended, or restated from time to time.

"Foothill Mortgage Loan Note" means that certain Amended and Restated Promissory Note (Mortgage Loan), dated as of July 26, 2022, made by Alta Newport in favor of MPT Foothill Lender in the amount of One Hundred and Fifty-One Million Two Hundred Sixty-Six Thousand Seven Hundred and No/100 Dollars ($151,266,700.00), as the same has been or may be modified, amended or restated from time to time.

"Foothill Propco" means FRMC Hospital Property, LLC, a California limited liability company and a wholly-owned subsidiary of PHP Holdings.

"Forbearance Agreement" means that certain Second Amended and Restated Forbearance Agreement, dated as of March 24, 2023, by and among Prospect Medical and certain of the other Prospect Parties named therein and certain of the MPT Parties named therein, as the same may have been amended, modified, supplemented, or extended from time to time.

"GAAP" shall mean generally accepted accounting principles in the United States as in effect from time to time and applied consistently throughout the periods involved.

"Governing Documents" has the meaning set forth in Section 7.1(a).

"Governmental Body" means any (a) national, federal, state, provincial, county, municipal or local government, foreign or domestic, (b) political subdivision of any of the foregoing or (c) entity, authority, agency, ministry or other similar body exercising any legislative, executive, judicial, regulatory or

administrative authority or functions of or pertaining to government, including any court, commission, tribunal or other quasi-governmental entity established to perform any such function (including, without limitation, the Securities and Exchange Commission, the Internal Revenue Service, the DMHC, and the California Board of Pharmacy).

"Government Programs" means all state and federal health benefit programs sponsored by a Governmental Body, including any "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), Medicare and Medicare Advantage, state Medicaid programs, state CHIP programs, TRICARE and similar or successor programs with or for the benefit of any Governmental Body.

"Health Care Facility" has the meaning set forth in Section 856(e)(3)(D)(ii) of the Code.

"Healthcare Laws" shall mean all applicable Laws relating to health care providers and facilities, participation in Government Programs, participation in Payor Programs, Information Privacy and Security Laws, institutional and professional licensure, pharmacology and dispensing medicines or controlled substances, medical documentation and professional orders, medical record retention, laboratory services, unprofessional conduct, fee-splitting, corporate practice of medicine, referrals, billing and submission of false or fraudulent claims, claims processing, quality, safety, medical necessity, informed consent, the hiring of employees or acquisition of services or supplies from Persons excluded from participation in Government Programs, standards of care, quality assurance, risk management, utilization review, peer review, mandated reporting of incidents, occurrences, diseases and events, advertising or marketing of health care services, and the enforceability of restrictive covenants on health care professionals, including: (a) the Federal anti-kickback law (42 U.S.C. § 1320a-7b(b)), the Federal False Claims Law (42 U.S.C. § 1320a-7b(a)), the Federal physician self-referral law (42 U.S.C. § 1395nn), the Federal False Claims Act (31 U.S.C. § 3729, *et seq.*), the Federal Civil Monetary Penalties Law (42 U.S.C. § 1320a-7a), the Federal Program Fraud Civil Remedies Act (31 U.S.C. § 3801 *et seq.*) and the Federal Health Care Fraud Law (18 U.S.C. § 1347), the Beneficiary Inducement Statute (42 U.S.C. § 1320a-7a(a)(5)), the Confidentiality of Alcohol and Drug Abuse Patient Records Act (42 U.S.C. § 290ee-3, *et seq.*), the Clinical Laboratory Improvement Act (42 U.S.C. § 263a, *et seq.*), the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (P.L. 108-173, 117 Stat. 2066), the Food, Drug and Cosmetic Act of 1938 (21 U.S.C. § 301, *et seq.*), the Prescription Drug Marketing Act of 1987 (P.L. 100-293, 102 Stat. 95), the Deficit Reduction Act of 2005 (P.L. 109-171, 120 Stat. 4), the Controlled Substances Act (21 U.S.C. 801, *et seq.*); (b) Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh (the Medicare statute), including the amendments implemented by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and the Medicare Improvements for Patients and Providers Act of 2008; (c) Title XIX of the Social Security Act, 42 U.S.C. §§1396-1396v (the Medicaid statute); (d) TRICARE, 10 U.S.C. §1071 *et seq.*; (e) the Patient Protection and Affordable Care Act (Pub. L. 111-148) as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152); and (f) all applicable regulations promulgated under each of the foregoing Healthcare Laws.

"Healthcare Licenses" means, collectively, all applicable licenses, approvals, qualifications, variances, certificates of need, franchises, accreditations, certificates, certifications, consents, permits and other authorizations and contracts issued by any Governmental Body which may be (i) necessary for the operation of the Managed Care Business or of each of the Facilities as a general acute care hospital facility (and for such other legal ancillary uses as may be necessary in connection with or incidental to such uses), or (ii) required for certification and participation under Medicare and Medicaid legislation and regulations, the provider programs of any Governmental Body for the Managed Care Business and each particular Facility, the United States Department of Health and Human Services, and the Centers for Medicare and Medicaid

Services, and/or state or federal Title XVIII and/or Title XIX provider programs applicable for each such Facility.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"HospitalCo Intercreditor Agreement" means that certain Intercreditor Agreement, dated of even date herewith, entered into between the certain of the MPT Parties and the PhysicianCo Term Loan Lenders under the HospitalCo Term Loan Agreement, as the same may be amended, modified, or restated from time to time.

"HospitalCo Term Loan Agreement" means that certain Financing Agreement, dated of even date herewith, entered into between certain Prospect Medical and MPT Picasso TRS, pursuant to which MPT Picasso TRS has made a term loan to Prospect Medical in the original principal amount of Seventy-Five Million and No/100 Dollars ($75,000,000.00), as the same may be amended, modified, or restated from time to time.

"HospitalCo Parties" means all of the Prospect Parties, other than PHP Holdings and its Subsidiaries, and Alta Newport.

"Indebtedness" means any obligation (whether incurred as a principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent.

"Information Privacy and Security Laws" shall mean HIPAA and any other laws concerning the privacy and/or security of personal information, including but not limited to the Gramm-Leach-Bliley Act, state data breach notification laws, state health information privacy laws, the Federal Trade Commission Act and state consumer protection laws.

"Insurance Policies" has the meaning set forth in Section 7.12(a).

"Intercompany Subordination Agreement" means that certain Intercompany Subordination Agreement, to be dated of even date herewith, entered into by (a) certain of the Prospect Parties and certain of their Affiliates, (b) MPT TRS Lender PMH, LLC (in its capacity as administrative agent and collateral agent for the "HospitalCo Creditors" as defined therein), (c) Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent for the "CB Creditors" as defined therein), and (d) certain of the MPT Parties named therein.

"Knowledge" or "Knowledge of the Prospect Parties" shall mean with respect to the Prospect Parties, the actual or deemed knowledge of a particular fact or matter if (i) with respect to any of the Prospect Parties, its chief executive officer, president, Samuel Lee, George Pillari, and Eric Samuels (collectively, "Knowledge Group"), has actual knowledge of such fact or matter or (ii) any of such Knowledge Group would reasonably be expected to discover or otherwise become aware of such fact or matter after conducting a reasonably diligent inquiry.

"Law" means any federal, state or local statute, rule, regulation, ordinance, order, code, policy or rule of common law, now or hereafter in effect, and in each case as amended, and any judicial or administrative interpretation thereof by a Governmental Body or otherwise, including, without limitation, any judicial or administrative order, consent, decree or judgment.

"Letter of Credit" means the "Letter of Credit" as defined in each of Master Lease I, Master Lease II, and the Pennsylvania Mortgage Loan Agreement.

"Liability" shall mean any and all debts, liabilities, expenses, commitments, obligations, actions and damages of any kind, character or description, whether direct or indirect, contingent or absolute, matured or unmatured, accrued or not accrued, asserted or not asserted, known or unknown, disputed or undisputed, joint or several, secured or unsecured, liquidated or unliquidated, determined, determinable or otherwise, whenever or however arising (including whether arising under any Law, Litigation or Order and those arising under any Contract), and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Licenses" shall mean all notifications, accreditations, licenses, Permits, franchises, certificates and certifications, approvals, exemptions, classifications, registrations and other similar documents and authorizations issued by any Governmental Body (including, without limitation, all Healthcare Licenses), and applications, amendments and modifications of any of the foregoing.

"Litigation" has the meaning set forth in Section 7.7(a).

"Lodging Facility" has the meaning set forth in Section 856(d)(9)(D)(ii) of the Code.

"Look-Back Date" shall mean July 19, 2019.

"ManageCo" has the meaning set forth in the preamble hereof.

"Managed Care Business" means value-based-managed care business operated by Prospect Medical, PHP Holdings, and certain of their respective Affiliates.

"Management Agreement" means that certain Management Services Agreement to hereafter be entered into in connection with the Phase II Transactions by and among ManageCo, PHP Holdings, and Alta Newport (and any other applicable Subsidiaries required be joined thereto), substantially in the form attached hereto as ***EXHIBIT D***.

"Master Lease I" means that certain Master Lease Agreement, dated August 23, 2019, by and among the Master Lease I Lessors and Master Lease I Lessees, as the same has been modified, amended, or restated from time to time.

"Master Lease I Amendment" means an amendment to Master Lease I to sever the applicable properties, Master Lease I Lessees, and Master Lease I Lessors (and to effect such other related actions) as described in this Agreement.

"Master Lease I Lessees" means, collectively, Prospect CCMC, LLC, Prospect DCMH, LLC, each a Pennsylvania limited liability company, Prospect Manchester Hospital, Inc., and Prospect Rockville Hospital, Inc., each a Connecticut corporation, and any other Person which becomes a "Lessee" under Master Lease I.

"Master Lease I Lessors" means, collectively, MPT of Upper Darby PMH, LLC, MPT of Manchester PMH, LLC, MPT of Rockville PMH, LLC, MPT of Springfield PMH, LLC, and MPT of Ridley Park PMH, LLC,

each a Delaware limited liability company and any other Person which becomes a "Lessor" under Master Lease I.

"Master Lease II" means that certain Master Lease Agreement, dated August 23, 2019, by and among the Master Lease II Lessors and Master Lease II Lessees, as the same has been modified, amended, or restated from time to time.

"Master Lease II Amendment" means an amendment to Master Lease II to sever the applicable properties, Master Lease II Lessees, and Master Lease II Lessors (and to effect such other related actions) as described in this Agreement.

"Master Lease II Lessees" means, collectively, Southern California Healthcare System, Inc., a California corporation, Alta Los Angeles Hospitals, Inc., a California corporation, Prospect Waterbury, Inc., a Connecticut corporation, and Prospect CCMC, LLC, a Pennsylvania limited liability company, and any other Person which becomes a "Lessee" under Master Lease II.

"Master Lease II Lessors" means, collectively, MPT of Van Nuys PMH, L.P., MPT of Hollywood PMH, L.P., MPT of Los Angeles PMH, L.P., MPT of Culver City PMH, L.P., MPT of Bellflower PMH, L.P., and MPT of Norwalk PMH, L.P., each a Delaware limited partnership, and MPT of Upland PMH, LLC, and MPT of Waterbury PMH, LLC, each a Delaware limited liability company, and any other Person which becomes a "Lessor" under Master Lease II.

"Master Leases" means, collectively, Master Lease I and Master Lease II.

"Material Adverse Effect" means, with respect to any Prospect Party, any change, event(s), occurrence(s) or effect(s), whether direct or indirect, that, both before and after giving effect to the transactions contemplated by this Agreement, could, individually or in the aggregate, have a material adverse effect, the cost of which exceeds or could reasonably be expected to exceed Ten Million and No/100 Dollars ($10,000,000.00), on (a) the business, properties, results of operations, assets, revenue, income or condition (financial or otherwise) of, or the ability to timely satisfy the obligations or liabilities (whether absolute or contingent) of, such Prospect Party, (b) such Prospect Party's business or assets, or (c) the ability of such Prospect Party to perform its obligations under, and/or consummate the transactions contemplated by, this Agreement within the time periods specified herein.

"Material Contracts" shall mean the following Contracts to the extent in effect as of the date hereof:

(a) any collective bargaining agreements;

(b) any equity purchase, option or similar plans;

(c) agreements or indentures relating to the borrowing of money or to mortgaging, pledging or otherwise placing an Encumbrance, except for Permitted Encumbrances, on any material portion of the assets of any of the Prospect Parties;

(d) any guaranty of any obligation for borrowed money or other material guaranty;

(e) any existing agreements relating to any material business acquisitions by any of the Prospect Parties or their respective Affiliates;

(f) any Contract (other than confidentiality and non-solicitation agreements entered into in the ordinary course) which places any material limitation on any of the Prospect Parties from freely engaging in business anywhere in the world;

(g) any Contracts or orders with any Governmental Body for payments to any of the Prospect Parties in excess of Five Percent (5%) of the gross revenue of any such Prospect Parties in any given year;

(h) any Contract for capital expenditures or the acquisition or construction of fixed assets requiring payments by Prospect Medical or any of its Subsidiaries in excess of Five Million Dollars ($5,000,000);

(i) any material management agreement whereby either (i) any of the Prospect Parties or their respective Subsidiaries is managed by a third party or (ii) a material line of the operating business is managed by a third party at one or more of the Facilities; and

(j) any third-party participation, reimbursement, provider, managed care, or similar payor contract or agreement to which the Facilities are parties exceeding Five Percent (5%) of the gross revenue of the Facilities, as applicable, in any given year.

"Merger" has the meaning set forth in Section 4.2.

"Most Recent Annual Financials" has the meaning set forth in Section 7.4(a).

"Most Recent Balance Sheet" has the meaning set forth in Section 7.4(a).

"MPT Advance Convertible Note" means that certain Convertible Promissory Note, dated as of March 31, 2023, in the original principal amount of Fifty Million and No/100 Dollars ($50,000,000.00), made by PHP Holdings in favor of MPT Picasso TRS, as the same may be amended, modified, or restated from time to time.

"MPT Foothill Lender" means MPT of Tustin PMH, L.P., a Delaware limited partnership.

"MPT Indemnified Parties" has the meaning set forth in Section 10.1.

"MPT Op" means MPT Operating Partnership, L.P., a Delaware limited partnership.

"MPT Parties" has the meaning set forth in the preamble hereof.

"MPT Parties' Resolutions" has the meaning set forth in Section 3.9(b).

"MPT Picasso TRS" has the meaning set forth in the preamble hereof.

"MPT Representative" has the meaning set forth in Section 11.21(c).

"MPT TRS Lender" means MPT TRS Lender PMH, LLC, a Delaware limited liability company.

"Multiemployer Plan" has the meaning set forth in Section 7.9(a).

"Net Capital Proceeds" means an amount equal to the proceeds received by Prospect Medical or its Affiliates in connection with or as a result of any Capital Transaction, less (i) the payment of taxes, reasonable third party transaction fees, and payments to minority interest holders, in each case, with respect to such Capital Transaction, and (ii) an amount, not to exceed five percent (5%) of the purchase price of a Capital Transaction, to be reserved by Prospect Medical or its Affiliates for any post-closing net working capital adjustments provided for in the definitive agreement with respect to such Capital Transaction. Notwithstanding the foregoing, in connection with the CT Transaction, Net Capital Proceeds shall be equal to the Net Transaction Proceeds (as defined in the Connecticut Master Agreement).

"Obligation Documents" has the meaning set forth in the Master Lease I, Master Lease II, the Pennsylvania Restructuring Documents, together with the TRS Note, the MPT Advance Convertible Note, the Amended and Restated Security Documents, and any other guaranty agreements, security agreements, pledge agreements, subordination agreements, or other agreements, documents, or instruments entered into or delivered from time to time by any of the Prospect Parties or their Affiliates (or direct or indirect Equity Interest holders) in connection therewith.

"OFAC" has the meaning set forth in Section 7.17(e).

"Omnibus Amendment of Collateral Lease Assignments" means that certain Omnibus Amendment of Collateral Lease Assignments, dated of even date herewith, and among certain of the Prospect Parties and certain of the MPT Parties, as the same may be modified, amended, or restated from time to time (and including the requisite landlord counterparty consents thereto).

"Orders" has the meaning set forth in Section 7.7(b).

"Ordinary Course of Business" means, with respect to the business of Prospect Medical, PHP Holdings, and their respective Subsidiaries, the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Original Restructuring Agreement" means that certain Master Restructuring Agreement, dated as of July 26, 2022, by and among certain of the Prospect Parties and the MPT Parties named therein, as amended by that certain First Amendment to Master Restructuring Agreement, dated October 5, 2022, the same may be further modified, amended, or restated from time to time.

"Other Applicable Subsidiaries" shall mean, collectively, all Subsidiaries of Prospect Medical that are parties to the Amended and Restated Pledge Agreement (other than the Designated Subsidiaries).

"Outstanding Obligations" means (i) all amounts owed under the Foothill Mortgage Loan Note, including without limitation, all interest, principal, Deferred Interest, additional interest, and any other amounts owed thereunder, (ii) all amounts owed pursuant to the TRS Note, including without limitation, all principal, interest, Deferred Interest and any other amounts thereunder, (iii) all Deferred Base Rent due and payable under and as defined in Master Lease I, (iv) all Deferred Base Rent due and payable under and as defined in Master Lease II, (v) all amounts (if any) owed pursuant to the MPT Advance Convertible Note, including without limitation, all principal, interest, Deferred Interest and any other amounts thereunder, and (vi) any other outstanding payment obligations due and payable by any of Prospect Medical or its Affiliates to the applicable MPT Parties or their Affiliates when all of the foregoing obligations in subsections (i) through (v) above have been paid and satisfied in full to the MPT Parties (including any outstanding payment obligations now or hereafter arising under Master Lease I, Master Lease II, or the Pennsylvania

Restructuring Documents), in each case in the amounts as of the date hereof specified pursuant to Section 2.2 hereof.

"Outstanding Property Insurance" means the aggregate outstanding amount of the premiums and other costs for property insurance to be reimbursed by the applicable Prospect Parties to the applicable MPT Parties pursuant to Master Lease I, Master Lease II, and the Foothill Mortgage Loan Agreement, which amount is specified in the attached ***EXHIBIT A***.

"Party" and "Parties" have the meanings set forth in the preamble hereof.

"Patriot Act" has the meaning set forth in Section 7.17(a).

"Payor Contract" has the meaning set forth in Section 7.14(e).

"Payor Programs" means all Government Programs, and all other third-party healthcare benefit plans and programs (including, but not limited to, those offered or administered by health maintenance organizations, preferred provider organizations, health benefit plans, waiver provider organizations and health insurance plans), to which claims for payment are submitted, presented or paid (in whole or part) by any of the Prospect Parties or any of their respective Subsidiaries.

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"Pennsylvania Facilities" means, collectively: (i) the Springfield Facility, the Taylor Facility, and the Delaware County Facility (as each such term is defined in Master Lease I) and (ii) the Crozer-Chester Facility (as such term is defined in Master Lease II).

"Pennsylvania Lessees" means, collectively, Prospect CCMC, LLC and Prospect DCMH, LLC, each a Pennsylvania limited liability company.

"Pennsylvania Lessors" means, collectively, MPT of Springfield PMH, LLC, MPT of Ridley Park PMH, LLC, MPT of Upper Darby PMH, LLC, and MPT of Upland PMC, LLC, each a Delaware limited liability.

"Pennsylvania Mortgage" has the meaning set forth in Section 3.7 hereof.

"Pennsylvania Mortgage Borrower" means the Pennsylvania Lessees.

"Pennsylvania Mortgage Lenders" means the Pennsylvania Lessors.

"Pennsylvania Mortgage Loan Agreement" has the meaning set forth in Section 3.7 hereof.

"Pennsylvania Mortgage Loan Note" has the meaning set forth in Section 3.7 hereof.

"Pennsylvania Purchase and Sale Agreement" means that certain Purchase and Sale Agreement, dated of even date herewith, by and among the Pennsylvania Lessees, as buyers, and the Pennsylvania Lessors, as sellers.

"Pennsylvania Purchase Price" has the meaning set forth in Section 3.7 hereof.

"Pennsylvania Restructuring Documents" means, collectively, the Pennsylvania Purchase Agreement, the Pennsylvania Mortgage Loan Agreement, the Pennsylvania Mortgage Loan Note, the Pennsylvania Subordination and Attornment Agreement, and each of the deeds, bills of sale, terminations, amendments, and other documents, instruments, certificates, or agreements contemplated therein or executed pursuant thereto, as each of the same may be amended or modified from time to time.

"Pennsylvania Subordination and Attornment Agreement" has the meaning set forth in Section 3.7 hereof.

"Permits" means any license, permit, consent, registration, authorization, approval, certificate or certificate of need (or similar Governmental Body approval) issued by or pending with any Governmental Body and accreditations.

"Permitted Encumbrance" shall mean each of (a) Encumbrances for or arising from current taxes not yet delinquent or which may hereafter be paid without penalty or which are being contested in good faith by appropriate proceedings; (b) defects or imperfections of title or other Encumbrances not interfering with the marketability or the Ordinary Course of Business of the Facilities or the Managed Care Business; and (c) any other matters, Encumbrances and defects that have been or are otherwise hereafter expressly approved in writing by any of the MPT Parties and/or provided as a "Permitted Encumbrance" (or similar words of import) in any document by and between any MPT Party, on the one hand, and any Prospect Party on the other (including those Encumbrances subject to the PhysicianCo Intercreditor Agreement and as expressly permitted in the Obligation Documents and in the Real Property Asset Purchase Agreement dated as of July 10, 2019).

"Permitted Transactions" means:

(a) the Connecticut Transaction, subject to the terms set forth in the Connecticut Master Agreement;

(b) the sale of all or substantially all of the assets of the Business and Joint Ventures (each as defined in the RI Purchase Agreement) on the terms set forth in such RI Purchase Agreement; or

(c) the sale of all or substantially all of the assets of Coordinated Regional Care Group, LLC ("CRCG") and/or any of its Subsidiaries (or Equity Interests in CRCG and its Subsidiaries holding such assets).

"Person" means an individual, a corporation, a limited liability company, a general or limited partnership, an unincorporated association, a joint venture, a governmental body or another entity or group.

"Phase I Convertible Note" means that certain Convertible Promissory Note, dated of even date herewith, made by PHP Holdings as more particularly described in Section 3.3(b) hereof, and pursuant to which PHP Holdings grants to the holder thereof the right to convert on a dollar-for-dollar basis all principal, interests and other amounts payable thereunder into PHPH Series A-1 Preferred Units in the manner set forth therein.

"Phase I Outstanding Obligations" has the meaning set forth in Section 3.2(c) hereof.

"Phase I Transactions" means, collectively, the transactions contemplated in ARTICLE III of this Agreement.

"Phase II Transactions" means, collectively, the transactions contemplated in ARTICLE IV of this Agreement.

"Phase III Transactions" means, collectively, the transactions contemplated in ARTICLE V of this Agreement.

"PHP Holdings" has the meaning set forth in the preamble hereof.

"PHP Holdings LLC Agreement" means that certain Third Amended and Restated Limited Liability Company Agreement for PHP Holdings, dated contemporaneously herewith, by and among PHP Holdings, Prospect Medical and MPT Picasso TRS, as the same may be modified, amended or restated from time to time.

"PHP Holdings Pledge Agreement" means that certain Pledge Agreement, to be dated as of the date hereof, executed by PHP Holdings in favor of MPT Picasso TRS, pursuant to which PHP Holdings is pledging its equity in Prospect Health Plan, Inc. and Prospect Intermediate Holdings, LLC to secure PHP Holdings' obligations under the Phase I Convertible Note, as the same may be modified, amended or restated from time to time.

"PHP Holdings Pro Forma Financials" has the meaning set forth in Section 7.4(a).

"PHP Holdings Representative" has the meaning set forth in Section 11.21(b).

"PHPH MidCo" means Prospect Intermediate Holdings, LLC, a Delaware limited liability company.

"PHPH Net Equity Value" has the meaning set forth in Section 2.3.

"PHPH Series A-1 Preferred Units" means the "Series A-1 Preferred Units," as defined in the PHP Holdings LLC Agreement.

"PHPH Series A-2 Preferred Units" means the "Series A-2 Preferred Units," as defined in the PHP Holdings LLC Agreement.

"PHS" has the meaning set forth in Section 3.1(d).

"Physician Holdings" means Prospect Physician Holdings, Inc., a California professional medical corporation.

"PhysicianCo Intercreditor Agreement" means that certain Intercreditor Agreement, dated of even date herewith, entered into between the certain of the MPT Parties and the PhysicianCo Term Loan Lenders under the PhysicianCo Term Loan Agreement, as the same may be amended, modified, or restated from time to time.

"PhysicianCo Term Loan" has the meaning set forth in Section 2.3(b).

"PhysicianCo Term Loan Agreement" means that certain Financing Agreement, dated of even date herewith, entered into between certain Subsidiaries of PHP Holdings set forth therein and the PhysicianCo Term Loan Lenders, pursuant to which the PhysicianCo Term Loan Lenders have collectively made a term

loan to PhysicianCo Term Loan Borrowers in the original principal amount of Three Hundred Seventy-Five Million and No/100 Dollars ($375,000,000.00), as the same may be amended, modified, or restated from time to time.

"PhysicianCo Term Loan Borrowers" has the meaning set forth in Section 2.3(b).

"PhysicianCo Term Loan Documents" means the PhysicianCo Term Loan Agreement and any guaranty agreements, security agreements, pledge agreements, subordination agreements, or other agreements, documents, or instruments entered into or delivered from time to time by any of the Prospect Parties to the PhysicianCo Term Loan Lenders in connection therewith.

"PhysicianCo Term Loan Lenders" means those Persons that are lenders under and pursuant to the PhysicianCo Loan Agreement.

"PPG" has the meaning set forth in Section 3.1(d).

"Present Fair Salable Value" means the amount that may be realized if the aggregate assets of (a) Prospect Medical, PHP Holdings, and each of their respective Subsidiaries, or (b) PHP Holdings and its Subsidiaries, as applicable, are sold as an entirety with reasonable promptness in an arm's length transaction under then-present conditions for the sale of comparable business enterprises.

"Priming Lien" means any first priority lien granted by any Prospect Party in the tangible personal property (and products and proceeds thereof) to a lender providing financing for such Prospect Party to purchase such items of tangible personal property, and any extension, refinancing, replacement or renewal thereof.

"Prospect CCMC" means Prospect CCMC, LLC, a Pennsylvania limited liability company.

"Prospect DCMH" means Prospect DCMH, LLC, a Pennsylvania limited liability company.

"Prospect Indemnified Parties" has the meaning set forth in Section 10.3.

"Prospect Medical" has the meaning set forth in the preamble hereof.

"Prospect Organizational Chart" has the meaning set forth in Section 2.3.

"Prospect Parties" has the meaning set forth in the preamble hereof.

"Prospect Parties' Resolutions" has the meaning set forth in Section 3.9(a).

"Prospect Representative" has the meaning set forth in Section 11.21(a).

"Redemption Agreements" means those certain Redemption Agreements, dated of even date herewith, by and among the Company, and each of PPG, and PHS, pursuant to which the Company has redeemed all of the Series A-2 Preferred Units previously held by PPG and PHS.

"Release and Waiver Agreement" means a Release and Waiver Agreement, duly executed by all of the Prospect Parties and delivered to the MPT Parties as described in Section 2.5 hereof.

"Released Defaults" means only those certain defaults under the Obligation Documents by the Prospect Parties that are described on the attached ***EXHIBIT E,*** including with respect thereto all manner of action or actions, causes of action, whether in law or equity, suits, debts, liens, remedies, contracts, agreements, promises, liabilities, judgments, claims, demands, damages, counterclaims, defenses, assertions, allegations, rights of setoff, suits, sums of money owed, reckonings, bonds, covenants, contracts, controversies, proceedings, agreements, promises, doings, omissions, variances, losses, costs, attorneys' fees, and expenses of whatever nature or kind whatsoever, whether fixed or contingent, asserted or unasserted, at law or in equity, in contract or tort, unsecured, secured, priority, administrative or otherwise, whether asserted, unasserted, suspected, unsuspected, accrued, unaccrued, patent, latent, liquidated, unliquidated, fixed, contingent, pending, threatened, now existing, or which may arise in the future, and all resulting damages, including, but not limited to, all actual damages, compensatory damages, consequential damages, statutory damages, punitive and exemplary damages, prejudgment and post-judgment interest, attorneys' fees and costs of court, and all other damages related to or arising out of claims by any MPT Parties related to such defaults.

"Required Consents" has the meaning set forth in Section 4.1(e).

"Restructuring Documents" means this Agreement and any other documents, instruments, certificates, or agreements to entered into by any of the Parties in connection with the transactions contemplated herein.

"Restructuring Term Sheet" has the meaning set forth in the recitals to this Agreement.

"Restructuring Transactions" means those actions taken by the Parties, in addition to the Equity Rollover Transactions, to restructure the remaining Outstanding Obligations, as described in this Agreement.

"RI Purchase Agreement" means that certain Asset Purchase Agreement dated as of November 18, 2022, by and among Centurion Foundation, Inc., Prospect and each of Prospect CharterCare, LLC, Prospect CharterCARE RWMC, LLC, Prospect RI Home Health and Hospice, Prospect CharterCARE Home Health & Hospice, LLC, New University Medical Group, LLC, Prospect CharterCARE SJSHRI, LLC, Prospect CharterCARE Physicians, LLC, Prospect CharterCARE Ancillary Services, LLC and Prospect Blackstone Valley Surgicare, LLC.

"Schedule Supplement" has the meaning set forth in Section 11.10.

"Series A-1 Subscription Agreement" means that certain Series A Preferred Unit Subscription Agreement, dated of even date herewith, among PHP Holdings and MPT Picasso TRS, pursuant to which MPT Picasso TRS will subscribe for and acquire 69,494 units of Series A-1 Preferred Units as more particularly described in Section 3.2(a) hereof.

"Solvent" means, when used with respect to Prospect Medical or PHP Holdings, as applicable, means that, as of the applicable date of determination:

(a) the Present Fair Salable Value of the assets of, as applicable: (i) Prospect Medical and each of its Subsidiaries, or (i) PHP Holdings and each of its Subsidiaries, will, as of such date, exceed all of its debts, as of such date,

(b) as applicable, (i) Prospect Medical and each of its Subsidiaries, or (ii) PHP Holdings and each of its Subsidiaries, will not have, or have access to, as of such date, an unreasonably small amount of capital for the business in which they are engaged or will be engaged, and

(c) as applicable, (i) Prospect Medical and each of its Subsidiaries, or (ii) PHP Holdings and each of its Subsidiaries, is able to pay their debts as they become absolute and mature, in the Ordinary Course of Business, taking into account the timing of and amounts of cash to be received by them and the timing of and amounts of cash to be payable on or in respect of its indebtedness, in each case after giving effect to the transactions contemplated herein.

The term "Solvency" shall have a correlative meaning. For purposes of the definition of "Solvent": (1) "debt" means liability on a "claim"; and (2) "claim" means any right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured or the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Subsidiary" or "Subsidiaries" mean, with respect to any Person, any other Person, of which an amount of the voting securities, voting ownership or voting partnership interests of which is sufficient to control such Person or elect at least a majority of its board of directors or other governing body (or, if there are no such control / voting interests, 50% or more of the Equity Interests of which), is owned directly or indirectly by such first Person. For the purposes hereof, the term Subsidiary shall include all Subsidiaries of any such Subsidiary.

"Support Services Agreement" means that certain Support Services Agreement, dated effective as of March 31, 2023, by and between Prospect Medical and PHP Holdings.

"Tax Returns" shall mean any report, return, document or other filing (including any additional or supporting material and any amendments or supplements) required to be supplied to any Governmental Body with respect to Taxes.

"Taxes" shall mean any and all taxes, charges, fees, levies or other assessments, including, without limitation, any and all income, gross receipts, excise, real and personal property (including leaseholds and interests in leaseholds), sales, use, occupation, transfer, license, ad valorem, gains, profits, gift, minimum estimated, alternative minimum, social security, unemployment, disability, premium, recapture, credit, payroll, withholding, severance, stamp, capital stock, value added leasing, franchise and other taxes or similar charges of any kind including any interest and penalties on or additions thereto or attributable to any failure to comply with any requirement regarding any tax return.

"Tranche 1 Advance" means the advance by MPT Foothill Lender to Alta Newport in the amount of Fifty-One Million Two Hundred Sixty-Six Thousand Seven Hundred and No/100 Dollars ($51,266,700.00), as evidenced by and further defined in the Foothill Mortgage Loan Note.

"Tranche 2 Additional Interest" means the outstanding "Additional Interest" (as defined in the Foothill Mortgage Loan Agreement) specified in the attached ***EXHIBIT A***.

"Tranche 2 Advances" means the additional loan advances made by MPT Foothill Lender to Alta Newport in the amount of (i) Fifty Million and No/100 Dollars ($50,000,000.00) on May 2, 2022 and (ii) Fifty Million and No/100 Dollars ($50,000,000.00) on May 31, 2022, as evidenced by and further defined in the Foothill Mortgage Loan Note.

"TRS Note" means that certain Promissory Note, dated as of August 23, 2019, in the original principal amount of One Hundred Twelve Million Nine Hundred Thirty Seven Thousand Two Hundred Four and No/100 Dollars ($112,937,204.00), made by Prospect Medical in favor of MPT TRS Lender, as amended by the Amendment to Promissory Note, dated May 27, 2021, as the same have been or may be amended, modified, or restated from time to time.

"Uncured Defaults" means those certain matters under the Obligation Documents by the Prospect Parties that are described on the attached ***EXHIBIT F***.

"WARN" has the meaning set forth in Section 7.10(e).

"Yale Consent" has the meaning set forth in Section 3.8.

# EXHIBIT A

## OUTSTANDING OBLIGATIONS

| **Phase I Obligations** | **Amount** |
|---|---|
| Tranche 1 Advance (Foothill Mortgage Loan) | $ 51,266,700.00 |
| Tranche 2 Advance (Foothill Mortgage Loan) | $ 100,000,000.00 |
| Tranche 2 Additional Interest (Foothill Mortgage Loan) | $9,137,500.00 |
| Accrued Base Interest -- Foothill Mortgage | $6,433,187.69 |
| TRS Note – Principal | $ 112,937,204.00 |
| Accrued Base Interest – TRS Note | $4,936,603.11 |
| MPT Advance Convertible Note - Principal | $50,000,000.00 |
| Accrued Base Interest – MPT Advance Convertible Note | $588,888.89 |
| Deferred Amounts | $182,605,385.16 |
| Agreed Pennsylvania Shortfall Amount | $100,000,000.00 |
| Agreed Connecticut Shortfall Amount | $102,942,998.00 |
| 2020/2021 & 2021/2022 Outstanding Property Insurance Premium | $783,708.00 |
| | |
| | |
| **TOTAL:** | **$721,632,174.85** |



4872-7950-5502v14
1038442-980002

# EXHIBIT B

**Ownership of MPT Picasso Investors TRS, LLC**



# Minority Interest Transaction – Second Step – May 23, 2023




* Manager-managed LLC with PHFM serving as Manager. PHFM is member-managed by its sole member, Prospect Medical Holdings, Inc.

** Immediately following the Contribution, PHP Holdings, LLC redeemed all of the equity interests held by Prospect Provider Groups, LLC and PHS Holdings, LLC (the "Redemption").

# EXHIBIT C

STATE OF CALIFORNIA
HEALTH AND HUMAN SERVICES AGENCY
**DEPARTMENT OF MANAGED HEALTH CARE**

File No. 933 0500
Material Modification No. 20232846
Order No. 20232846

Licensee: Prospect Health Plan, Inc.

**ORDER**
**POSTPONING NOTICE OF MATERIAL MODIFICATION**

Pursuant to Health and Safety Code section 1352(b), the terms of the Notice of Material Modification filed on June 23, 2023, proposing a change of control resulting from a Minority Interest Transaction, are postponed as of the date set forth below for the reasons stated in the letter attached hereto and incorporated herein by reference.

This Order shall remain in effect until revoked or superseded by further Order of the Director.

Dated: July 20, 2023
Sacramento, California

MARY WATANABE
Director
Department of Managed Health Care

By______________________________
JENNY MAE PHILLIPS
Deputy Director, Office of Plan Licensing

Gavin Newsom, Governor
State of California
Health and Human Services Agency
**DEPARTMENT OF MANAGED HEALTH CARE**
**980 9th Street, Suite 500**
**Sacramento, CA 95814**
**Phone: 916-324-8176 | Fax: 916-255-5241**
**www.HealthHelp.ca.gov**

July 20, 2023

**VIA ELECTRONIC MAIL**

Crystal Lautrup
Deputy General Counsel
Prospect Health Plan, Inc.
3415 South Sepulveda Blvd., 9th Floor
Los Angeles, CA 90034

Re: Notice of Material Modification Proposing Minority Interest Transaction
Filed June 23, 2023; Filing No. 20232846

Dear Ms. Lautrup:

The Department of Managed Health Care (Department) reviewed information submitted in the above-referenced Notice of Material Modification (Notice) filed by Prospect Health Plan, Inc. (Plan) for compliance with the Knox-Keene Health Care Service Plan Act of 1975, as amended.[1]

Please review the attached Comment Table which includes comments from the Office of Plan Licensing and Office of Financial Review and include the Plan's responses in the appropriate fields of the Table. The Comment Table should be saved in Word and uploaded as document type "Comment Table (CT01)" in the eFiling Portal. Feel free to contact me if you would like to discuss any issues before filing the Plan's responsive amendment. All other revised documents should be filed according to standard procedure.

After reviewing the Department's comments, revise all Plan documents and exhibits that contain similar language or provisions to ensure similar deficiencies are eliminated before filing the Plan's responsive amendment. Be sure all changes to the amended information are highlighted by strikeout, underline or other method in accordance with Rule 1300.52. The Department's review of this Notice will continue when the Plan's responsive amendment is filed.

[1] California Health and Safety Code sections 1340 et seq. (Act). References herein to "Section" are to sections of the Act. References to "Rule" refer to the California Code of Regulations, title 28.

**Department's Action**

Enclosed is Order No. 20232846, issued pursuant to Health and Safety Code section 1352 (b), postponing the terms of the Notice. The Order incorporates by reference the Department's findings and comments as set forth in the attached Comment Table. The Order postpones the effectiveness of the material modification of the Plan or its operations as proposed in the Notice, and thereby prohibits the Plan from implementing the terms of the Notice until the Director issues a subsequent Order approving the Notice.

The Order is issued because at this time the Department finds the Notice does not demonstrate compliance with the Act and Rules and further amendment is necessary as set forth in the Department's attached comments. Pursuant to Health and Safety Code section 1354, the Plan has a right to a hearing upon the issuance of an Order postponing a material modification if the Plan makes a written request within thirty (30) days after the date of mailing of the enclosed Order.

**Within 30 days** of the date of this letter, please file the Plan's response as an amendment to the above-referenced Notice and include the Plan's Exhibit E-1, with reference to the amendment as a "Response to Department Comments," as well as the Plan's responses included in the Comment Table as an attachment to the Exhibit E-1 and any additional necessary documents. When submitting the Plan's responsive amendment at the Department's web portal, please ensure accurate entry of the Primary Filing Number.

Please contact me at 916-445-4998 or Steven.Coskie@dmhc.ca.gov if you have any questions or concerns.

Sincerely,



Steven Coskie
Attorney III
Office of Plan Licensing

State of California
Health and Human Services Agency
Department of Managed Health Care
COMMENT TABLE
DMHC 10-180 New: 07/19 Rev: 10/21

Health Plan: Prospect Health Plan, Inc. (Plan ID: 933 0500) File Number: 20232846
Filed: 6/23/2023 / Comment/Response Letter: Comment Letter #1 / July 20, 2023
Licensing Counsel: Steven Coskie

***Instructions***: Review comments for each exhibit below. Include your response and/or references to changes made in the appropriate columns and return as a Word Document as a "Comment Table" in the pull down menu on the Web Portal. Comments should not be repeated in the Exhibit E-1 narrative.

A. Request for Confidentiality

| # | Date/ Amend No. | DMHC Comment | Plan Response/Comment | Plan Resp. Date/Amend # | Changes (Plan) - Page # or redlined text | Additional Action (DMHC) |
|---|---|---|---|---|---|---|
| 1. | 7/20/2023 | Plan submitted a confidentiality request for the entirety of Exhibit HH-2-b. Submit a public version of the Exhibit HH-2-b redacting only the numeric dollar amounts, percentages of revenue and other income, and number of enrollees. (Rule 1007, APL 18-007) | | | | |

B. Exhibit HH-3-e Lag Time Assumptions

| # | Date/ Amend No. | DMHC Comment | Plan Response/Comment | Plan Resp. Date/Amend # | Changes (Plan) - Page # or redlined text | Additional Action (DMHC) |
|---|---|---|---|---|---|---|
| 2. | 7/20/2023 | Please confirm that the projections that were submitted under filings 20232111 and 20232846 are the same. | | | | |

J. Exhibit L-1 Organization Chart

| # | Date/ Amend No. | DMHC Comment | Plan Response/Comment | Plan Resp. Date/Amend # | Changes (Plan) - Page # or redlined text | Additional Action (DMHC) |
|---|---|---|---|---|---|---|
| 18. | 7/20/2023 | Minority Interest Transaction- First Step<br><br>In the key, at the single asterisk, Plan uses the acronym PHFM. Explain what entity PHFM refers to, no entity within the exhibit appears to contain the initials PHFM. Revise the Exhibit L-1 to include the organization if it is omitted. | | | | |
| 19. | 7/20/2023 | Minority Interest – Final Step<br><br>The Exhibit L indicates MPT Picasso Investors TRS, LLC acquired a 49% equity interest in PHP Holdings LLC but the press release filed as an Exhibit E-1 refers to Medical Properties Trust, Inc. Explain, and revise the Exhibit L to demonstrate the involvement of Medical Properties Trust, Inc. | | | | |

K. Exhibit E-1 Summary of eFiling Information (Press Release)

| # | Date/ Amend No. | DMHC Comment | Plan Response/Comment | Plan Resp. Date/Amend # | Changes (Plan) - Page # or redlined text | Additional Action (DMHC) |
|---|---|---|---|---|---|---|
| 20. | 7/20/2023 | Plan states MPT Picasso Investors TRS, LLC acquired a 49% equity interest in PHP Holdings LLC but the press release filed refers to Medical Properties Trust, Inc. Explain and | | | | |

| # | Date/ Amend No. | DMHC Comment | Plan Response/Comment | Plan Resp. Date/Amend # | Changes (Plan) - Page # or redlined text | Additional Action (DMHC) |
|---|---|---|---|---|---|---|
| | | revise the filing throughout to reflect the involvement of each entity. | | | | |

L. Exhibit E-1 Summary of eFiling Information (Minority Interest Transaction)

| # | Date/ Amend No. | DMHC Comment | Plan Response/Comment | Plan Resp. Date/Amend # | Changes (Plan) - Page # or redlined text | Additional Action (DMHC) |
|---|---|---|---|---|---|---|
| 21. | 7/20/2023 | Plan uses the name “MPT Picasso Investors TRS, LLC,” if this is not the legal name of the entity, respond by providing the legal name of the entity and amending the filing accordingly. Also, provide the d.b.a. of MPT Picasso Investors TRS, LLC. | | | | |
| 22. | 7/20/2023 | Provide a thorough description of the blocking rights the entity Plan refers to as “MPT” was granted and explain the circumstances when “MPT” may exercise those blocking rights. Also, please state the legal name of the entity granted the blocking rights plan references.<br>a. Explain the effects of MPT exercising blocking rights.<br>b. Explain why MPT was granted blocking rights. | | | | |
| 23. | 7/20/2023 | Plan refers the Department to eFiling No. 20232111-2 for a more detailed analysis of | | | | |

| # | Date/ Amend No. | DMHC Comment | Plan Response/Comment | Plan Resp. Date/Amend # | Changes (Plan) - Page # or redlined text | Additional Action (DMHC) |
|---|---|---|---|---|---|---|
| | | Section 1399.65. Provide a more detailed analysis of Section 1399.65, within this filing. | | | | |
| 24. | 7/20/2023 | File all relevant transaction agreement(s) pursuant to which MPT acquired the 49% equity interest in PHP Holdings, LLC, within this filing. Also, clarify which entity acquired the 49% equity interest by providing the legal name of the entity.<br><br>a. If there are separate agreements granting MPT blocking rights or separate agreements whereby MPT assumed the $50 million converted loan, file those agreements. | | | | |
| 25. | 7/20/2023 | Explain whether any approvals by federal or other state agencies is or was required for the transaction or agreement to proceed. (Section 1399.65 (a)(3).) If approvals are or were required, provide the name of the agency, the status of any approvals or pending decisions, and the associated dates. | | | | |
| 26. | 7/20/2023 | Provide a list of all governmental authorities notified of the transaction and the date the authorities were notified, if any. | | | | |
| 27. | 7/20/2023 | The filing states that PHPH issued 49% of its equity interest to MPT. Please state the type of equity issued and the terms of the $50 million converted loan. Please also clarify which entity | | | | |

| # | Date/ Amend No. | DMHC Comment | Plan Response/Comment | Plan Resp. Date/Amend # | Changes (Plan) - Page # or redlined text | Additional Action (DMHC) |
|---|---|---|---|---|---|---|
| | | was issued a 49% equity interest and which entity now holds the $50 million converted loan. | | | | |
| 28. | 7/20/2023 | MPT Picasso Investors TRS, LLC, was formed on 12/14/2022. Please provide an organizational chart and information regarding the corporate structure of MPT. | | | | |

# EXHIBIT D

STATE OF CALIFORNIA
HEALTH AND HUMAN SERVICES AGENCY
**DEPARTMENT OF MANAGED HEALTH CARE**

File No. 933 0500
Material Modification No. 20232846
Order No. 20232846

Licensee: Prospect Health Plan, Inc.

**ORDER**
**APPROVING NOTICE OF MATERIAL MODIFICATION**

Pursuant to Health and Safety Code section 1352(b), the terms of the Notice of Material Modification filed on June 23, 2023, requesting approval of Licensee's proposal for a change of control, are approved as of the date set forth below.

This Order supersedes the Order issued on July 20, 2023, and shall remain in effect until revoked or superseded by further Order of the Director.

Dated: April 18, 2024
Sacramento, California




MARY WATANABE
Director
Department of Managed Health Care

By_______________________________
JENNY MAE PHILLIPS
Deputy Director, Office of Plan Licensing

DEPARTMENT OF Managed Health Care

Gavin Newsom, Governor
State of California
Health and Human Services Agency
**DEPARTMENT OF MANAGED HEALTH CARE**
**980 9th Street, Suite 500**
**Sacramento, CA 95814**
**Phone: 916-324-8176 | Fax: 916-255-5241**
**www.HealthHelp.ca.gov**

April 18, 2024

**VIA ELECTRONIC MAIL**

Ms. Crystal Lautrup
Co-General Counsel
Prospect Health Plan, Inc.
600 City Parkway West, 10th Floor
Orange, CA 92868

Re: Notice of Material Modification Proposing Change of Control
Filed ; Filing No. 20232846

Dear Ms. Lautrup:

Enclosed is Order No. 20232846 issued by the Department of Managed Health Care (Department) approving the terms of the above-referenced Notice of Material Modification (Notice) filed by Prospect Health Plan, Inc. (Plan) requesting approval of a change of control.

Please note that the Order is issued subject to and conditioned upon the Plan's full compliance with the Undertakings attached to the Order.

The Department's review of this Notice was limited to the information specifically described in the Exhibit E-1 and highlighted in the filed documents by strikeout, underline or other method in accordance with California Code of Regulations, Title 28, section 1300.52.[1]

This Order does not constitute a waiver of any compliance issues that may be identified on subsequent review and analysis of the Plan's operations or documents as described in the Notice, whether or not highlighted to reflect a change, or of any other Plan documents or operations, whether or not disclosed in this Notice. This Order does not approve or waive any right or compliance issues that may be identified on subsequent review and analysis of this filing or any other related Plan documents, filings, or operations, whether or not disclosed herein. Further this Order does not approve or

---

[1] California Health and Safety Code sections 1340 et seq. (Act). References herein to "Section" are to sections of the Act. References to "Rule" refer to the California Code of Regulations, title 28.

waive any right or compliance issues that may be identified in any current open plan filing.

The revisions necessary to correct compliance concerns identified by the Department in this Notice apply to all Plan documents that contain similar language or provisions. Plan documents and operations that do not reflect compliance with the Act and Rules in accordance with the Department's determinations regarding this Notice are not approved. Accordingly, review and revise all Plan documents to correct similar compliance concerns; if these are the only changes made to existing variations of the same or similar documents, the Plan need not file those revised documents as an Amendment. The Department reserves the right to require additional revisions to Plan documents and operations as necessary to ensure compliance with the Act.

Please contact me at 916-445-4998 or Steven.Coskie@dmhc.ca.gov if you have any questions or concerns.

Sincerely,



Steven Coskie
Attorney III
Office of Plan Licensing

cc: Jenny Mae Phillips, Deputy Director, Office of Plan Licensing
Rathna Pai, Acting Assistant Chief Counsel, Office of Plan Licensing
Phuc Nguyen, Assistant Chief Counsel, Office of Plan Licensing

Case 1:25-cv-06595-VSB Document 1-28 Filed 08/11/26/24 Page 185 of 206

## UNDERTAKINGS

MPT Picasso Investors TRS, LLC, a Delaware limited liability company acquired a 49% equity interest ("Minority Interest") in Prospect Health Plan, Inc.'s ("Plan") parent company, PHP Holdings, LLC. The Plan has filed with the Department a Notice of Material Modification (Filing No. 20232846) regarding the Minority Interest transaction.

To demonstrate continued compliance with the Knox-Keene Health Care Service Plan Act of 1975, California Health and Safety Code section 1340 et seq. (the "Act") and the Act's corresponding regulations at Title 28, California Code of Regulations (the "Rules"), following entities (collectively, the "Parties") agree to the Undertakings set forth herein and acknowledge that any Orders issued by the Department approving Filing Number 20232846 are conditioned upon these Undertakings:

- Chamber, Inc. (Ultimate Parent)
- MPT Picasso Investor TRS, LLC
- PHP Holdings, LLC (Parent)
- Prospect Health Plan, Inc.

By so doing, the Parties agree to fully and completely comply with these Undertakings and agree that it will not violate these Undertakings.

### Financial and Filing Requirements

1. ***Change of Control***

Plan will not merge, consolidate, or enter into a single or series of transactions resulting in its purchase, acquisition, or control by, any entity, including another health care service plan or a health insurer licensed under the Insurance Code, without first submitting a Pre-Filing Request Form (DMHC 10-195) and attending a Pre-Filing conference with the Department. After the Pre-Filing conference, the DMHC will determine whether the proposed transaction(s) require the Plan to file a Notice of Material Modification. This includes individual transactions which, when considered cumulatively with any other transactions within a three-year period, could impact ownership interest.

2. ***Equity Interest***

Before MPT Picasso Investors TRS, LLC (MPTP) may take any additional equity interest in Plan or any of its affiliates, Plan will first file a Notice of Material Modification, in accordance with the standards set forth in Section 1352 of the Act and Rule 1300.52.4, requesting prior Department approval of MPTP taking additional equity interest in Plan or any of its affiliates and await an order from the

Department before transferring any equity interest from Plan or any of its affiliates to MPTP.

### 3. *Phase II Transactions*

Plan will not initiate the transactions described as the Phase II Transactions in Article IV of the Amended and Restated Master Restructuring Agreement filed in eFile No. 20232846, without first filing a Notice of Material Modification, and securing approval from the director. The Notice will detail the total cumulative aggregation of ownership interests that will occur from all phases of transactions. This includes not only the Phase II Transactions but also any other transactions that, when combined with Phase II and any potential future transactions, impact ownership interest.

### 4. *Minimum Tangible Net Equity*

The Plan is required to maintain 200% of tangible net equity (TNE) at all times. Further, the Plan shall not use Secured Affiliate Receivables to meet the TNE requirements.

### 5. *Restrictions on Upstreaming of Funds*

The Plan shall not declare or pay dividends, make other distributions of cash or property or in any other way upstream any funds or property to its shareholders or any of the Parties' affiliates (collectively, "Affiliate Company Distributions") if such actions would cause any of the following:

(a) The Plan to fail to maintain, at all times, 200 percent of the minimum TNE (which annualized amount shall be calculated by multiplying the applicable current quarter revenues and expenditures by four) required by Rule 1300.76; or

(b) Result in insufficient working capital or insufficient cash flow necessary to provide for the retirement of existing or proposed indebtedness of the Plan, as required by Rule 1300.75.1(a); or

(c) Adversely affect the ability of the Plan to provide or arrange for health care services.

For the purposes of these Undertakings, "Affiliate Company Distributions" will not be deemed to refer to payments made under the terms of any administrative service agreement or tax sharing agreement that was filed with and received prior approval from the Department.

### 6. *Prior Approval Before Guaranteeing, Cosigning or Assuming Loans, or Before Borrowing*

The Plan and its affiliates shall not take any of the following actions prior to the submission of a Notice of Material Modification and the receipt of the Department's

Order or Approval of the Notice of Material Modification:

(a) Allow the Plan to cosign or guarantee any portion of any current or future loans and/or credit facilities entered into by the Plan's shareholders, affiliates, or any of its affiliate shareholders.

(b) Permit any portion of loans obtained by the Plan's shareholders, affiliates or any of its affiliate shareholders to be assumed by the Plan unless the Plan is currently a party to the existing loan.

(c) Allow a pledge or hypothecation of the Plan's assets in any way connected with any current or future loans of the Plan's shareholders, its affiliates, or its affiliate shareholders.

(d) Allow the Plan to borrow any funds or otherwise incur any indebtedness for the purpose of making any Affiliate Company Distribution, except (i) any Affiliate Company Distribution that is made in compliance with Undertaking 5 herein, or (ii) a payment made pursuant to any written administrative services agreement or tax sharing agreement between or among the Plan's shareholders, its affiliates, or its affiliate shareholder.

Notwithstanding the above, these undertakings do not supersede the Plan's requirement to file a Notice of Material Modification when required by Section 1352(b), Rule 1300.52.4(d), or as otherwise required by the Act or Rules.

7. ***Notice of Undertakings to Creditors***

The Plan shall ensure that written disclosure of Undertakings 4, 5 and 6 is provided to any and all future holders of any loans and/or credit facilities of the Plan's affiliates, to the extent that Plan assets and/or stock are involved in such loans and/or credit facilities, to ensure that the holder of such instrument(s) has written notice that the satisfaction of any obligations under such instrument(s) is subordinated to the Plan's obligations under the Act and Rules thereunder.

8. ***Outsourcing of Plan's Duties***

If the Plan intends to have duties, in whole or in part, performed by another entity, the Plan shall submit a filing to the Department in accordance with the standards set forth in Section 1352 and Rule 1300.52.

9. ***Parent's Quarterly and Annual Audited Financial Statements***

Quarterly and annually, through eFiling, as Exhibit HH-32, within 45 days after the Plan's quarter end and 120 days after the Plan's fiscal year, the Plan shall submit the combined audited financial statements of its parent, PHP Holdings, LLC.

### 10. Books And Records to Stay in California Unless Approved by The Department

The Plan shall not remove, require, permit, or cause the removal of the Plan's books and records, as defined in the Act, from California before filing a Notice of Material Modification and receiving written approval from the Department, in accordance with Rule 1300.81 and the Act. Further, notwithstanding any failure or omission on the Plan's part to maintain the Plan's books and records that have been removed from California without the Department's express, written permission, this Undertaking shall not restrict the Plan from maintaining books and records in an electronic format, as long as electronic books and records are contemporaneously available in California.

The Plan shall make all records available to the Department Director, or the Department Director's delegate, at any time to ensure compliance with Department Rules and these Undertakings.

### 11. Changes to Administrative Service Agreements Must Be Filed as Material Modifications

Prior to the execution of any change, as defined below, to an administrative services agreement (ASA), the Plan shall file notice of the proposed change(s) with the Department in a Notice of Material Modification in accordance with the requirements of the Act and Rules. Neither the Plan, nor any affiliate, may implement such change(s) until after the Department has issued an Order of Approval for such change(s).

"Change" is defined for the purpose of these Undertakings to be an amendment, modification, termination, or replacement of an ASA, which involves any of the following:

(a) The addition of new services, or a change in the scope of services;

(b) Change to reimbursement terms or method for reimbursement for services performed on behalf of the Plan;

(c) Change to the location of books and records documenting performance of the services performed on behalf of the Plan pursuant to an ASA, resulting in removal of the ASA provider's books and records outside of California;

(d) Change to the location of performance of any of the functions that relate to the Plan's administrative capacity from California to another state or country, or from a state other than California to another state or country;

(e) Change to the entity performing the Plan functions on behalf of the Plan pursuant to an ASA; or

(f) The addition, modification, termination of any funding arrangement used to provide funding to the Plan in order to maintain compliance with the financial rules and regulations of the Act and Rules.

Notwithstanding the above, this Undertaking 11 does not supersede Plan's requirement to file a Notice of Material Modification when required by Section 1352(b), Rule 1300.52.4(d), or as otherwise required by the Act or Rules.

### 12. *New Plan-To-Plan Agreement Must Be Filed as Material Modifications*

The Plan will not execute any plan-to-plan agreements prior to submitting them to the Department for review in the form of a Notice of Material Modification.

Neither the Plan, nor its affiliates and/or shareholders, may implement such plan-to-plan agreements until after the Department has issued an Order of Approval for such agreements.

### 13. *Notification of Plan-To-Plan Agreement Termination*

The Plan agrees to notify the Department, at least 30 days prior to a termination of any plan-to-plan agreements, by submitting an Amendment filing through the Department's eFiling portal.

### 14. *Payment Of Costs Associated with The Department's Surveys, Audits, Examinations, Or Inquiries*

The Plan agrees to pay, within 15 business days from the receipt of billings from the Department, the actual costs arising from the activities of the Department, including any necessary out-of-state travel, incurred in the course of verifying and auditing compliance with the Act and each of the undertakings set forth herein. Such activities, including any of the routine and non-routine surveys, audits, examinations, investigations or inquiries required or permissible under the Act, will be conducted at the Department's discretion. The Department's activities to verify and audit the Plan's performance of these undertakings are not a survey, audit, or examination under Sections 1380 and 1382 and their implementing regulations.

### 15. *Appointment of an Independent Third-Party Monitor*

In the event the Plan fails to maintain at all times 100 percent of the minimum TNE required by Rule 1300.76 (TNE deficiency) and fails to remedy the TNE deficiency within 30 calendar days, an independent third-party monitor (Third-Party Monitor) shall be appointed to monitor the Plan's financials. The Third-Party Monitor shall periodically report to the Department the Plan's actions towards remedying the TNE deficiency. The Plan, in consultation with the Department, will select an appropriately qualified Third-Party Monitor. Upon the Department's approval, the Plan shall promptly appoint the Third-Party Monitor. The appointment shall cease when the Plan remedies the TNE deficiency and demonstrates to the Department that the Plan is financially stable. Termination of the Third-Party Monitor's appointment shall

require the Department's approval. The Plan shall be financially responsible for the Third-Party Monitor's costs and fees, including any cost and fees associated with the Third-Party Monitor's services. The Plan shall reimburse the Department for any reasonable costs incurred in verifying the Third-Party Monitor's qualifications.

***16. Tax Sharing Agreements to be Filed as Material Modifications***

After the closing date of the Acquisition, if the Parties desire to amend, change, terminate or replace its tax sharing agreements, as previously filed with and approved by the Department, the Plan shall file any changes to those tax sharing agreements as a Notice of a Material Modification in accordance with the standards set forth in Section 1352 and Rule 1300.52.4.

***17. Changes in Enrollment of Greater Than 10%***

The Plan shall inform the Department within five (5) business days of any changes (increase or decrease) to the Plan's enrollment in excess of 10% unless the Department has previously approved such change. Upon the Department's request, the Plan shall submit financial and enrollment projections and detailed assumptions to show the impact to the Plan as a result of the change in its enrollment.

## General Undertakings

***18. Reports to the Department***

The Plan will submit an annual report to the Department by March 1 informing the Department of activities and compliance regarding these Undertakings during the preceding calendar year. These reports shall be organized by Undertaking and shall provide sufficient detail for the Department to determine whether the Parties are compliant with each Undertaking. The first report is due March 1, 2025.

***19. Enforceability of Undertakings***

The Undertakings set forth herein shall be enforceable to the fullest extent of the authority and power of the Director of the Department under the provisions of the Act, including all civil, criminal, and administrative remedies (such as Cease and Desist Orders, freezing enrollment, and assessment of fines and penalties). The Undertakings shall act as an Order of the Director.

The Parties acknowledge that the Act's enforcement remedies are not exclusive and may be sought and employed in any combination deemed advisable by the Department to enforce these Undertakings.

***20. Terms and Conditions of Undertakings***

The Undertakings set forth herein shall be subject to the following terms and conditions:

(a) **Binding Effect.** The Undertakings set forth herein shall be binding on the Parties and their respective successors and permitted assigns. If the Parties fail to fulfill their obligations to the Department as provided under the Undertakings set forth herein, the Parties stipulates and agree that the Department shall have the authority to enforce the provisions of these Undertakings in a California court of competent jurisdiction or an Office of Administrative Hearing.

(b) **Governing Law.** The Undertakings set forth herein and their validity, enforcement, and interpretation, shall for all purposes be governed by and construed in accordance with the laws of the state of California.

(c) **Venue.** The proper venue of any dispute arising from the Undertakings set forth herein shall be Sacramento, California.

(d) **Invalidity.** In the event that any Undertakings or any portion of any Undertaking set forth herein shall be declared invalid or unenforceable for any reason by a court of competent jurisdiction, the validity or enforceability of any other Undertakings or any portion of any Undertaking shall not affect the validity or enforceability of any other Undertakings, and such other Undertakings shall remain in full force and effect and shall be enforceable to the maximum extent permitted by applicable law.

(e) **Duration.** The Undertakings set forth herein shall become effective upon the effective date of the issuance of the Order of Approval for the Acquisition, and except as to those provisions of the Undertakings that contain separate termination provisions, shall remain in full force and effect until terminated by the Plan with the written consent of the Department.

(f) **Third Party Rights.** Nothing in the Undertakings set forth herein is intended to provide any person other than the Parties and the Department, and their respective successors and permitted assigns, with any legal or equitable right or remedy with respect to any provision of any Undertaking set forth herein.

(g) **Amendment.** The Undertakings set forth herein may be amended only by written agreement executed by the Parties and the Department.

(h) **Assignment.** No Undertaking set forth herein may be assigned by the Parties in whole or in part, without the prior written consent of the Department.

(i) **Specific Performance.** In the event of any breach of these Undertakings, the Parties acknowledge that the state of California would be irreparably harmed and could not be made whole by monetary damages. It is accordingly agreed that the Parties shall waive the defense in any action for specific performance that a remedy at law would be adequate, and the Department should be entitled to seek an injunction or injunctions to prevent breaches of the provisions of these Undertakings and to seek to specifically enforce the terms and provisions stated herein. The Department's right to seek an injunction does not supersede the remedies available to the Director.

**Chamber, Inc.**

Signature: ______________________

Date: 4-10-24

Print Name: Von Crockett

Print Title: SVP

**PHP Holdings, LLC**

Signature: ______________________

Date: 4.10.24

Print Name: Von Crockett

Print Title: SVP, Prospect Healthcare Facilities Management, LLC, Manager of PHP Holdings, LLC

**MPT Picasso Investor TRS, LLC**

Signature: ______________________

Date: ______________________

Print Name: R. Steven Hamner

Print Title: Executive Vice President and CFO

**Prospect Health Plan, Inc.**

Signature: ______________________

Date: ______________________

Print Name: Mitchell Lew, MD

Print Title: CEO

**Chamber, Inc.**

Signature: ________________________

Date: ____________________________

Print Name: Von Crockett

Print Title: SVP

**PHP Holdings, LLC**

Signature: ________________________

Date: ____________________________

Print Name: Von Crockett

Print Title: SVP, Prospect Healthcare Facilities Management, LLC, Manager of PHP Holdings, LLC

**MPT Picasso Investor TRS, LLC**

Signature: ________________________

Date: April 10, 2024

Print Name: R. Steven Hamner

Print Title: Executive Vice President and CFO

**Prospect Health Plan, Inc.**

Signature: ________________________

Date: ____________________________

Print Name: Mitchell Lew, MD

Print Title: CEO

**Chamber, Inc.**

Signature: ______________________

Date: __________________________

Print Name: Von Crockett

Print Title: SVP

**PHP Holdings, LLC**

Signature: ______________________

Date: __________________________

Print Name: Von Crockett

Print Title: SVP, Prospect Healthcare Facilities Management, LLC, Manager of PHP Holdings, LLC

**MPT Picasso Investor TRS, LLC**

Signature: ________________________________

Date: ____________________________________

Print Name: R. Steven Hamner

Print Title: Executive Vice President and CFO

**Prospect Health Plan, Inc.**

Signature: ______________________

Date: 4/10/24

Print Name: Mitchell Lew, MD

Print Title: CEO

# EXHIBIT E

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/business/deals/cracks-deepen-for-americas-biggest-hospital-landlord-struggling-tenants-a-bailout-on-hold-21e3294c

◆ WSJ NEWS EXCLUSIVE | DEALS

# Cracks Deepen for America's Biggest Hospital Landlord: Struggling Tenants, a Bailout on Hold

California regulator has halted plan for MPT to take stake in struggling hospital chain's business

*By Jonathan Weil* Follow

*Aug. 18, 2023 10:00 am ET*

The nation's largest hospital landlord said an unusual transaction that provided crucial financial support for one of its biggest tenants was a done deal. It wasn't.

The deal was good news for both companies, and for communities across the country concerned that their local hospitals could go broke. The landlord, Medical Properties Trust MPW **-14.81%** ▼ , announced the transaction in May. When it reported quarterly results on Aug. 8, it said the arrangement boosted its own revenue.

But a California state regulator on July 20 ordered that the transaction between MPT and Prospect Medical Holdings be put on hold, according to the order that the regulator sent to Prospect. MPT didn't disclose the regulator's order when it reported second-quarter results, or in its quarterly report filed the next day with the Securities and Exchange Commission.

An MPT spokesman, Drew Babin, said: "Information is being provided to the relevant agencies, and MPT continues to expect to complete the transactions."

MPT played a crucial role in private-equity firms' push into healthcare facilities. It used cheap, plentiful financing to buy more than 400 hospitals, in some cases enriching private-equity firms that sold to MPT at high prices and paid themselves large dividends. Now some of the deals have soured. Hospital chains that are MPT's tenants have closed facilities and cut services, reducing healthcare options in some communities.

## Medical Properties Trust

$18




Source: FactSet

The Prospect deal was designed to alleviate financial stress for both it and MPT. Before the deal, Prospect had stopped paying rent, closed two hospitals near Philadelphia, and owed MPT hundreds of millions of dollars. MPT's own finances are under scrutiny by investors, its shares are down by half over the past year, and it has already suffered large losses on

Prospect, its third-largest tenant. If the deal is killed by regulators, it would further pressure the two companies' finances.

Prospect's hospital closures have caused hardship in Pennsylvania's Delaware County. "It's a maternity desert on the eastern side of Delaware County, with no maternity services available for about a fifth of our population," said Monica Taylor, chair of the Delaware County Council. The closures have meant longer ambulance trips for many patients, and more-crowded emergency rooms at the county's remaining four hospitals.

MPT announced the deal with Los Angeles-based Prospect on May 23, saying it would receive equity in Prospect's managed-care business—PHP Holdings—in lieu of cash payment for $573 million of loans, unpaid rent and interest, and other amounts owed. PHP Holdings owns a small health insurer, Prospect Health Plan, as well as other businesses.




When Springfield Hospital near Philadelphia suspended services in January 2022, its owner said the closure would be temporary. The hospital remains closed. PHOTO: PETE BANNAN/MEDIANEWS GROUP/DAILY TIMES VIA GETTY IMAGES

MPT didn't disclose whether the transaction with closely held Prospect would require regulatory approval. Last week MPT said it owned 49% of PHP Holdings.

It isn't clear how Prospect would pay MPT if the regulator, the California Department of Managed Health Care, rejected the deal permanently. The department oversees Prospect Health Plan.

Kevin Durawa, a department spokesman, said the regulator is reviewing the matter and doesn't have a statutory time frame for making a decision. "The department's review includes

the plan's decision to move forward with this transaction before the department's approval," he said.

The Wall Street Journal obtained the July 20 order and other documents from the California regulator through requests under the state's Public Records Act.

Prospect said it was "in no position right now" to answer questions about the July 20 order. The company has been crippled by a ransomware attack that was announced Aug. 3 and took out all of its computer systems, causing emergency-room closures and forcing hospital staff to use paper records. Prospect said that emergency departments have reopened but that it doesn't know when all of its systems will be restored.

Babin, the MPT spokesman, said the deal is "proceeding through a normal regulatory review process that was expected and is not controversial." He said the company expects the deal to be approved.

MPT grew quickly during the years of low interest rates and buoyant stock markets. The Birmingham, Ala.-based real-estate investment trust made $23 billion of acquisitions over two decades, mainly of hospital properties. MPT buys the bricks and mortar, and leases the buildings back to hospital operators.

Now, with interest rates higher and money tighter, MPT is shrinking. MPT has been extending financial support to some of its most-troubled tenants, including Prospect and Steward Health Care. Steward, a for-profit hospital operator based in Dallas, accounted for $3.7 billion, or 19%, of MPT's assets as of June 30 and is MPT's largest tenant. Prospect and PHP Holdings together accounted for $1.7 billion, or 9%, of MPT's assets.

MPT shares fell sharply last week after the company said it lent $140 million to Steward during the current quarter—part of a larger credit package that included other lenders. MPT already had more than $500 million of other loans to Steward, which is closely held, plus a $126 million equity investment. On Thursday, MPT said it had sold $105 million of the new loan to an unnamed investment firm.




Steward Health Care closed this hospital in Youngstown, Ohio, in 2018. PHOTO: NATE SMALLWOOD FOR THE WALL STREET JOURNAL

John Pawlowski, an analyst at real-estate investment-research firm Green Street Advisors, in an Aug. 8 note said "it has become increasingly clear in recent quarters that Steward would likely be on the verge of insolvency without MPW's financial support," referring to MPT by its ticker symbol. A Steward spokeswoman said the company's new loan package "is an indication of Steward's economic strength and potential."

On May 1, Steward closed Texas Vista Medical Center in San Antonio, citing losses from treating low-income patients. The 327-bed facility was one of only two hospitals serving the city's south side, home to about half a million people.

MPT's shares trade at 54% of book value. MPT has been borrowing to help pay its dividend, which exceeded operating cash flow in each of the past two quarters. The stock has a 15.5% dividend yield, reflecting concern that the payout might not be sustainable.

MPT and Prospect have provided different descriptions, at different points in time, of the details of their deal. The California regulator appears to be concerned about how much control MPT would have over Prospect Health Plan. The deal is unusual in part because MPT, a REIT, would get a big stake in a health insurer.

When the deal was announced, MPT didn't say what its percentage ownership of PHP Holdings would be. Prospect Health Plan has about 73,000 managed-care enrollees in five Southern California counties. PHP Holdings' other businesses include physician-practice groups.

Prospect Health Plan notified the California regulator of the transaction in a June 23 filing that said an MPT subsidiary had "acquired a 49% equity interest" in PHP Holdings, the health plan's parent, on May 23. The health plan said MPT acquired its stake by converting $370 million of loans, unpaid rent and interest, and other amounts owed by Prospect Medical Holdings into equity in PHP Holdings. The health plan called MPT a passive investor. It said the deal wasn't a change of control and didn't need the regulator's advance approval.




Pennsylvania's Easton Hospital, once owned by MPT and operated by Steward, was saved from closure after a nonprofit operator bought it in 2020. PHOTO: KEVIN HAGEN FOR THE WALL STREET JOURNAL

"The equity interests acquired by MPT are not 'voting' interests, although MPT was granted blocking rights with respect to certain major decisions" of PHP Holdings, the health plan said. The June 23 filing didn't provide details about the blocking rights.

The California regulator on July 20 issued the order putting the deal on hold. It characterized the deal's terms as "proposing a change of control." The regulator said the order would "remain in effect until revoked or superseded by further order of the director." In an accompanying letter, the regulator said the order "prohibits the plan from implementing the terms" until further notice, because the health plan's proposal "does not demonstrate compliance" with state law.

The regulator also sent the health plan a 12-page list of comments and requests for information. It asked for "a thorough description of the blocking rights," and an explanation of "the circumstances when MPT may exercise those blocking rights." The health plan's responses are due Sept. 13, after the regulator granted a deadline extension.

Asked to describe the blocking rights, Babin, the MPT spokesman, said "these are standard in any partnership agreement where a significant equity ownership interest exists and the specifics are confidential."

When MPT reported second-quarter results last week, its description of the equity deal differed significantly from its previous explanation in May—and from what Prospect Health Plan told the California regulator in June.

When MPT last week said it had taken a 49% equity interest in PHP Holdings, that percentage figure matched what the health plan had said. MPT, however, said its "non-controlling ownership interest" was worth $654.5 million as of June 30—based on updated valuations—and consisted of "an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings." The valuation exceeded the $370 million of Prospect obligations that the health plan in its June 23 filing had said was converted into equity.




MPT last year found a new tenant for its Watsonville, Calif., facility after the previous tenant filed for bankruptcy.
PHOTO: HELYNN OSPINA FOR THE WALL STREET JOURNAL

The Prospect deal helped MPT's income statement, too. MPT said it recorded its receipt of the $68 million equity investment as revenue; that was 20% of its second-quarter revenue. Asked what MPT's rationale was for recognizing revenue in light of the regulator's July 20 order, Babin said "this is governed by accounting regulations."

As a regulated insurer, Prospect Health Plan files financial reports publicly. Other businesses owned by PHP Holdings don't, making it difficult for outsiders to gauge the unit's value. For the fiscal year ended Sept. 30, 2022, Prospect Health Plan reported net income of $1.9 million, total assets of $30.7 million and total equity of $14.2 million.

The last time Prospect Medical Holdings' consolidated financial statements were disclosed publicly, its liabilities exceeded its assets by $1.1 billion as of September 2020, and its cumulative loss for the previous six years was $603 million.

Shortly afterward, Leonard Green & Partners, the private-equity firm that was Prospect's majority owner, sold its stake to Prospect's senior management. The agreed-upon sale price was $12 million, according to a 2021 report by the Rhode Island attorney general's office.

Write to Jonathan Weil at jonathan.weil@wsj.com

JF

Your WSJ Bundle News

Personalize Your Experience

More Stories

# EXHIBIT 2

# TOLLING AGREEMENT

THIS TOLLING AGREEMENT (the "Tolling Agreement") is made and entered into by Medical Properties Trust, Inc. ("Medical Properties," "MPT," or the "Company") and [Alleged Wrongdoer] ("[Name]," and together with the Company, the "Parties") to be effective as of November 4, 2025 (the "Effective Date").

1. **Tolling.** With respect to any claim, right of action, cause of action, demand, action, suit or proceeding, whether legal or equitable, that the Company may have against [Name] as specifically described in the letter dated November 4, 2025 from William Bercury to the Company's Board of Directors[1] (a "Claim"), the Parties hereby agree that the period of time commencing on the Effective Date and continuing until the Termination Date (defined below) shall not be included in the calculation of time for any time-based defense [Name] may assert, including, but not limited to, the doctrine of laches or other equitable defenses, or any statute of limitations, statute of repose, or other similar defense ("Time-Based Defenses"). This Tolling Agreement shall not be construed to constitute an acknowledgment by [Name] that any basis exists in fact or law for any such Claim.

2. **Forbearance.** During the period of time commencing on the Effective Date and ending on the Termination Date (defined below), the Company shall forbear from commencing any action as to any of the Claims the Company may have against [Name].

3. **Term.** The Tolling Agreement shall remain in full force and effect for a period of eighteen (18) months from the Effective Date, subject to renewal by written agreement of the Parties, expressed via email or formal amendment to the Tolling Agreement. The date at which the Term expires shall be the "Termination Date."

[1] A copy of the letter is attached hereto as Exhibit A.

4. **Entire Agreement; Modification.** The provisions of the Tolling Agreement shall comprise all terms, conditions, agreements, and representations of the Parties respecting the tolling of Time-Based Defenses to the Claims and supersedes all prior agreements concerning forbearance to sue between or among the Parties. The Tolling Agreement may not be altered or amended except by written agreement of the Parties affected by the proposed amendment, expressed via email or formal amendment to the Tolling Agreement.

5. **Successors and Assigns.** The Tolling Agreement shall be binding upon and inure to the benefit of the Parties and their respective officers, agents, employees, attorneys, directors, subsidiaries, affiliates, parent companies, heirs, executors, administrators, representatives, successors, and assigns.

6. **Choice of Law.** The Tolling Agreement shall be interpreted and construed under the laws of the State of Maryland (without regard to its conflict of laws principles).

7. **Jurisdiction; Service of Process.** Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, the Tolling Agreement shall be brought against any of the Parties only in the courts of the State of Maryland or, if it has or can acquire jurisdiction, in the United States District Court for the District of Maryland, and each of the Parties consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere in the world.

8. **Authority.** Each signatory hereto represents and warrants that he or she is authorized to execute the Tolling Agreement on his or her own behalf or on behalf of the Party for whom he or she is signing the Tolling Agreement.

9. **Counterparts.** The Tolling Agreement and any modification thereto may be executed in separate counterparts that together constitute one instrument.

______________________________

Email:
Telephone:
Facsimile:

on behalf of the Company

Dated: __________________

______________________________
[Alleged Wrongdoer]

Address:

Email:
Telephone:
Facsimile:

Dated: __________________________